# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF TENNESSEE

UNITED STATES OF AMERICA and the
STATES of GEORGIA, LOUISIANA,
TENNESSEE, and VIRGINIA ex rel. [UNDER
SEAL],

                            Plaintiffs,

v.

[UNDER SEAL],

                            Defendants.

**Civil Action No.**
3:17-cv-01478 *SEALED*

**FIRST AMENDED COMPLAINT
FOR VIOLATION OF THE FALSE
CLAIMS ACT [31 U.S.C. §§ 3729 et
seq.]; GEORGIA FALSE MEDICAID
CLAIMS ACT [Ga. Code Ann. §§ 49-
4-168.1 et seq.]; LOUISIANA
MEDICAL ASSISTANCE
PROGRAMS INTEGRITY LAW [La.
Rev. Stat. §§ 46:437 et seq.];
TENNESSEE FALSE CLAIMS ACT
AND MEDICAL ASSISTANCE ACT
[Tenn. Code Ann. §§ 4-18-101 et seq.;
71-5-182 et seq.]; VIRGINIA FRAUD
AGAINST TAXPAYERS ACT [Va.
Code Ann. §§ 4-18-103 et seq.]**

**FILED IN CAMERA AND
UNDER SEAL PURSUANT TO 31
U.S.C. § 3730(b)(2)**

**JURY TRIAL DEMANDED**

**DOCUMENT TO BE KEPT UNDER SEAL
DO NOT ENTER ON PACER**

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE

| | |
|---|---|
| UNITED STATES OF AMERICA and the STATES of GEORGIA, LOUISIANA, TENNESSEE, and VIRGINIA ex rel. GREGORY FOLSE,<br><br>                  Plaintiffs,<br><br>v.<br><br>CARE SERVICES MANAGEMENT LLC, MARQUIS HEALTH SYSTEMS LLC, MARQUIS MOBILE DENTAL SERVICES LLC, FLEUR DE LIS MOBILE DENTAL LLC, GEORGIA MOBILE DENTAL LLC, PREMIERE MOBILE DENTISTRY OF VA LLC, and DOES 1-50,<br><br>                  Defendants. | **Civil Action No.**<br>3:17-cv-01478 *SEALED*<br><br>**FIRST AMENDED COMPLAINT FOR VIOLATION OF THE FALSE CLAIMS ACT [31 U.S.C. §§ 3729 et seq.]; GEORGIA FALSE MEDICAID CLAIMS ACT [Ga. Code Ann. §§ 49-4-168.1 et seq.]; LOUISIANA MEDICAL ASSISTANCE PROGRAMS INTEGRITY LAW [La. Rev. Stat. §§ 46:437 et seq.]; TENNESSEE FALSE CLAIMS ACT AND MEDICAL ASSISTANCE ACT [Tenn. Code Ann. §§ 4-18-101 et seq.; 71-5-182 et seq.]; VIRGINIA FRAUD AGAINST TAXPAYERS ACT [Va. Code Ann. §§ 4-18-103 et seq.]**<br><br>**FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**<br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT

1. Pursuant to the *qui tam* provisions of the federal False Claims Act, 31 U.S.C. § 3729 et seq., (the "False Claims Act" or the "FCA"), *qui tam* Plaintiff-Relator Gregory Folse ("Relator" or "Dr. Folse"), through his attorneys, on behalf of the United States of America (the "Government") and the States of Georgia, Louisiana, Tennessee, and Virginia (the "States"), for his Complaint against Defendants Care Services Management, LLC ("CSM"), Marquis Health Systems, LLC ("MHS"), Marquis Mobile Dental Services, LLC ("Marquis Mobile Dental" or "MMDS"), Fleur De Lis Mobile Dental, LLC ("Fleur De Lis"

or "FDL"), Georgia Mobile Dental, LLC ("Georgia Mobile Dental" or "GMD"), Premiere Mobile Dentistry of VA, LLC ("Premiere Mobile Dentistry" or "PMD"), and Does 1-50 (collectively, "Defendants") alleges, based upon personal knowledge, relevant documents, and information and belief, as follows:

## I.    **INTRODUCTION**

2.      This is an action to recover damages and civil penalties on behalf of the United States of America and the States arising from false and/or fraudulent records, statements, and claims made or caused to be made by Defendants and/or their agents and employees in violation of the False Claims Act, 31 U.S.C. §§ 3729 et seq. ("FCA"), and the false claims acts of the States.  For purposes of this Complaint the United States Government and the States shall be referred to collectively as "the Governments."

3.      At the heart of this fraudulent scheme is Care Services Management, a communications and health management organization, which contracts with health care provider affiliates to facilitate patient care for residents in nursing homes.  Among other things, CSM, Marquis Health Systems, and their agents provide CSM affiliates with business and logistical services, including marketing, billing, and collections.  CSM also serves as the primary contact for the client nursing homes, and often coordinates a variety of healthcare services for the nursing homes' residents.

4.      For at least the past several years, Care Services Management, Marquis Health Systems, Marquis Mobile Dental, Fleur de Lis, Georgia Mobile Dental, and Premiere Mobile Dentistry have generated business by providing illegal kickbacks to nursing homes. Kickback-tainted claims for reimbursement submitted, or caused to be submitted, by the Defendants to the Governments are false claims and are subject to liability under the Governments' False Claims Acts.

5.      As detailed below, by agreement with CSM, it has been the practice of MMDS, FDL, GMD, PMD, and, upon information and belief, other dental affiliates in the

3

CSM network, to induce nursing homes to enter sole-provider contracts by offering free dental services to residents who do not otherwise have the resources to pay ("zero liability" residents). The offer of free services for zero liability residents is a powerful inducement to nursing homes that would otherwise carry the substantial financial burden of paying for emergency dental care for zero liability residents as required by federal and/or state law.

6. As reflected in the standard contracts that CSM affiliates use with nursing homes, the CSM-affiliated dental service providers agree to provide free care for one zero liability resident in exchange for the referral of six paying residents by the nursing home.

7. Since at least 2013, and likely longer, CSM's dental affiliates have used kickbacks to obtain the referral of paying patients. Over the last ten years, CSM's dental affiliates have provided dental services to tens of thousands of nursing home residents in numerous states.

8. Upon information and belief, CSM also uses kickbacks to induce nursing homes to contract with CSM and its other specialty providers. By doing so, CSM generates a constant stream of referrals in specialties including optometry, podiatry, audiology, vestibular auto-rotation testing, behavioral health, wound care, audiology, lab work, telemetry, and mobile x-ray.

9. Many of the services that the CSM network delivers are billed directly to Medicare and Medicaid. All kickback-induced claims for reimbursement submitted to the Governments are false claims and are subject to liability under the Governments' False Claims Acts.

10. In addition, the Defendants' fraudulent scheme wrongly obtains payment from the Governments through a Medicaid payment mechanism called Incurred Medical Expenses ("IME"). As explained below, through the IME payment mechanism, Medicaid pays for medical services that are not covered under State Medicaid plans (e.g., dental care or optometry) for certain beneficiaries in long term care.

4

11.     *Qui tam* Plaintiff Gregory Folse seeks, through this action, to end the illegal and harmful practices of CSM and its affiliates, and to recover damages and civil penalties arising from the false or fraudulent records, statements, and/or claims that Defendants made, or caused to be made, in connection with their fraudulent scheme.

## II.    JURISDICTION AND VENUE

12.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1367, and 31 U.S.C. § 3732, the latter of which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§ 3729 and 3730.

13.     This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a), which authorizes nationwide service of process and because Defendants have minimum contacts with the United States.  Moreover, Defendants can be found in and transact business in the Middle District of Tennessee.

14.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), 28 U.S.C. § 1395(a), and 31 U.S.C. § 3732(a) because Defendants can be found in, and/or transact or have transacted business in this District.

15.     The allegations in this Complaint have not been publicly disclosed within the meaning of the False Claims Act.  Even if the allegations had been publicly disclosed, the Relator would qualify as an "original source" of the information within the meaning of the FCA.  Relator's information is based upon his personal observations, independent of any relevant public disclosure and materially adds to any information that could have been publicly disclosed.  Relator, moreover, voluntarily provided the information upon which this action is based to the Governments before filing this case.

## III.    PARTIES

### A.    Relator

16.     Gregory J. Folse, D.D.S. resides in Sunset, Louisiana.  In 1989, Dr. Folse received a Doctor of Dental Surgery Degree from Louisiana State University, School of

Dentistry, and since 1989, he has operated his own dental practice. Additionally, since 2002, Dr. Folse has been a Clinical Assistant Professor at Louisiana State University, School of Dentistry.

17. Dr. Folse has spent his entire career facilitating dental care for the elderly and vulnerable populations. He has also has been instrumental in policy and advocacy efforts to improve dental outcomes and access to care. Among many other professional accomplishments, in 2004, Dr. Folse was instrumental in the drafting of the Special Care Dentistry Act, which was introduced into Congress in 2005, 2010, and 2011. In February 2012, he testified before the Senate Committee on Health, Education, Labor and Pensions about the urgent need to expand access to dental care. Dr. Folse is also a member of the National Elder Care Advisory Committee of the American Dental Association's Council on Access, Prevention, and Inter-Professional Relations.

18. In the early 2000s, in an effort to expand the elderly poor's access to dental care, Dr. Folse was among the first dentists to use the IME payment mechanism to provide dental care for the needy in Louisiana. Since that time, he has worked to expand the use of IME. He urged the American Dental Association to advocate for its use, and he has given dozens of presentations to dentists and dental organizations nationally on using IME to increase access to dental care.

## B. Defendants

### 1. Care Services Management, LLC

19. Care Services Management, LLC ("CSM") is a communication and health management organization that coordinates and provides contracting and billing services for health care specialists that contract with nursing homes and other long term care facilities. CSM's affiliates provide nursing home residents with care in the areas of dentistry, optometry, podiatry, audiology, vestibular auto-rotation testing, behavioral health, wound care, audiology, lab work, telemetry, and mobile x-ray. CSM is headquartered in Murfreesboro, Tennessee.

6

### 2. **Marquis Health Systems, LLC**

20.     Marquis Health Systems, LLC ("MHS") is a medical billing company that performs billing services on behalf of CSM, including for care provided by CSM affiliates. MHS is headquartered in Murfreesboro, Tennessee.

21.     Upon information and belief, Marquis Health Systems and CSM share common ownership, common business contracts, and regularly engage in business as partners.

### 3. **Marquis Mobile Dental Services, LLC**

22.     Marquis Mobile Dental Services, LLC is a mobile dental practice that provides services to residents at senior care facilities throughout the state of Tennessee.  It is an affiliate of Care Services Management. Marquis Mobile Dental Services is headquartered in Murfreesboro, Tennessee.

23.     The CEO of Marquis Mobile Dental Services, Marquis "Mark" Napper, is also the CEO of CSM and Marquis Health Systems, and the companies share a close relationship.  CSM distributed template contracts and other business materials to its dental affiliates that contained markings and branding indicating the materials were originally used for Marquis Mobile Dental Services. On information and belief, these materials, including the nursing home contract containing the kickback provision, were originally created by CSM or Marquis Mobile Dental Services, for use by Marquis Mobile Dental Services.

### 4. **Fleur De Lis Mobile Dental, LLC**

24.     Fleur De Lis Mobile Dental, LLC is a mobile dental practice that provides dental services to residents at over 60 senior care facilities throughout the state of Louisiana. It is a dental affiliate of Care Services Management.  Fleur De Lis is headquartered in Baton Rouge, Louisiana.

### 5.     Georgia Mobile Dental, LLC

25.     Georgia Mobile Dental, LLC is a mobile dental practice that provides dental services to residents at senior care facilities in Atlanta and the surrounding areas. It is a dental affiliate of Care Services Management. Georgia Mobile Dental is headquartered in Baton Rouge, Louisiana.

### 6.     Premiere Mobile Dentistry of VA, LLC

26.     Premiere Mobile Dentistry of VA, LLC is a mobile dental practice that provides dental services to residents at senior care facilities throughout the state of Virginia. It is a dental affiliate of Care Services Management. Premiere Mobile Dentistry is headquartered in Baton Rouge, Louisiana.

### 7.     Does 1-50

27.     Defendants Doe 1-50 are dental and other CSM physician affiliates that participated in the fraudulent scheme by offering improper kickbacks to nursing homes pursuant to CSM affiliate contracts or received referrals as a result of those kickbacks. Relator has not, as yet, ascertained the true identities of Does 1-50, and therefore identifies these defendants by fictitious names.

## IV.     APPLICABLE LAW

### A.     The False Claims Act

28.     The FCA was originally enacted during the Civil War. Congress substantially amended the Act in 1986—and, again, in 2009 and 2010—to enhance the ability of the United States to recover losses sustained as a result of fraud against it. The Act was amended after Congress found that fraud in federal programs was pervasive and that the Act, which Congress characterized as the primary tool for combating government fraud, was in need of modernization. Congress intended that the amendments would create incentives for individuals with knowledge of fraud against the Government to disclose the

8

information without fear of reprisals or government inaction, and to encourage the private bar to commit legal resources to prosecuting fraud on the government's behalf.

29.     The FCA prohibits knowingly presenting or causing to be presented to the federal government a false or fraudulent claim for payment or approval and knowingly making or using, or causing to be made or used, a false or fraudulent record or statement material to a false or fraudulent claim.  31 U.S.C. §3729(a)(1)(A)-(B).  Any person who violates the FCA is liable for a civil penalty for each violation, plus three times the amount of the damages sustained by the United States.  31 U.S.C. § 3729(a)(1).

30.     Under the FCA, an individual has knowledge of the falsity of a claim or statement if that person: "(i) has actual knowledge of [the falsity of] the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information."  31 U.S.C. § 3729(b)(1).  The FCA does not require proof that a defendant specifically intended to commit fraud.  Id.

31.     The FCA allows any person having information about an FCA violation to bring an action on behalf of the United States and to share in any recovery.  Such an action is known as a *qui tam* action and the individual bringing the suit is a *qui tam* relator.  The FCA requires that the *qui tam* complaint be filed under seal for a minimum of 60 days (without service on the defendant during that time) to allow the government time to conduct its own investigation and to determine whether to join the suit.

**B.     The Anti-Kickback Statute**

32.     The federal health care Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), ("AKS") arose out of Congressional concern that financial inducements can influence health care decisions and result in goods and services being more expensive, medically unnecessary, and harmful to patients.  To protect the integrity of federal health care programs, Congress prohibited the payment of kickbacks in any form, regardless of whether the kickback actually gives rise to overutilization or unnecessary care.  The AKS also reaches kickbacks concealed as legitimate transactions.  See Social Security Amendments of

9

1972, Pub. L. No. 92-603, §§242(b) and (c); 42 U.S.C. § 1320a-7b, Medicare and Medicaid Antifraud and Abuse Amendments, Pub. L. No. 95-142; Medicare and Medicaid Patient and Program Protection Act of 1987, Pub. L. No. 100-93.

33.     The AKS prohibits any person or entity from making or accepting payments to induce or reward any person for referring, recommending, or arranging for the purchase of any item for which payment may be made under a Federal health care program.  42 U.S.C. § 1320a-7b(b).  "Federal health care program," for purposes of the statute, means "any plan or program that provides health benefits, whether directly … or otherwise, which is funded directly, in whole or in part, by the United States Government." Or, "any State health care program," which includes State Medicaid programs.  § 1320a-7b(e)(1)-(2); §1320a-7(h).

34.     The AKS has been interpreted to cover any arrangement where one purpose of the remuneration was to obtain money for the referral of services or to induce further referrals.  United States v. Borrasi, 639 F.3d 774, 782 (7th Cir. 2011); United States v. McClatchey, 217 F.3d 823, 835 (10th Cir. 2000); United States v. Davis, 132 F.3d 1092, 1094 (5th Cir. 1998); United States v. Kats, 871 F.2d 105, 108 (9th Cir. 1989).

35.     Compliance with the AKS is a precondition to participation as a health care provider in and for payment under Medicaid, Medicare, CHAMPUS/TRICARE, CHAMPVA, Federal Employee Health Benefit Program, and other federal health care programs.

36.     To establish eligibility and seek reimbursement from the Medicare Program, hospitals and other providers must enter into Provider Agreements with CMS.  As part of that agreement, the provider must sign the following certificate:

I agree to abide by the Medicare laws, regulations and program instructions that apply to [me].  The Medicare laws, regulations and program instructions are available through the [Medicare] contractor.  I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on the [provider's] compliance with all applicable conditions of

participation in Medicare.

37. Similarly, compliance with the federal AKS is a prerequisite to a provider's right to receive or retain reimbursement payments from government-funded health care programs.

38. Many states criminalize the payment or receipt of kickbacks, or make it grounds for the denial or revocation of a dental license. For example, Virginia makes the solicitation or receipt of remuneration for referrals of Medicaid services a felony, additionally punishable by a fine not exceeding $25,000. Va. Code Ann. § 32.1-315(A)(1). Likewise, the Louisiana State Dental Practice Act includes in its definition of "unprofessional conduct: … Directly or indirectly offering, giving, receiving, or agreeing to receive any fee or other consideration to or from a third party for the referral of a patient in connection with the performance of a dental service." La. Stat. Ann. § 37:775(A)(7). Such activity is cause for Louisiana's dental board to "refuse to issue … suspend or revoke any license or permit or impose probationary or other limits or restrictions [on the license or permit]. § 37:776(A); (A)(15).

39. Many states have enacted additional rules and regulations prohibiting kickbacks in connection with state Medicaid services. Louisiana's Medicaid Provider Agreement, for example, requires as a precondition for reimbursement that participating providers comply with "all federal and state laws and regulations." Tennessee's Provider Payment and Participation Agreement likewise states that claims or bills submitted to TennCare "constitute[] a certification that [the] Provider … has complied with all applicable Medicaid laws, regulations and program instructions including but not limited to … the Federal anti-kickback statute." Similarly, Georgia includes as a "General Condition of Participation" a prohibition on "[a]ny offer or payment of remuneration, whether direct, indirect, overt, covert, in cash or in kind, in return for the referral of a Medicaid or PeachCare for Kids member. . . ."

40.     Compliance with the anti-kickback provisions of the participation agreements is material to the Governments' decision to reimburse provider services.  To receive payment, providers participating in government health care programs must expressly certify, in a provider agreement or on claim forms, that they have complied with the applicable federal rules and regulations, including specifically the AKS.

41.     Any party convicted of violating the AKS must be excluded from participating in federal health care programs for at least five years.  42 U.S.C. § 1320a-7(a)(1).  Even without a conviction, the Secretary of the Department of Health and Human Services ("HHS") may exclude providers administratively found to have violated the AKS from participating in federal health care programs for a discretionary period (in which event the Secretary must direct the relevant State agency to also exclude the provider).  HHS also may impose administrative sanctions of $50,000 per violation.  42 U.S.C. § 1320a-7(b).

42.     Federal anti-kickback provisions demonstrate Congress's commitment to the principle that federal health care programs should not be influenced by financial inducements.  Thus, compliance with the AKS is a prerequisite to a provider's right to receive or retain reimbursement payments from Medicare, Medicaid, and other federal and state health care programs.

43.     Furthermore, pursuant to the Affordable Care Act, any claim for reimbursement submitted to a federal health care program "that includes items or services resulting from a violation of [the AKS] constitutes a false or fraudulent claim for purposes of [the False Claims Act]."  42 U.S.C. § 1320a-7b(g) (emphasis added).  Courts have interpreted this language broadly.  See, e.g., U.S. ex rel. Kester v. Novartis Pharm. Corp., 41 F. Supp. 3d 323, 333 (S.D.N.Y. 2014) (describing Congress's intent that the AKS should render kickback-tainted claims 'false or fraudulent,' even when submitted by an innocent third-party).

C.   **Federal Health Care Programs**

1.   **Medicare**

44.   Medicare is a federally-funded health insurance program that provides for certain medical expenses for persons who are over 65, who are disabled, or who suffer from End Stage Renal Disease.

45.   The Medicare Program has four parts: Part A, Part B, Part C, and Part D. Medicare Part A, the Basic Plan of Hospital Insurance, covers the cost of inpatient hospital services and post-hospital nursing facility care.  Medicare Part B, the Voluntary Supplemental Insurance Plan, covers the cost of services performed by physicians and certain other health care providers, both inpatient and outpatient, if the services are medically necessary and directly and personally provided by the provider.  Medicare Part C covers certain managed care plans, and Medicare Part D provides subsidized prescription drug coverage for Medicare beneficiaries.

46.   The Medicare program is administered through the Department of Health and Human Services, Centers for Medicare and Medicaid Services ("CMS").

47.   Medicare coverage is limited to those items and services that are reasonable and medically necessary.  42 U.S.C. §1395y(a)(1).  Health care practitioners and providers are required to ensure that all services are "provided economically and only when, and to the extent, medically necessary."  42 U.S.C. §1320c-5(a)(1), (3).  Providers who furnish services or items substantially in excess of the needs of their patients may be excluded from participation in federal health care programs altogether.  42 U.S.C. §1320a-7(b)(6).

48.   To enroll as a Medicare provider, independent clinical laboratories, portable X-ray suppliers, optometrists, ophthalmologists, practice groups, and surgical centers must complete Form CMS-855B.  Form CMS-855B requires applicants to certify that they will "abide by the Medicare laws, regulations and program instructions," and to certify their understanding that "payment of a claim by Medicare is conditioned upon the claim and the

13

underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal Anti-Kickback Statute), and on the supplier's compliance with the applicable conditions of participation in Medicare."

49. By submitting CMS-855B, independent clinical laboratories, portable X-ray suppliers, optometrists, ophthalmologists, practice groups, surgical centers, and other providers certify that they are eligible for participation in the Medicare Program, and that they have complied with all applicable regulations and laws governing the program, specifically including, but not limited to, the Anti-Kickback Statute.

### 2. Medicaid

50. Medicaid is a public-assistance program created in 1965 that provides payment of medical expenses for low-income and disabled patients. Funding for Medicaid is shared between the federal government and those states participating in the program. Medicaid is the largest source of funding for medical services for America's poor and disabled. Each provider that participates in the Medicaid program must sign a provider agreement with his or her state.

51. Federal regulations require each state to designate a single state agency responsible for the Medicaid program. The agency must create and implement a "plan for medical assistance" that is consistent with Title XIX of the Social Security Act and with the regulations the Secretary of HHS promulgates. Although Medicaid is administered on a state-by-state basis, the state programs adhere to federal guidelines. Federal statutes and regulations restrict the items and services for which the federal government will pay through its funding of state Medicaid programs.

### a. Incurred Medical Expenses

52. Incurred Medical Expenses ("IME") is an income-offset mechanism by which State Medicaid programs pay for medical expenses not otherwise covered under the State's Medicaid plan—including, for example, dental care—for beneficiaries who live in nursing homes and other long term care facilities.

14

53. State Medicaid plans are required to make long term care available to eligible beneficiaries, including care in a nursing facility. 42 U.S.C. 1396a(a)(10); 1396d(a)(4). The cost of such care is generally split between Medicaid and the beneficiary, with Medicaid's portion defined by federal regulation. The beneficiary's share is called the "patient liability," and it is the beneficiary's income (e.g., SSI or AFDC) minus certain enumerated expenses. 42 C.F.R. § 435.725(a). In general, Medicaid's share is the difference between the entire cost of care and the patient liability. Id. For example, if the cost of nursing home care is $4,000 a month, and a Medicaid beneficiary has SSI income of $1,000 a month, of which $200 qualifies for deduction, then the patient liability each month is $800 and Medicaid will pay the remaining $3,200. If a beneficiary's deductions increase, then his/her patient liability will decrease, and Medicaid will have to increase its payments to the long term care facility to make up the difference.

54. Among the enumerated deductions are: the cost of home maintenance, provided that a doctor certifies that the beneficiary will be returning home within six months, id. at § 435.725(d); the costs of certain personal, spousal, and family maintenance; and, "amounts for incurred expenses for medical or remedial care that are not subject to payment by a third party" (i.e., IME). Id. at § 435.725(c)(1)-(4) (emphasis added).

55. The IME deduction includes "necessary medical or remedial care recognized under State law but not covered under the State's Medicaid plan, subject to reasonable limits the agency may establish on amounts of these expenses." Id. at § 435.725(c)(4)(ii); 42 USC § 1396a(r)(1)(A). "Reasonable limits" are defined in each State's Medicaid plan and vary state by state.

56. The IME process works as follows: First, a Medicaid case worker performs an income assessment of the beneficiary when he or she first enters care (e.g., a nursing home), as well as an assessment of any optional or mandatory deductions for which the beneficiary is eligible. Once the patient liability is determined, i.e., the amount s/he will

15

have to pay to the care facility, the case worker directs Medicaid to pay the remainder of the costs to the nursing facility.

57.     If the beneficiary later incurs an IME—for example, dental work or optometry services not eligible for reimbursement under the State's Medicaid plan—the beneficiary must notify the case worker, who will then decrease the beneficiary's patient liability for future months by the amount of the IME.  The case worker also directs Medicaid to increase its payment to the nursing facility correspondingly, in the same amount to make up the difference.

58.     Thus, when a beneficiary receives medical care that qualifies for an IME deduction, Medicaid provides more funds so the beneficiary can pay for the care, even though it is not covered under the State Medicaid plan.

59.     A small number of Medicaid beneficiaries in long term care facilities are not able to make use of IME to pay for medical expenses.  In order to utilize IME deductions to pay for uncovered medical expenses, the beneficiary must have some income to offset. If a Medicaid beneficiary does not have income to offset (e.g., does not receive SSI), then Medicaid pays the full cost for the care facility and the beneficiary is ineligible for IME deductions.

**D.     <u>Other Federal Health Care Programs</u>**

60.     In addition to Medicare and Medicaid, the federal government pays for medical services under several other federal health care programs, including but not limited to TRICARE, CHAMPVA, the Federal Employees Health Benefit Program, and federal workers' compensation programs.

61.     TRICARE, administered by the United States Department of Defense, is a federally-funded program that provides medical benefits, including clinical services, to certain relatives of active duty, deceased, and retired service members or reservists, as well as to retirees.  TRICARE sometimes provides for hospital services at non-military facilities for active duty service members as well.  10 U.S.C. §§ 1071-1110; 32 C.F.R. § 199.4(a).

16

62.     CHAMPVA, administered by the United States Department of Veterans Affairs, is a health care program for the families of veterans with 100 percent service-connected disability.

63.     The Federal Employee Health Benefit Program, administered by the United States Office of Personnel Management, provides health insurance for federal employees, retirees, and survivors.

**E.     Regulation For Provision Of Dental Services In Nursing Homes**

64.     The Omnibus Budget Reconciliation Act of 1987 ("OBRA 1987") requires that Medicare and Medicaid-certified nursing homes conform to minimum accepted standards of care, including with respect to the provision of dental services.  See 42 C.F.R. § 483.55.  Among other requirements, nursing facilities must provide or obtain from outside resources (i) routine dental services covered under the State Medicaid plan, and (ii) emergency dental services.  § 483.55(b)(1).  CMS guidance defines "emergency dental services" to include "services needed to treat an episode of acute pain in teeth, gums, or palate; broken, or otherwise damaged teeth, or any other problem of the oral cavity by a dentist that required immediate attention."  CMS, State Operations Manual (SOM): Appendix PP – Guidance to Surveyors for Long Term Care Facilities § F411 (2011).  Nursing facilities must provide required care "without charge" to the resident, id. at § F412, regardless of a resident's ability to pay.  No provision is made for the facility to recoup money expended on these services.

65.     In addition, as of November 28, 2016, nursing facilities must "assist residents who are eligible and wish to participate to apply for reimbursement of dental services as an incurred medical expense" under the State Medicaid plan.  42 C.F.R. § 483.55(b)(5) (emphasis added).

## V.    ALLEGATIONS

### A.    Overview

66.    Since at least July 2013, and likely longer, CSM and its medical provider affiliates have engaged in an illegal kickback scheme, providing financial inducements to nursing homes in exchange for a guaranteed stream of referrals.

67.    Dental service contracts prepared by CSM, and entered into by CSM dental service affiliates and nursing homes, explicitly set forth the kickback arrangement. The contracts provide that free dental services will be given to one zero liability resident—i.e., resident for whom the nursing home would be financially responsible—in exchange for six IME-eligible referrals.

68.    As described below, the Defendants' kickback arrangements lead to the displacement of dental service providers that do not offer kickbacks. In addition, because the arrangement is so advantageous to the nursing homes, CSM's dental affiliates are able to charge higher rates to nursing home residents and undertake unnecessary dental work with minimal pushback from the facilities.

69.    Nearly all of the services provided by CSM dental affiliates are billed to Medicaid, either directly or through IME.

70.    The dental kickback arrangement serves to entice the nursing homes into contracting for bundles of CSM's other specialty services with its provider affiliates. These include providing referrals in, inter alia, optometry, podiatry, audiology, vestibular auto-rotation testing, behavioral health, wound care, audiology, lab work, telemetry, and mobile x-ray. Much of this care, too, is billed to Medicare or Medicaid, directly or through IME.

71.    All of the kickback-tainted claims for reimbursement—for dental care and otherwise—that CSM and its affiliates have submitted or caused to be submitted for reimbursement to Government healthcare programs, are false and fraudulent claims under the Governments' False Claims Acts.

## B.     The CSM Mobile Dental Kickback Model

72.     CSM has affiliate relationships with numerous mobile dental service providers.  For example, Marquis Mobile Dental Services operates in CSM's home state of Tennessee.  In Louisiana, CSM affiliate Fleur De Lis states that its mobile dental business began when Marquis "Mark" Napper, the CEO of CSM and namesake of Marquis Mobile Dental Services, taught them about a "truly innovative" model to provide dental services to nursing homes.

73.     Other CSM dental affiliates include, but are not limited to, Georgia Mobile Dental, Premier Mobile Dentistry of VA, Midwest Mobile Dental, Cook and Associates of North Carolina, and Lester Mobile Dentistry dba Maple Leaf Mobile Dentistry.

74.     CSM's dental services model is successful, lucrative, and expanding.  CSM dental affiliates have treated tens of thousands of nursing home residents since 2008.  CSM affiliates actively recruit new dentists, promising them "$180,000 a year working 3-4 days a week, but [with] the ability to make more"—an amount that is well above the national median compensation for dentists based on a 40-hour work week.

### 1.     CSM Mobile Dental Kickbacks Are Written Explicitly Into Contracts With Nursing Homes

75.     As noted above, federal OBRA regulations require nursing homes to provide certain emergency dental services for their residents, regardless of a resident's ability to pay.  Ordinarily, a resident with limited income can pay for dental care through use of the IME deductions so the nursing home bears no financial liability.  For IME-ineligible "zero liability" patients, however, the nursing home must cover the cost for care.

76.     CSM and its dental affiliates remove the financial burden by agreeing to provide free treatment for one "zero liability" resident in exchange for the referral of six IME-eligible (paying) residents.  The Defendants' kickback scheme is designed to take advantage of the IME mechanism for billing uncovered medical expenses to Medicaid.  This is clear from the kickback language of the contract, which requires referrals of IME-eligible

Medicaid beneficiaries. For example, CSM dental affiliates Fleur de Lis and Georgia Mobile Dental, and on information and belief, Marquis Mobile Dentistry and Premiere Mobile Dentistry, use CSM form dental contracts that state in pertinent part:

> Provider shall provide exam, cleaning, x-rays, extractions and prosthesis adjustments annually. Residents are only eligible for this program if a resident does not have resources to pay for these dental services ("zero liability residents"), Provider will provide these services annually at no additional cost, subject to a cap of one zero liability resident to every six Incurred Medical Expense Deduction eligible residents per unit visit.

Section 4.e, "Compensation and Billing" for "SSI / Zero liability residents."

77.        The contracts plainly condition free services on the nursing home's provision of six referrals to the CSM dental affiliate. Upon information and belief, it is the pattern and practice of other CSM affiliated dental service providers (Doe Defendants 1-50) to enter contracts with nursing facilities that are substantially similar to the contracts described herein.

78.        CSM affiliate contracts also require the nursing facilities to use the dental affiliate as the sole provider of services. The CSM form contract states under "Provider Services," that the facility "will not engage or contract with any Mobile Dental provider not affiliated with [the CSM affiliate] during the [one year term of the contract]."

### 2.        False Claims For Dental Coverage To State Medicaid Programs

79.        Claims for payment for dental care submitted or caused to be submitted through the IME income offset deductions are tainted by improper kickbacks, and are therefore false and fraudulent claims under the Governments' False Claims Acts.

80.        Claims for reimbursement for dental care submitted directly to Medicaid by CSM and its dental affiliates are also tainted by improper kickbacks, and are therefore false and fraudulent claims under the Governments' False Claims Acts.

81.     States have discretion over which dental services, if any, they will reimburse under their state Medicaid plans.  Regardless of whether IME is available to a particular Medicaid beneficiary, if the dental care s/he receives is covered by a State's Medicaid program, then it must be billed directly to Medicaid.  For example, Louisiana Medicaid covers the cost of one set of dentures every eight years, as well as periodic denture repair, for adults.  Virtually no other dental care is covered.  In instances where Fleur De Lis provides dentures to a nursing home resident pursuant to a CSM dental contract that secures referrals with kickbacks, therefore, claims for reimbursement submitted by FDL to Louisiana Medicaid are false claims.

82.     In Georgia, where Georgia Mobile Dental operates under a CSM dental contract with the kickback provision, Medicaid covers a limited scope of dental care, including emergency tooth extractions and related procedures.  Therefore, any claims for reimbursement that GMD submits to Georgia's Medicaid program for services provided under the dental contract are false claims.

### 3.     Defendants' Scheme Has Led to the Increased Cost of Care, Unnecessary Procedures and Patient Harm

83.     As a direct result of Defendants' kickback scheme, federal and state healthcare programs have been burdened with higher costs, and patients have been subject to unnecessary and harmful procedures.  CSM dental affiliates' contracts set fees for dental services at the 90th percentile of local rates.  The Fleur De Lis and Georgia Mobile Dental contracts, for example, both state at Section 4.a on "Compensation and Billing":

> Such fee schedule shall be determined based upon CDT, dental procedure codes as promulgated by the American Dental Association as reported at the 90th percentile in the National Dental Advisory Service Comprehensive Fee Report for each respective year hereunder and adjusted for geographic variation as reported therein.

84.     In addition, on information and belief, FDL performs unnecessary procedures on nursing home residents, which also exposes the residents to the health risks that necessarily accompany medical procedures on the elderly.  For example, FDL performed

21

dental extractions on a hospice patient—a procedure that is rarely appropriate for a patient at the end of life, when the primary focus should be ensuring that the patient is comfortable. In this case, the extractions raised serious concerns from the nursing home staff and complaints from the patient's family. Relator also understands from nursing home staff that families regularly raise concerns about FDL, particularly about unnecessary procedures, poor quality of care, the high cost of services, and aggressive bill collection practices by CSM.

### C. CSM Uses Kickbacks To Obtain A Wide Variety Of Business

85. The Defendants' kickback scheme extends to the other types of care that CSM affiliates offer. CSM offers free dental coverage for zero liability patients to induce nursing home referrals for all of CSM's medical providers. As described in its affiliates' contracts with nursing homes, CSM's Care Services program "provide[s] a designated representative to coordinate medical services between participating residents and Providers affiliated with CSM." The list of medical services that nursing homes can select is extensive and includes, inter alia: dentistry, podiatry, optometry, behavioral health, audiology, wound care, Medication Therapy Management & DNA testing, vestibular auto-rotation testing, mobile X-Ray, Lab, and Telemetry. CSM provides further information about these offerings on its website and in its marketing materials.

86. Many of the services provided by CSM affiliates are billed to Medicare and/or Medicaid, either directly or through IME. To the extent services are provided pursuant to the kickback arrangement, related claims for reimbursements are tainted by kickbacks and are subject to liability under the Governments' False Claims acts.

### COUNT I
### Federal False Claims Act
### 31 U.S.C. § 3729(a)(1)(A), (C), (G)

87. Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 86 above as though fully set forth herein.

88.     This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729 et seq., as amended.

89.     By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the United States Government for payment or approval.

90.     By virtue of the acts described above, Defendants have knowingly conspired to defraud the Government by getting a false or fraudulent claim allowed or paid.

91.     By virtue of the acts described above, Defendants knowingly concealed overpayments from the United States Government and failed to remit such overpayments.

92.     The Government, unaware of the falsity of the records, statements, and claims made or caused to be made by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' illegal conduct.

93.     By reason of Defendant's acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

94.     Additionally, the United States is entitled to the maximum penalty of $21,916 for each and every violation alleged herein that occurred on or after November 2, 2015, and $11,000 for every violation prior to November 2, 2015.

**COUNT II**
**Georgia False Medicaid Claims Act**
**Ga. Code Ann. §§ 49-4-168.1(1), (3), (7)**

95.     Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 86 as though fully set forth herein.

96.     This is a claim for treble damages and penalties under Georgia False Medicaid Claims Act, Ga. Code Ann. §§ 49-4-168.1 et seq.

97.     By virtue of the acts described above, Defendants knowingly presented, or caused to be presented, false or fraudulent claims to the Georgia State Government for payment or approval.

23

98. By virtue of the acts described above, Defendants have knowingly conspired to defraud the Georgia State Government by getting a false or fraudulent claim allowed or paid.

99. By virtue of the acts described above, Defendants knowingly concealed and improperly avoided or decreased an obligation to pay money to the Georgia State Government.

100. The Georgia State Government, unaware of the falsity of the records, statements, and claims that Defendants made or caused to be made, paid and continues to pay the claims that would not be paid but for Defendants' illegal conduct.

101. Defendants have damaged, and continue to damage, the State of Georgia in a substantial amount to be determined at trial.

102. Additionally, the Georgia State Government is entitled to the maximum penalties pursuant to the Georgia False Claims Act for each and every violation alleged herein.

## COUNT III
### Louisiana Medical Assistance Programs Integrity Law
### La. Rev. Stat. §§ 46:439.1; 46:438.2; 46:438.3(A), (C)-(D)

103. Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 86 above as though fully set forth herein.

104. This is a claim for treble damages and penalties under Medical Assistance Programs Integrity Law, La. Rev. Stat. §§ 46:437 et seq.

105. By virtue of the acts described above, Defendants solicited, received, offered, or paid remuneration in return for referring an individual to a health care provider.

106. By virtue of the acts described above, Defendants knowingly presented, or caused to be presented, false or fraudulent claims to the Louisiana State Government for payment or approval.

24

107. By virtue of the acts described above, Defendants have knowingly conspired to defraud the Louisiana State Government by getting a false or fraudulent claim allowed or paid.

108. By virtue of the acts described above, Defendants knowingly concealed and improperly avoided or decreased an obligation to pay money to the Louisiana State Government.

109. The Louisiana State Government, unaware of the falsity of the records, statements, and claims that Defendants made or caused to be made, paid and continues to pay the claims that would not be paid but for Defendants' illegal conduct.

110. Defendants have damaged, and continue to damage, the State of Louisiana in a substantial amount to be determined at trial.

111. Additionally, the Louisiana State Government is entitled to the maximum penalties pursuant to the Louisiana Medical Assistance Programs Integrity Law for each and every violation alleged herein.

**COUNT IV**
**Tennessee False Claims Act and Tennessee Medical Assistance Act**
**Tenn. Code Ann. §§ 4-18-103(a)(1), (3), (7), (9) and §§ 71-5-182(a)(1)(A), (C)-(D)**

112. Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 86 above as though fully set forth herein.

113. This is a claim for treble damages and penalties under Tennessee False Claims Act, Tenn. Code Ann. §§ 4-18-101 et seq., and Tennessee Medicaid False Claims Act, Tenn. Code Ann. §§ 71-5-182 et seq.

114. By virtue of the acts described above, Defendants knowingly presented, or caused to be presented, false or fraudulent claims to the Tennessee State Government for payment or approval.

115.    By virtue of the acts described above, Defendants have knowingly conspired to defraud the Tennessee State Government by getting a false or fraudulent claim allowed or paid.

116.    By virtue of the acts described above, Defendants knowingly concealed and improperly avoided or decreased an obligation to pay money to the Tennessee State Government.

117.    The Tennessee State Government, unaware of the falsity of the records, statements, and claims that Defendants made or caused to be made, paid and continues to pay the claims that would not be paid but for Defendants' illegal conduct.

118.    Defendants have damaged, and continue to damage, the State of Tennessee in a substantial amount to be determined at trial.

119.    Additionally, the Tennessee State Government is entitled to the maximum penalties pursuant to the Tennessee False Claims Act and the Tennessee Medicaid False Claims Act for each and every violation alleged herein.

**COUNT V**
**Virginia Fraud Against Taxpayers Act**
**Va. Code Ann. §§ 8.01-216.3(A)(1), (3), and (7)**

120.    Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 86 above as though fully set forth herein.

121.    This is a claim for treble damages and penalties under the Virginia Fraud Against Taxpayers Act, Va. Code Ann. §§ 8.01-216.3 et seq.

122.    By virtue of the acts described above, Defendants knowingly presented, or caused to be presented, false or fraudulent claims to the Virginia State Government for payment or approval.

123.    By virtue of the acts described above, Defendants have knowingly conspired to defraud the Virginia State Government by getting a false or fraudulent claim allowed or paid.

26

124. By virtue of the acts described above, Defendant knowingly concealed and improperly avoided or decreased an obligation to pay money to the Virginia State Government.

125. The Virginia State Government, unaware of the falsity of the records, statements, and claims that Defendant made or caused to be made, paid and continues to pay the claims that would not be paid but for Defendant's illegal conduct.

126. Defendants have damaged the State of Virginia in a substantial amount to be determined at trial.

127. Additionally, the Virginia State Government is entitled to the maximum penalties pursuant to the Virginia Fraud Against Taxpayers Act for each and every violation alleged herein.

## PRAYER

WHEREFORE, Plaintiff-Relator prays for judgment against Defendants as follows:

1. That Defendants cease and desist from violating 31 U.S.C. § 3729 et seq.;

2. That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the Governments have sustained because of Defendants' actions, plus a civil penalty of not less than $10,957 and not more than $21,916 for each violation occurring on or after November 2, 2015, and a civil penalty of not less than $5,500 and not more than $11,000 for each violation occurring prior to November 2, 2015;

3. That Plaintiff-Relator be awarded the maximum amount allowed pursuant to the Federal False Claims Act, 31 U.S.C. § 3729 et seq., the Georgia False Medicaid Claims Act, Ga. Code Ann. §§ 49-4-168.1 et seq., the Louisiana Medical Assistance Programs Integrity Law, La. Rev. Stat. §§ 46:437 et seq., the Tennessee False Claims Act and Tennessee Medicaid False Claims Act, Tenn. Code Ann. §§ 4-18-103(a)(1)–(2) and §§ 71-5-182(a)(1)(A)–(B), and the Virginia Fraud Against Taxpayers Act, Va. Code Ann. §§ 8.01-216.3 et seq.;

27

4.      That Plaintiff-Relator be awarded all costs of this action, including attorneys' fees and expenses; and

5.      That Plaintiff-Relator recover such other relief as the Court deems just and proper.

## <u>DEMAND FOR JURY TRIAL</u>

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator hereby demands a trial by jury.


Dated: ___12/10/2018___


Erika A. Kelton                                      Michael Hamilton
ekelton@phillipsandcohen.com         mhamilton@pulf.com
Luke J. Diamond                                  PROVOST-UMPHREY LAW FIRM, LLP
ldiamond@phillipsandcohen.com        4205 Hillsboro Pike, Suite 303
PHILLIPS & COHEN LLP                  Nashville, TN 37215
2000 Massachusetts Ave., NW           Tel: (615) 297-1932
Washington, DC 20036                     Fax: (615) 297-1986
Tel: (202) 833-4567
Fax: (202) 833-1815

                                                          *Attorneys for Plaintiff-Relator*
                                                          *Gregory Folse*