# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA and the STATES OF GEORGIA, LOUISIANA, TENNESSEE, and VIRGINIA ex rel. GREGORY FOLSE,** | ) ) ) ) ) | |
| **Plaintiffs,** | ) ) | |
| **v.** | ) ) | **Case No. 3:17-cv-1478** |
| | ) | **Judge Aleta A. Trauger** |
| **MARQUIS "MARK" NAPPER, JOSHUA KILGORE, DANIEL BIRD, CARE SERVICES MANAGEMENT LLC, MARQUIS HEALTH SYSTEMS LLC, MARQUIS MOBILE DENTAL SERVICES LLC, and SALLY B. DALY DDS LLC d/b/a FLEUR DE LIS MOBILE DENTAL,** | ) ) ) ) ) ) ) ) | |
| **Defendants.** | ) | |

## MEMORANDUM

Pending before the court are seven motions. Care Services Management, LLC ("CSM"), Marquis "Mark" Napper, Joshua Kilgore, Daniel Bird, Marquis Health Systems, LLC ("MHS"), and Marquis Mobile Dental Services, LLC ("MMDS") (collectively, "CSM Defendants") have filed a Motion to Dismiss Pursuant to Fed. R. Civ. P 12(b)(6) (Doc. No. 89), to which the State of Tennessee and the State of Louisiana (collectively, "State Plaintiffs") have filed a Response (Doc. No. 118). Some of the CSM Defendants—namely, CSM, MHS, and MMDS—have filed a separate Motion to Dismiss Pursuant to Fed. R. Civ. P 12(b)(6) (Doc No. 93), which is directed at claims other than the State Plaintiffs', and relator Gregory Folse has filed a Response (Doc. No. 114). The CSM Defendants[1] have also filed a Motion for Joinder or, in the Alternative, to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(7) (Doc. No. 95), to which the State Plaintiffs have filed a Response (Doc.

---

[1] This motion purports to be on behalf of "Defendants," but it is signed only by counsel for the CSM Defendants. (*See* Doc. No. 95 at 1, 3.)

No. 116). Sally B. Daly DDS LLC d/b/a Fleur de Lis Mobile Dental ("Fleur de Lis") has filed a Motion to Dismiss Relator's First Amended Complaint (Doc. No. 106), to which Folse has filed a Response (Doc. No. 127), and Fleur de Lis has filed a Reply (Doc. No. 133). Fleur de Lis has also filed a Motion to Dismiss Complaint in Intervention (Doc. No. 106), to which the State Plaintiffs have filed a Response (Doc. No. 128), and Fleur de Lis has filed a Reply (Doc. No. 132). The State Plaintiffs have filed a Motion to Exclude Additional Facts Outside the Pleadings (Doc. No. 117), to which the CSM Defendants have filed a Response (Doc. No. 124). Finally, Fleur de Lis has filed a Motion to Strike and Exclude Facts Outside the Complaint (Doc. No. 130), to which the State Plaintiffs have filed a Response (Doc. No. 134). For the reasons set out herein, the evidentiary motions will be granted and the motions to dismiss will be denied, without prejudice to the filing of renewed motions if the plaintiffs and relator fail to amend their complaints in a manner consistent with this Memorandum.

## I. BACKGROUND[2]

### A. Medicaid and the IME System

"Enacted in 1965, Medicaid offers federal funding to States to assist pregnant women, children, needy families, the blind, the elderly, and the disabled in obtaining medical care." *Nat'l Fed'n of Indep. Bus. v. Sebelius* ("*NFIB*"), 567 U.S. 519, 541 (2012) (citing 42 U.S.C. § 1396a(a)(10)). When a state elects to participate the Medicaid program—which every state has done—it agrees that, in exchange for federal funds, the state will "comply with federal criteria governing matters such as who receives care and what services are provided at what cost." *Id.* at 541–42. Medicaid pays for a wide range of medical services, including, at least in some instances,

---

[2] Unless otherwise indicated, the underlying facts are taken from Folse's Amended Complaint (Doc. No. 22) and the State Plaintiffs' Complaint in Intervention (Doc. No. 76) and are taken as true for the purposes of the motions to dismiss.

long-term care ("LTC") provided to beneficiaries who, due to aging, illness, and/or disability, are unable to live with the degree of independence available to most fully healthy adults. *See In re Est. of Trigg*, 368 S.W.3d 483, 487 (Tenn. 2012) (discussing LTC payments under Medicaid).

Although Medicaid pays for a great deal of necessary care for a large number of people, it does not pay for everything that a beneficiary might want or need. Central to this case are two types of payments for beneficiaries' medical services that Medicaid typically will *not* make: (1) payment for the so-called "patient liability" share of LTC costs; and (2) payment for "non-covered" services that, though medical in nature, are outside the scope of the Medicaid program. The first of those two categories of expense—patient liabilities—stem from the fact that the Center for Medicare and Medicaid Services ("CMS") "requires [LTC] residents with income remaining . . . to contribute [a portion of] that income to the [LTC facility] to defray the cost of their care to the extent possible." *Md. Dep't of Health & Mental Hygiene v. CMS*, 542 F.3d 424, 430 (4th Cir. 2008) (citing 42 C.F.R. § 435.725(a)). Although it is presumably rare for LTC residents to have substantial income from ongoing employment, Medicaid beneficiaries in LTC nevertheless routinely qualify for patient liability because, if nothing else, the beneficiaries often have income from the Social Security Act's Supplemental Security Income ("SSI") program (as well as, depending on the patient, potentially other sources of limited passive income). (*See* Doc. No. 76 ¶ 45.) The amount of patient liability in any given beneficiary's case is calculated based on the beneficiary's income minus a number of deductions. *See* 42 C.F.R. § 435.725(b)–(c). The patient liability share calculated pursuant to Medicaid rules is subtracted from the amount that Medicaid pays to the LTC facility, and the patient must pay that amount himself. 42 C.F.R. § 435.725(a)(1).

The second category of medical expenses not paid for by Medicaid but central to this case—payment for non-covered services—is, at least at first glance, fairly straightforward. Medicaid is a large program but not a wholly comprehensive one; there are some healthcare

3

services that Medicaid beneficiaries would benefit from—or even that they truly, desperately need—that Medicaid nevertheless simply does not pay for. One significant example of a non-covered service—and the one most relevant to this case—is non-emergency adult dentistry, which, at least for the most part, is not covered by either of the two Medicaid programs at issue, Louisiana Medicaid or Tennessee Medicaid, known as "TennCare."

The Medicaid program's approach to these non-covered services, however, consists of more than just leaving recipients to fend for themselves. Medicaid is a complex program and, as such, has tools it can use to subsidize and/or encourage certain services, even if the program itself does not "cover" those services in the ordinary sense. With regard to adult dental services provided to LTC residents, the Medicaid program subsidizes the services in two ways: first, by requiring Medicaid-participating LTC facilities to assist their residents in obtaining emergency dental services, despite the fact that Medicaid itself will not separately compensate the facility for that assistance, *see* 42 C.F.R. § 483.55(b); and, second, by requiring that states allow Medicaid-eligible LTC residents to classify the money that they spend on non-emergency dental services (and some other specialty services) as incurred medical expenses—"IMEs," in health-law parlance—that can be deducted from the resident's income for the purposes of calculating the patient liability share of his LTC charges, *see* 42 C.F.R. § 435.725(c)(4).

The requirement to assist residents in need of emergency dental care has the potential to benefit every Medicaid beneficiary in an LTC facility. The benefits of the IME deduction, however, are less broadly shared. Medicaid's ability to offer subsidies through IME deductions is inherently limited to recipients whose income causes them to have some patient liability in the first place; otherwise, there is nothing to deduct from. For patients with no recognized income and therefore no share of LTC charges apportioned to patient liability—typically referred to as "zero

4

liability" patients—there is no equivalent mechanism under Medicaid for subsidizing non-emergency dental care.

## B. The Defendants' Business

In 2008, Bird and Napper founded MMDS for the purpose of "providing mobile dental services to residents in LTC facilities." (Doc. No. 76 ¶ 65.) According to the State Plaintiffs, MMDS's business model was specifically designed to reap the benefits of the IME deduction system available to Medicaid-covered LTC residents. To that end, there were "four functions" at the core of the business:

> 1) market to and sign up client LTC facilities to provide mobile dental services to their residents, 2) obtain consents for treatment from and then schedule residents at particular client LTC facilities for treatment, 3) treat the residents with MMDS-contracted dentists, and 4) generate invoices to be submitted to the state agency that approves IME deductions.

(*Id.* ¶ 65.) The business was a success. (*Id.* ¶ 69.) Looking to expand, Napper and Bird began exploring the possibility of providing additional, non-dental IME-eligible services, such as optometry, podiatry, audiology, psychology, and dermatology. They could do so by relying on "provider affiliates"—healthcare providers who contracted with the defendants to perform services in accordance with the defendants' business model. A provider affiliate capable of providing one or more types of specialty care would receive a "turn-key operation," including a trailer outfitted with the needed equipment and a promise that the defendants would take care of all billing, collections, and scheduling. (*Id.* ¶ 84.) For example, Fleur de Lis was a Louisiana-based dental provider affiliate. (Doc. No. 22 ¶¶ 72, 76, 81, 83.) Napper and Bird founded CSM and MHS for the purpose of facilitating this expansion. CSM coordinated the provision of services through provider affiliates, while MHS handled billing and collections, and each company got a cut of the provider affiliate's income. (Doc. No. 76 ¶¶ 70–74.) Around the same time, Kilgore joined Bird and Napper as a co-owner and operator of CSM. (*Id.* ¶ 78.)

5

According to the State Plaintiffs, the defendants marketed their services to LTC clients with a "twofold" pitch. (Id. ¶ 79.) First, they would highlight that, by contracting with CSM, the facility could provide its residents with access to an "array of specialist providers (both mobile and telemedicine)." (*Id.* ¶ 79.) Second, the defendants would promise that, in addition to providing specialty services themselves, they would "take care of all the associated administrative duties so that all services are free to the facilities." (*Id.*) Such a setup, they claimed, would help the facility's bottom line because it would reduce the need to pay for residents' offsite transportation and would prevent lost revenues due to vacancies caused by hospitalizations. (*Id.* ¶ 80.)

## C. The False Claims Act and State False Claims Statutes

"Since its enactment during the Civil War , the False Claims Act"—often referred to as the "FCA"—"has authorized both the Attorney General and private *qui tam* relators[3] to recover from persons who make false or fraudulent claims for payment to the United States." *Graham Cty. Soil & Water Conservation Dist. v. U.S. ex rel. Wilson*, 559 U.S. 280, 283 (2010). Because systems of government payment are various and often complex, Congress has, over the years, set forth a number of different ways in which an individual or entity can incur liability under the FCA, some of which do not even expressly refer to a "false claim" at all, and others of which allow the underlying claim to be false *or* fraudulent. Specifically, a person or company violates the Act if he or it

> (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; (B) knowingly makes, uses, or causes to be made or used, a

---

[3] "[T]he *qui tam* provision of the FCA" allows a private party—known as a "*qui tam* relator"—to file a cause of action "in the name of the United States." *U.S. ex rel. Smith v. Lampers*, 69 F. App'x 719, 720 (6th Cir. 2003) (citing 31 U.S.C. § 3730(b)(1)). The complaint is initially placed under seal, while the United States has an opportunity to evaluate the relator's allegations. 31 U.S.C. § 3730(b)(2). The United States ultimately must either elect to intervene in the case— in which case, it takes over the prosecution of the claims—or decline to intervene, giving the relator the option to pursue the FCA claims in the name of the government himself. 31 U.S.C. § 3730(b)(4), (c). Either way, if the claims are ultimately successful, the relator will be entitled to a share of the recovery, as a reward for his assistance and an enticement for future potential whistleblowers. 31 U.S.C. § 3730(d).

false record or statement material to a false or fraudulent claim; (C) conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G); (D) has possession, custody, or control of property or money used, or to be used, by the Government and knowingly delivers, or causes to be delivered, less than all of that money or property; (E) is authorized to make or deliver a document certifying receipt of property used, or to be used, by the Government and, intending to defraud the Government, makes or delivers the receipt without completely knowing that the information on the receipt is true; (F) knowingly buys, or receives as a pledge of an obligation or debt, public property from an officer or employee of the Government, or a member of the Armed Forces, who lawfully may not sell or pledge property; or (G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government . . . .

31 U.S.C. § 3729(a)(1).

Over the last several decades, the FCA has grown to play a major role in combating fraud within the federal healthcare programs that now make up a substantial portion of federal non-defense expenditures. That, unsurprisingly, includes Medicaid, which accounts for hundreds of billions of dollars of spending each year.[4] As the court has already noted, however, the federal government is not the only government with a major financial stake in the Medicaid program, because that program, by design, is operated, and partially paid for, by individual states. The State of Tennessee, for example, provides a bit over a third of the funding for the TennCare program. (Doc. No. 76 ¶ 21.)

In light of the FCA's demonstrable benefits, many states, including Tennessee and Louisiana, have enacted their own false claims statutes that largely mirror the federal version and that are, in some instances, specifically targeted at fraud in the Medicaid program. Indeed, the federal government not only encourages but incentivizes states to do so. By federal statute, "if a State has in effect a law relating to false or fraudulent claims" that is "at least as effective in

---

[4]    *See* Annual Medicaid & CHIP Expenditures, https://www.medicaid.gov/state-overviews/scorecard/annual-medicaid-chip-expenditures/index.html.

7

rewarding and facilitating qui tam actions for false or fraudulent claims as" the FCA and "contains a civil penalty that is not less than the amount of the civil penalty authorized" by the FCA, then the federal government will decrease the state's share of fiscal responsibility for its Medicaid program "by 10 percentage points." 42 U.S.C. § 1396h(a), (b)(2), (b)(4).

Tennessee actually has two false claims acts: the Tennessee Medicaid False Claims Act ("TMFCA"), Tenn. Code Ann. §§ 71-5-181 to -185, which is specifically directed at the TennCare program, and the Tennessee False Claims Act ("TFCA"), Tenn. Code Ann. §§ 4-18-101 to -108, which, like the federal FCA, applies generally to all government programs. The TMFCA creates a cause of action against any entity or individual who:

> (A) Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval under the medicaid program;
>
> (B) Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim under the medicaid program;
>
> (C) Conspires to commit a violation of subdivision (a)(1)(A), (a)(1)(B), or (a)(1)(D); or
>
> (D) Knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money, or property to the state, or knowingly conceals, or knowingly and improperly, avoids, or decreases an obligation to pay or transmit money or property to the state, relative to the medicaid program . . . .

Tenn. Code Ann. § 71-5-182(a)(1). Louisiana, in turn, has adopted its Medical Assistance Programs Integrity Law ("MAPIL"), La. Rev. Stat. Ann. §§ 46:437.1 to 46:440.16, which includes an array of fraud-related provisions, including ones modeled on the FCA. MAPIL provides that

> A. No person shall knowingly present or cause to be presented a false or fraudulent claim.
>
> B. No person shall knowingly engage in misrepresentation or make, use, or cause to be made or used, a false record or statement material to a false or fraudulent claim.

C. No person shall knowingly make, use, or cause to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the medical assistance programs, or to knowingly conceal, avoid, or decrease an obligation to pay or transmit money or property to the medical assistance programs.

D. No person shall conspire to defraud, or attempt to defraud, the medical assistance programs through misrepresentation or by obtaining, or attempting to obtain, payment for a false or fraudulent claim.

E. (1) No person shall knowingly submit a claim for goods, services, or supplies which were medically unnecessary or which were of substandard quality or quantity.

La. Rev. Stat. Ann. § 46:438.3.

## D. The Anti-Kickback Statute

Although the FCA and the state statutes modeled after it play an important role in the legal landscape applicable to government healthcare benefits, they are not the only statutes safeguarding those programs. Another such federal statute, the Anti-Kickback Statute, or "AKS," "prohibits 'knowingly and willfully solicit[ing] or receiv[ing] any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or kind, . . . in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program.'" *Jones-McNamara v. Holzer Health Sys.*, 630 F. App'x 394, 400 (6th Cir. 2015) (quoting 42 U.S.C. § 1320a–7b(b)(1)(A)). "Federal health care program" is defined broadly and includes state-operated Medicaid programs, which receive federal funding. 42 U.S.C. § 1320a-7(h); 42 U.S.C. § 1320a-7b(f). In addition to outlawing the solicitation or receipt of kickbacks, the AKS also prohibits "offer[ing] or "pay[ing]" kickbacks, 42 U.S.C. § 1320a–7b(b)(2), meaning that either party to the kickback transaction is subject to the law. The purpose of these prohibitions is to "protect federal health care programs from 'increased costs and abusive practices resulting from provider decisions that are based on self-interest rather than cost, quality of care or necessity of services.'" *United*

9

*States ex rel. Suarez v. AbbVie, Inc.*, 503 F. Supp. 3d 711, 723 (N.D. Ill. 2020) (quoting *United States v. Patel*, 778 F.3d 607, 612 (7th Cir. 2015)). Louisiana has its own anti-kickback statutory provisions that largely mirror the AKS, La. Rev. Stat. Ann. § 46:438.2, although Tennessee apparently does not.

The federal AKS "is a criminal statute, and does not," by its own terms, "create a private right of action." *United States ex rel. Arnstein v. Teva Pharm. USA, Inc.*, No. 13 CIV. 3702 (CM), 2019 WL 1245656, at *5 (S.D.N.Y. Feb. 27, 2019) (citing *Donovan v. Rothman*, 106 F. Supp. 2d 513, 516 (S.D.N.Y. 2000)). Over the years, however, the United States and *qui tam* relators developed a practice of pursuing civil FCA claims in which an AKS violation was the "FCA predicate." *U.S. ex rel. Wheeler v. Union Treatment Centers, LLC*, No. CV SA-13-CA-4-XR, 2019 WL 571349, at *5 (W.D. Tex. Feb. 12, 2019). The logic of these cases, which many courts embraced, was that AKS compliance is a requirement for providing services under federal healthcare programs, and, therefore, submitting claims for payment when one was in knowing violation of the AKS amounted to fraudulently seeking a payment to which one was not entitled. *See U.S. ex rel. Pogue v. Diabetes Treatment Centers of Am.*, 565 F. Supp. 2d 153, 159 (D.D.C. 2008) ("Legion other cases have held violations of AKS . . . can be pursued under the FCA, since they would influence the Government's decision of whether to reimburse Medicare claims.") (collecting cases).

Whether courts were correct in linking the FCA and AKS in early cases may have been debatable; at the very least, that linkage did not expressly appear in either statute. In 2010, however, Congress, "as part of the Patient Protection and Affordable Care Act ('PPACA'), . . . amended the AKS by adding the following language: 'In addition to the penalties provided for in this section . . . , a claim that includes items or services resulting from a violation of this section constitutes a false or fraudulent claim for purposes of subchapter III of chapter 37 of Title 31,' i.e.,

10

the FCA." *Arnstein*, 2019 WL 1245656, at *5 (quoting 42 U.S.C. § 1320a-7b(g)). As a result, the term "false or fraudulent claim," under the FCA, is defined, as a matter of law, to encompass any "claim that includes items or services resulting from" an AKS violation. Since the AKS revision in the PPACA went into effect, therefore, the premise that one can support an FCA claim with an AKS violation has been a creature of statutory text, not merely judicial construction or administrative guidance.

## E. This Litigation

On November 22, 2017, a competitor of CSM, Gregory Folse, filed a *qui tam* suit on behalf of the United States, Tennessee, Louisiana, and Georgia against CSM, Fleur de Lis, Georgia Mobile Dental LLC, and up to a hundred John Does. (Doc. No. 1.) The Does were either "CSM physician affiliates" or "other entities and individuals that planned, facilitated and/or participated in the scheme" alleged. (*Id.* ¶¶ 22–23.) Folse alleged that the defendants had "generated business by providing illegal kickbacks to nursing homes across the southeastern United States" and that, as a result, "[k]ickback-tainted claims for reimbursement" were "submitted by the Defendants to the" named plaintiff governments. (*Id.* ¶ 4.) Specifically, Folse alleged that the defendants' business model, in practice, resulted in an illegal kickback relationship between LTC facilities and CSM affiliates, whereby the LTC facilities referred their residents who were capable of paying for specialty services to CSM, and CSM, in exchange, provided free services to the facility's zero-liability patients at no cost to the facility. Because that relationship involved an exchange of valuable services for referrals, Folse argued, any resulting Medicare or Medicaid claim was "kickback-induced" and therefore subject to the respective false claims statutes. (*Id.* ¶ 9.) Folse recognized that at least some of the specialty services at issue were not actually covered by Medicaid in the conventional sense, but he asserted that the defendants, by knowingly seeking and

receiving payments subsidized through IME deductions, were nevertheless making or causing to be made unlawful kickback-induced claims. (*Id.* ¶ 10.)

The Complaint was served on the respective named governments, and they began their evaluation of the allegations. On March 13, 2018, the United States formally declined to intervene. (Doc. No. 15.) The state governments, however, continued looking into the matter. (*See* Docs. No. 17, 19 (seeking and receiving extension of time to consider intervention).) On December 11, 2018, Folse filed an Amended Complaint, in which he added claims on behalf of the Commonwealth of Virginia and named, as additional defendants, MHS, MMDS, and Premiere Mobile Dentistry of VA, LLC. Folse continued to assert claims against 50 John Doe defendants, whom he did not identify by name. (Doc. No. 22.) The state governments continued to evaluate the claims, and, on November 25, 2020, they filed a joint Notice informing the court that Tennessee and Louisiana had elected to intervene, but Georgia and Virginia had elected to decline. (Doc. No. 40.) On February 9, 2021, Folse filed a Notice of Voluntary Dismissal regarding the Georgia Mobile Dental LLC and Premiere Mobile Dentistry of VA LLC, with the consent of the various governments, although he did not otherwise dismiss any claims related to Medicaid in Georgia or Virginia. (Doc. No. 51.)

On March 10, 2021, Tennessee and Louisiana filed a joint Complaint in Intervention. (Doc. No. 76.) They alleged two "schemes of fraud," which they referred to as "Scheme One" and "Scheme Two." Scheme One involved alleged kickbacks between LTC facilities and the defendants, in the form of free services provided to (or for the benefit of) LTC facilities. In particular, the State Plaintiffs noted that the CSM-drafted contracts between LTC facilities and CSM provider affiliates expressly required the providers to offer free services to the facility's zero-liability patients in exchange for the opportunity to provided billable services to the facility's IME eligible patients. Some contracts even went so far as to set what was, in effect, a rate of exchange

12

governing free services and billable referrals: the provider affiliate would agree to provide services to no more than one zero-liability patient per six paying patients referred. (*Id.* ¶¶ 100-01.) The State Plaintiffs also noted that the defendants provided free administrative services to these LTC facilities as well, particularly regarding billing and scheduling for the patients subject to the referral agreement. This scheme, the State Plaintiffs alleged, included the defendants' submission of IME deduction paperwork on behalf of patients, meaning that, although the scheme sometimes did not involve "Medicaid claims" in the ordinary sense, it did involve the submission of claims for payment from the Medicaid program in the form of deductions to patient liability shares and corresponding increases in Medicaid payments. (*Id.* ¶ 107.)

Scheme Two involved alleged kickbacks, not between the defendants and LTC facilities, but between the defendants and their provider affiliates. The State Plaintiffs explained that, "[o]nce CSM signed up the residents referred to it by the LTC facilities and secured all of the consents from the residents or their guardians, CSM then had a large and lucrative pool of IME-eligible and other residents in its network." (*Id.* ¶ 114.) A provider who agreed to become a CSM provider affiliate would gain referrals of those residents from CSM and, in exchange, provide CSM with a roughly 20% cut of the resulting payments. (*Id.* ¶ 117.) The State Plaintiffs noted that some of the services involved, such as podiatry services, were, in fact, Medicaid-covered, meaning that, for those allegedly kickback-induced referrals, there were resultant conventional Medicaid claims that did not rely on the IME deduction to provide the requisite link between the kickback and payment from a government healthcare program. Ultimately, however, Scheme One and Scheme Two each included some claims based on conventional Medicaid reimbursement for services and some claims based on IME deductions. (*Id.* ¶¶ 119–23.)

The State of Tennessee pleaded four counts. Tennessee Count 1 encompasses TMFCA claims based on the defendants' knowingly causing false claims to be submitted to TennCare. (*Id.*

¶¶ 147–50.) Tennessee Count 2 is also under the TMFCA but is based on alleged conspiracy. (*Id.* ¶¶ 151–53.) Tennessee Counts 3 and 4 are, respectively, common law claims for unjust enrichment and payment by mistake. (*Id.* ¶¶ 154–60.) The State of Louisiana pleaded two counts. Louisiana Count 1 is pursuant to the anti-kickback provisions of the MAPIL. (*Id.* ¶¶ 161–63.) Louisiana Count 2 is pursuant to MAPIL's provisions regarding false claims. (*Id.* ¶¶ 164–67.) The State Plaintiffs allege actual damages in excess of $12,000,000, to be trebled, in addition to numerous per-violation civil penalties. (*Id.* at 35.)

## II. LEGAL STANDARD

### A. Rule 12(b)(6)

In deciding a motion to dismiss for failure to state a claim under Rule 12(b)(6), the court will "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007); *Inge v. Rock Fin. Corp.*, 281 F.3d 613, 619 (6th Cir. 2002). The Federal Rules of Civil Procedure require only that the plaintiff provide "a short and plain statement of the claim that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47 (1957). The court must determine only whether "the claimant is entitled to offer evidence to support the claims," not whether the plaintiff can ultimately prove the facts alleged. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)).

The complaint's allegations, however, "must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). To establish the "facial plausibility" required to "unlock the doors of discovery," the plaintiff cannot rely on "legal conclusions" or "[t]hreadbare recitals of the elements of a cause of action," but, instead, the plaintiff must plead "factual content that allows the court to draw the reasonable inference that the

14

defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009). "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.* at 679; *Twombly*, 550 U.S. at 556.

## B. Rule 9(b)

Rule 9(b) of the Federal Rules of Civil Procedure states that, when alleging fraud, "a party must state with particularity the circumstances constituting fraud." The Sixth Circuit has recognized that the particularity requirement applies not only to claims that explicitly go under the name "fraud" but also to any "claims sounding in fraud." *Smith v. Bank of Am. Corp.*, 485 F. App'x 749, 751 (6th Cir. 2012) (emphasis added). Complaints alleging FCA violations fall within that category and, as such, must comply with Rule 9(b). *Chesbrough v. VPA, P.C.*, 655 F.3d 461, 466 (6th Cir. 2011) (citing *U.S. ex rel. Yuhasz v. Brush Wellman, Inc.*, 341 F.3d 559, 563 (6th Cir. 2003)).

The Sixth Circuit has explained that, while Rule 9(b) imposes a heightened standard, the underlying purpose of the rule is, in significant part, to serve the same ends as the general pleading requirements of Rule 8:

> [Rule 9(b)] should not be read to defeat the general policy of "simplicity and flexibility" in pleadings contemplated by the Federal Rules. Rather, Rule 9(b) exists predominantly for the same purpose as Rule 8: to provide a defendant fair notice of the substance of a plaintiff's claim in order that the defendant may prepare a responsive pleading. Rule 9(b), however, also reflects the rulemakers' additional understanding that, in cases involving fraud and mistake, a more specific form of notice is necessary to permit a defendant to draft a responsive pleading

*United States ex rel. SNAPP, Inc. v. Ford Motor Co.*, 532 F.3d 496, 504 (6th Cir. 2008) (citations and quotation marks omitted).

"So long as a [plaintiff] pleads sufficient detail—in terms of time, place, and content, the nature of a defendant's fraudulent scheme, and the injury resulting from the fraud—to allow the defendant to prepare a responsive pleading, the requirements of Rule 9(b) will generally be met."

15

*Id.* However, "[w]here a complaint alleges 'a complex and far-reaching fraudulent scheme,' then

that scheme must be pleaded with particularity and the complaint must also 'provide examples of

specific' fraudulent conduct that are 'representative samples' of the scheme." *United States ex rel.*

*Marlar v. BWXT Y–12, LLC*, 525 F.3d 439, 444–45 (6th Cir. 2008) (quoting *United States ex rel.*

*Bledsoe v. Cmty. Health Sys., Inc.*, 501 F.3d 493, 510 (6th Cir. 2007)).


## III. ANALYSIS[5]

### A. Status of Federal FCA Claims

As a preliminary matter, the CSM Defendants complain that the State Plaintiffs have

inappropriately sought to intervene, not only with regard to the TMFCA and MAPIL claims, but

also with regard to the federal claims that Folse pleaded under the FCA. The State Plaintiffs

respond that they did not intend to (and did not) intervene for the purposes of prosecuting claims

under the federal FCA, but rather intervened pursuant to TMFCA and MAPIL. (Doc. No. 118 at

28.) A review of the State Plaintiffs' Complaint in Intervention confirms that they are correct; each

of their claims is quite explicitly pleaded in terms of the appropriate and correct state statute or

principle of common law. (*See* Doc. No. 76 ¶¶ 148, 152, 157, 160, 165.) Regardless of where the

defendants got the idea that the State Plaintiffs were attempting such a strange procedural gambit,

the text of the Complaint in Intervention, which is controlling, definitively shows that they were

not. The only government empowered to pursue the federal claims in this case was the United

---

[5] There is some dispute regarding whether the court should consider all of the pending motions or should instead treat at least some of the requests made as untimely in light of this court's scheduling orders. (*See* Doc. No. 114 at 20.) The court, in its discretion, grants any short retroactive extensions necessary to allow it to consider the motions, each of which has been fully briefed, on the merits.

States, and, because that government declined to intervene, those claims remain pending and under the control of Folse, as the intervenor, whom the FCA empowers to act in the name of the United States in the event of the government's declination.[6] *See* 31 U.S.C. § 3730(b)(4), (c).

## B. Consideration of Matters Outside of the Pleadings

Two of the pending motions are addressed to the question of what materials the court should consider as part of its resolution of the other, more substantive motions. The State Plaintiffs ask the court to exclude a number of exhibits and facts offered by the CSM Defendants in support of their motion to dismiss. (Doc. No. 117.) Fleur de Lis, in turn, asks the court to exclude and "strike from the record" an exhibit, offered by the State Plaintiffs, purporting to depict a slide excerpted from CSM's marketing materials.[7] (Doc. No. 130 at 1; *see* Doc. No. 128-1.)

"If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are [1] presented to and [2] not excluded by the court, the motion must be treated as one for summary judgment under Rule 56." Fed. R. Civ. P. 12(d). In other words, when a party filing or opposing a Rule 12(b)(6) or 12(c) motion brings up facts that are outside the four corners of the pleadings and not subject to either judicial notice or incorporation by reference into the pleadings, the court has two choices: it can ignore the non-pleaded facts on the ground that they are, by definition, irrelevant to the pending motion, which is confined to testing the pleadings; or, in the alternative, the court can consider some or all of the additional, non-pleaded facts, in which case the court is required to convert the motion to one for summary judgment under Rule 56. If the court chooses

---

[6] Because the State of Georgia and Commonwealth of Virginia each declined to intervene, Folse also has the authority to prosecute those claims.

[7] The State Plaintiffs have stressed that they are only offering the exhibit for the limited purpose of illustrating aspects of their argument. Of course, if the State Plaintiffs had believed that the exhibit was necessary to bolster or clarify their claims, they could have simply included that single-page exhibit in the Complaint in Intervention itself. Because they did not, the court will consider Fleur de Lis' request to exclude the exhibit, even if the practical effects of such an exclusion, if any, would be negligible.

17

the second option, however, "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d).

As long as a district court limits itself to one of the two options contemplated by Rule 12(d), the decision to convert or not to convert a motion is within that court's reasonable discretion. *See Miller v. Mearns*, 643 F. App'x 552, 554 (6th Cir. 2016) (citing *Wysocki v. Int'l Bus. Mach. Corp.*, 607 F.3d 1102, 1104 (6th Cir. 2010)). In this instance, the court sees no reason to exacerbate the already-complicated nature of this case by departing from the well-established standards and sequence of events envisioned by the Federal Rules of Civil Procedure. The external evidence offered by the defendants, if considered, would plunge the court headlong into evaluating potentially contestable, difficult factual questions that have not been fully developed. Expanding the court's analysis beyond the pleadings at this stage, therefore, would not only be premature but would, in the view of the court, carry a serious risk of error that could be avoided by giving these complex facts the time and space they need to be supported, contested, and explained. The court, accordingly, will grant the parties' evidentiary motions and will confine its consideration of the pending motions to the pleadings themselves.

## C. Identification of Underlying Claims

Many of the defendants' arguments for dismissal are variations on the same fundamental premise: that the plaintiffs cannot state causes of action under the FCA, TMFCA, or MAPIL because they have not alleged particular actionable "false claims" that can be attributed to the defendants. The law of this circuit is that, at least generally speaking, when an FCA plaintiff alleges a large fraudulent scheme that occurred across numerous transactions over time, Rule 9(b) requires the plaintiff not only to describe the scheme but also to "identify a representative false claim that was actually submitted to the government." *Chesbrough*, 655 F.3d at 470 (citing *Bledsoe*, 501 F.3d at 510). That requirement serves at least two purposes. First, identifying a specific, representative

false claim forces the plaintiff to nail down, definitively, what its theory of the case is—what kind of claims are at issue; what representations were made as part of the claims; what the claims were seeking; who submitted them; how they were submitted; and how they were false. Second, identifying an actual, past false claim as an example, as opposed to merely pleading a hypothetical description of the defendant's scheme, forces the plaintiff to do the necessary legwork to verify that the defendant was, in fact, doing what the plaintiff suspected it was doing—that is, that false claims were actually being submitted and that the plaintiff was not simply mistakenly assuming facts about the defendant's practices.[8] The defendants in this case suggest that the plaintiffs, despite having had the benefit of a significant investigatory period during which the original complaint was under seal, have failed to accomplish either of those objectives and have failed to introduce even a single false claim attributable to them.

The FCA defines "claim" to refer, with some exceptions inapplicable here, to

any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that—

    (i)    is presented to an officer, employee, or agent of the United States; or

---

[8] There are persuasive critiques of this requirement, or at least the unyielding application of it. There may, for example, be cases in which a *qui tam* relator is able to plead a fraudulent scheme with all of the clarity and specificity that Rule 9(b) could reasonably be read to require, but the relator—because he is not himself the government and does not enjoy direct access to government data—is, by "no fault of his own," unable to identify specific paid claims until after he has had the benefit of ordinary discovery. *United States v. Walgreen Co.*, 846 F.3d 879, 881 (6th Cir. 2017) (citing *Bledsoe*, 501 F.3d at 504 n.12). Dismissing the claims of such a relator would, in the view of this court, contradict the clear policy, embodied in the FCA, that relators should be able to pursue FCA violations even if the government—which may, in some cases, face potential embarrassment if false claims are fully investigated—refuses to do so. *See United States ex rel. Prather v. Brookdale Senior Living Communities, Inc.*, 838 F.3d 750, 769 (6th Cir. 2016) (allowing limited exception to exemplary claims requirement in case in which no government intervened and allegations were otherwise sufficient). The Sixth Circuit, however, has, in recent years, strongly cautioned against relaxing the requirement of pleading actual, exemplary false claims unless there is a strong reason for doing so, *see Walgreen*, 846 F.3d at 881–82, and the court will apply the ordinary rule in this case.

(ii)    is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government—

(I)    provides or has provided any portion of the money or property requested or demanded; or

(II)    will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded . . . .

31 U.S.C. § 3729(b)(2). The TMFCA and MAPIL have similar definitions of "claim," generally encompassing requests for money or property under government programs, whether administered by the government itself or a contractor. *See* Tenn. Code Ann. § 71-5-182(c); La. Rev. Stat. Ann. § 46:437.3. Each of those statutes imposes liability, not only on a party that knowingly submits such a claim, but also on any party that knowingly causes such claims to be presented. 31 U.S.C. § 3729(a)(1)(A); Tenn. Code Ann. § 71-5-182(a)(1); La. Rev. Stat. Ann. § 46:438.3(A).

The State Plaintiffs allege two types of illegal kickback arrangements for which examples are necessary under Rule 9(b): kickbacks between LTC facilities and the defendants; and kickbacks between the defendants and their provider affiliates. With regard to alleged kickbacks between LTC facilities and the defendants, the State Plaintiffs explain the "claims" at the heart of their theory of liability as follows:

> TennCare and Louisiana Medicaid reimburse the cost of certain healthcare services that are not "Covered Services" by the Medicaid programs, such as adult dental services, through the IME deduction process. . . . [W]hen a provider submits an invoice to TennCare or Louisiana Medicaid requesting approval for an income offset to the patient's liability in the amount of the services provided and described on the invoice, TennCare or Louisiana Medicaid will pay that amount (if approved) for the following month by reducing the patient's portion of their LTC facility cost, i.e., the patient liability. Medicaid then increases its portion of the beneficiary's cost by the amount of the approved invoice.

(Doc. No. 128 at 7.) The Complaint in Intervention includes an example of one such invoice, sent from MMDS billing director Lori Stephens to an entity identified as "TN Health Connections,"

which, according to the pleading, was serving as "TennCare's Member Services." (Doc. No. 76 ¶ 107; Doc. No. 76-5 at 2.) The invoice characterizes itself as a "Request for Item D Approval"— "Item D" being a term that the TennCare program has historically used to refer to IME deductions. (*Id.* at 3.) The invoice describes dental services provided to an identified (but, for the purposes of the public docket, redacted) TennCare beneficiary at an LTC facility in Decatur, Tennessee. (*Id.* at 2–5.) Such an invoice, when approved, would result in an IME deduction attributed to the beneficiary, which would, in turn, result in a larger payment by TennCare to the LTC facility on behalf of the beneficiary. According to the State Plaintiffs' theories of the case, the request for the deduction was induced by AKS violations, rendering it a "false claim" for statutory purposes.

The State Plaintiffs could have provided more information regarding that example, in order to be certain that they were complying with the Sixth Circuit's stringent pleading requirements under Rule 9(b). In particular, they could have provided more information about the LTC's own claims for payment to the TennCare program for the relevant period, in order to confirm that the IME deduction was applied to a particular claim calculation resulting in payment from TennCare. That said, faulting the State Plaintiffs for failing to provide that additional information would entail an elevation of form over substance that even the Sixth Circuit's stringent pleading requirements do not require. By including the deduction invoice, the State Plaintiffs have provided a concrete, documented example of a specific transaction, including a submission to the TennCare program, that is typical of the scheme they have alleged. The court sees no reason from the text or purposes of Rule 9(b) to require more. That transaction, moreover, fits within the FCA's definition of a claim, because a request for an IME deduction is a request for money, in that the deduction is, by definition, applied in such a manner as to increase TennCare's payout on behalf of the beneficiary.

The State Plaintiffs also provided TennCare-specific examples of claims allegedly induced by kickbacks between the defendants and provider affiliates for referral of services that were

21

compensable themselves, as opposed to being eligible for an IME deduction. Although the adult non-emergency dental services that were the centerpiece of CSM's early business were not compensable under TennCare or Louisiana Medicaid, CSM and its provider affiliates did eventually begin offering specialty care that was, in some instances, covered. The State Plaintiffs argue that the claims for those compensable services were kickback-induced, and they provide specific exemplary claims for podiatry and behavioral health services submitted by providers in such relationships. (Doc. Nos. 76-6 & -7.) Tennessee, accordingly, has adequately pleaded the existence of specific exemplary claims with regard to both Scheme One and Scheme Two, as well as with regard to both IME-eligible services and covered services.

The same, however, cannot be said about Louisiana. Not one of the Complaint in Intervention's exhibits directly documents a claim under Louisiana Medicaid, either for payment of a fee for services or for an IME deduction. Requiring such examples may seem like a technicality; those examples would not tell the court or the defendants much more than the TennCare examples, combined with the plaintiffs' descriptions of the underlying schemes, have already explained. Nevertheless, the State of Louisiana is a distinct plaintiff with distinct causes of action, and the law of this circuit is clear that the requirement that a plaintiff plead exemplary false claims is, if not absolutely ironclad, only to be disregarded for the most compelling of reasons. *See Walgreen*, 846 F.3d at 881 (citing *Bledsoe*, 501 F.3d at 504 n.12). Accordingly, Louisiana's pleading of its claims has failed to comply with Rule 9(b), as that rule has been interpreted and applied by the Sixth Circuit

Folse's Amended Complaint is similarly lacking. Folse, who retains control over the federal FCA causes of action in this case as well as the statutory claims based out of Virginia and Georgia, pleads the underlying scheme, but he does not provide specific examples of kickback-induced claims that would illustrate that scheme. Of course, Tennessee's TennCare-based

examples might suffice as examples for overlapping federal FCA claims, but those examples were not asserted in any pleading by Folse. Folse's pleading of his claims, therefore, did not fully comply with Rule 9(b).

The court could dismiss Louisiana's claims and the claims being pursued by Folse outright. However, the ordinary practice of this court, when a plaintiff has made a technical and potentially easily rectified pleading error, is to afford the plaintiff the opportunity to rectify its oversight and allow its claims to stand on the overall merits of the pleadings. Accordingly, the court will consider the remaining pending issues and, if there is no basis for dismissing the claims other than the lack of examples, will grant Folse and Louisiana the opportunity to amend their complaints to provide the required examples.

## D. Relationship Between the AKS and the Falsity/Materiality

### 1. Statutory Framework

Of course, a plaintiff's providing examples of claims is not worth much, unless the plaintiff has also pleaded facts establishing that those claims were "false" within the meaning of the relevant false claims statutes or otherwise fell within those statutes' prohibitions. As the court has explained, the plaintiffs' allegations in this case do not involve claims that were false in the most straightforward, traditional sense—such as, for example, claims in which a healthcare provider asserted that he performed a service when, in fact, he did not. Rather, the plaintiffs argue that the underlying claims qualify as "false" because they were induced by kickbacks in violation of the AKS.

As the court has already explained, such a theory is undoubtedly sound with regard to the federal FCA. Since the enactment of the PPACA, federal statutes have mandated that any claim submitted to a government healthcare program that "include[d] items or services resulting from a violation of" the AKS must be considered a "a false or fraudulent claim for purposes of" the FCA.

23

42 U.S.C. § 1320a-7b(g). *See Guilfoile v. Shields*, 913 F.3d 178, 190 (1st Cir. 2019) ("[I]f there is a sufficient causal connection between an AKS violation and a claim submitted to the federal government, that claim is false within the meaning of the FCA."); *United States v. Teva Pharms. USA, Inc.*, No. 13 CIV. 3702 (CM), 2019 WL 1245656, at *28 (S.D.N.Y. Feb. 27, 2019) ("Congress has decreed these claims to be 'fraudulent' . . . ."); *United States v. Berkeley Heartlab, Inc.*, No. CV 9:14-230-RMG, 2017 WL 6015574, at *2 (D.S.C. Dec. 4, 2017) (acknowledging that "the provision [states] that a claim is false and fraudulent if it results from an AKS violation," and "the only reasonable inference is that AKS violations are *per se* material").

The plaintiffs, moreover, have adequately alleged that the claims at issue in this case included items or services resulting from an AKS violation. Specifically, the claims for IME deductions were based specifically on services performed pursuant to a kickback relationship, as were any claims for covered podiatry, behavioral health, or other specialty services provided by CSM provider affiliates. Accordingly, the plaintiffs have sufficiently pleaded that, if the underlying relationships did violate the AKS, then the resulting claims were false for the purposes of the federal FCA, in light of the PPACA amendment.

However, the PPACA is a federal statute and does not, on its face, purport to amend either TMFCA or MAPIL. Nor, as a formal matter, could PPACA do so, given that the U.S. Congress has no direct power to amend legislation enacted by the legislatures of Tennessee and Louisiana. The court's evaluation of the TMFCA and MAPIL claims, therefore, must proceed under the assumption that the relationship between the AKS and the state false claims statutes has not been definitively resolved by any particular statutory provision. Because the caselaw regarding those state statutes is limited, the court will look, in large part, to caselaw involving the federal FCA, as applied prior to the PPACA amendment and/or as applied to statutes other than the AKS. Although judicial interpretations of the federal FCA are not technically binding on the court with regard to

24

the TMFCA or MAPIL, the court finds that caselaw highly persuasive, given that both state statutes were drafted largely to mirror their federal counterpart.

### 2. False Certification of Compliance with a Condition of Payment

Courts in the Sixth Circuit have historically dealt with FCA claims based on violations of non-FCA laws through the lens of "conditions of payment" and "implied certification." *See, e.g., United States v. Brookdale Senior Living Communities, Inc.*, 892 F.3d 822, 826 (6th Cir. 2018) (describing false certification theory of FCA liability); *Ickes v. Nexcare Health Sys., LLC*, No. 13-14260, 2014 WL 12650930, at *2–3 (E.D. Mich. Aug. 4, 2014) (discussing caselaw regarding conditions of payment). According to this framework, a Medicaid provider who submits a claim impliedly certifies compliance with all laws that are "conditions of payment"—that is, all laws that would lead Medicaid to deny the claim if it knew about a violation.[9] *See U.S. ex rel. Hobbs v. MedQuest Assocs., Inc.*, 711 F.3d 707, 714 (6th Cir. 2013). Accordingly, the claim, though not expressly false on its face, is impliedly false in a manner material to payment or nonpayment of the claim and, therefore, actionable under the FCA. *Id.*

Courts and litigants have struggled at times with the implied certification/conditions of payment framework or even rejected that framework altogether. In particular, the various circuit courts found considerable disagreement with regard to the types of evidence or legal grounds that were sufficient (or required) to establish that a particular non-FCA legal requirement could support an implied false certification claim—if such a theory was even available at all. *Compare United States v. Sanford-Brown, Ltd.*, 788 F.3d 696, 711–12 (7th Cir. 2015) ("Although a number of other circuits have adopted this so-called doctrine of implied false certification, we decline to join them"

---

[9] Conditions of payment are sometimes contrasted with "conditions of participation"—requirements for participation in the relevant healthcare program that nevertheless are not treated as preconditions for payment of any individual claim. "Of course, a regulation may in some cases be both a condition of payment and a condition of participation." *Hobbs*, 711 F.3d at 714. Only a claim tainted by a false certification about a condition of payment, however, would be a false claim. *Id.*

25

(footnote omitted)) *with Mikes v. Strauss*, 274 F.3d 687, 702 (2d Cir. 2001) (allowing implied false certification claims, but only with regard to requirements expressly identified as conditions of payment) *with United States v. Sci. Applications Int'l Corp.*, 626 F.3d 1257, 1269 (D.C. Cir. 2010) ("The existence of express contractual language specifically linking compliance to eligibility for payment may well constitute dispositive evidence of materiality, but it is not . . . a necessary condition.").

Recognizing that disagreement among the lower courts, the Supreme Court stepped in to clarify matters in *Universal Health Services, Inc. v. U.S. ex rel. Escobar*, 136 S. Ct. 1989 (2016). The defendant in *Escobar* had sought payment under the Medicaid program for mental health services, despite allegedly having been out of compliance with a number of licensing, qualifications, and supervision requirements. Under the care of these unlicensed, unqualified, and/or inadequately supervised individuals, a teenage patient died, allegedly from her reaction to prescribed medication. After the deceased patient's parents learned of the defendant's alleged deficiencies, they brought an FCA suit. *Id.* at 1997. The First Circuit held that, based on the "express and absolute language" of the relevant regulations, which that court considered "dispositive," the regulations were conditions of payment sufficient to give rise to FCA liability. *U.S. ex rel. Escobar v. Universal Health Servs., Inc.*, 780 F.3d 504, 514 (1st Cir. 2015). In other words, the First Circuit treated the question of whether a regulation can form the predicate of an FCA claim as an issue resolvable by looking solely at its text and the text of any relevant program rules, at least where the rules' status as conditions of payment is explicit.

The defendant appealed, and the Supreme Court vacated the decision below—not because the Court concluded that the regulations categorically were *not* conditions of payment, but because the Court disagreed with the First Circuit's purely text-based approach. The Court agreed, as an initial matter, that, contrary to some courts' conclusions, "the implied false certification theory can

26

be a basis for liability" under the FCA. *Escobar*, 136 S. Ct. at 1995. The Court concluded, however, that liability "does not turn upon whether those requirements were expressly designated as conditions of payment." *Id.* at 1996. Rather, "[w]hat matters is not the label the Government attaches to a requirement, but whether the defendant knowingly violated a requirement that the defendant knows is material to the Government's payment decision." *Id.*

The Court emphasized that materiality of a purported condition is a factual issue and explained some of the ways that the government or a *qui tam* relator can satisfy the "demanding" requirements of the FCA "materiality standard." *Id.* at 2003. The court reiterated that "[a] misrepresentation cannot be deemed material merely because the Government designates compliance with a particular statutory, regulatory, or contractual requirement as a condition of payment." *Id.* The court added that it also is not "sufficient for a finding of materiality that the Government would have the option to decline to pay if it knew of the defendant's noncompliance." *Id.* Although those facts would be relevant, the issue of materiality, as defined in *Escobar*, looks more deeply into the actual practices of the government entity at issue:

> [P]roof of materiality can include, but is not necessarily limited to, evidence that the defendant knows that the Government consistently refuses to pay claims in the mine run of cases based on noncompliance with the particular statutory, regulatory, or contractual requirement. Conversely, if the Government pays a particular claim in full despite its actual knowledge that certain requirements were violated, that is very strong evidence that those requirements are not material. Or, if the Government regularly pays a particular type of claim in full despite actual knowledge that certain requirements were violated, and has signaled no change in position, that is strong evidence that the requirements are not material.

*Id.* at 2003–04. The examples provided by the Supreme Court in *Escobar* contrast starkly with the text-focused approach taken by the circuit court below. The language of the relevant provisions is still relevant under *Escobar*, but just as important is how the regulation is actually treated by the federal program at issue. In other words, under *Escobar*, materiality is better demonstrated in both the government's words *and* its deeds, rather than through its words alone. *See Brookdale Senior*

27

*Living*, 892 F.3d at 831 (describing the materiality inquiry under *Escobar* as "holistic") (quoting *United States ex rel. Escobar v. Universal Health Servs.*, Inc., 842 F.3d 103, 109 (1st Cir. 2016) (following remand)). The court holds that the same framework applies under the TMFCA and MAPIL. *See Caldwell v. Janssen Pharm., Inc.*, 144 So. 3d 898, 909 (La. 2014) (confirming that MAPIL false claims provisions include materiality requirement).

Although there are other potential wrinkles to the standard set out in *Escobar*, it suffices to say, for the purposes of the currently pending motions, that the questions of the materiality of a condition and, by extension, the falsity of the relevant claim are, under *Escobar*, highly factual in nature. While some pre-*Escobar* approaches left open the possibility that determining conditions of payment might consist of a fairly straightforward legal analysis, the Supreme Court has decisively foreclosed such an approach in all but the most obvious of cases. As a result, it is difficult to resolve the viability of a plaintiff's implied certification theory at the motion to dismiss stage. The State Plaintiffs have alleged that AKS compliance of the sort at issue here was a condition of payment under Medicaid, and that is sufficient to survive Rule 12(b)(6). Whether the State Plaintiffs can actually establish that such a condition of payment existed, as a matter of actual practice within the respective states' Medicaid programs, is not an issue that can be resolved on the pleadings.[10] Rather, materiality under *Escobar* is better evaluated after, among other things, a defendant has had the opportunity to engage in discovery regarding the actual practices of the relevant government healthcare agency.

**E. Whether the Defendants' Business Model Violated the AKS**

---

[10] Because the court concludes that the plaintiffs' claims are viable as ordinary causes of actions under the relevant false claims statutes, there is no need to consider whether, in the alternative, the causes of action might survive under a so-called "reverse false claims" theory. *See Am. Textile Mfrs. Inst., Inc. v. The Ltd., Inc.*, 190 F.3d 729, 733 (6th Cir. 1999) (explaining reverse false claims).

The preceding analyses conclude that the general framework of the plaintiffs' causes of action, as pleaded, is viable: claims for IME deductions and payments for services that were induced by AKS violations are potentially actionable as false claims under the FCA, TMFCA, and MAPIL. That, of course, leaves a critical piece left to examine: whether the plaintiffs have actually pleaded violations of the AKS.[11] In order to do so, the plaintiffs were required to plead, with particularity, that each defendant "knowingly and willfully" paid or received "any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person . . . to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program." 42 U.S.C. § 1320a–7b(b)(1)–(2). Depending on how one carves the statute up, that makes for something along the lines of four elements required to establish a violation:

> (1) the defendant solicited or received [or offered or paid] any remuneration, including any kickback or bribe, directly or indirectly, overtly or covertly, in cash or in kind, to any person; (2) that the remuneration was solicited or received to induce such person to refer an individual to a person for furnishing or arranging of an item or service; (3) that the item or service was one for which payment may be made in whole or in part under a federal healthcare program; and (4) that the defendant acted knowingly and willfully.

[11] Fleur de Lis has provided an August 6, 2021 advisory opinion by the Department of Health and Human Services Office of Inspector General ("OIG") regarding whether certain dental arrangements similar to those at issue here violate the AKS. (Doc. No. 135-1.) The opinion is generally favorable to the defendants' position. However, it was based on facts certified by the requester, and the court cannot assume, at this stage, that the facts underlying this case will be identical in all respects to those certified to the OIG. In any event, Department regulations make clear that advisory opinions have "no application to any individual or entity that does not join in the request for the opinion" and that "[n]o individual or entity other than the requestor(s) may rely on an advisory opinion." 42 C.F.R. § 1008.53. Moreover, the same regulations forbid the issuance of an advisory opinion where "[t]he same, or substantially the same, course of action is under investigation, or is or has been the subject of a proceeding involving the Department of Health and Human Services or another governmental agency." 42 C.F.R. § 1008.15(c)(2). In other words, the advisory opinion process is specifically designed not to be a tool for interfering in ongoing proceedings and investigations. The court, accordingly, will consider the opinion as a potentially persuasive analysis of the underlying legal issues—akin to an opinion of another district court—but not as a definitive statement of the Department's position regarding the application of the AKS to these entities. The court's conclusion is without prejudice to reliance on the opinion for any other purpose at any other stage in the litigation.

29

*United States v. St. Junius*, 739 F.3d 193, 210 n.18 (5th Cir. 2013) (citing 42 U.S.C. § 1320a–7b(b)(1)(A)).

### 1. Whether the Relevant Claims Were Paid "Under" a Federal Healthcare Program

Although the requirement that the item or service at issue must be one for which payment may be made in whole or in part under a federal healthcare program is not typically listed as the first element of an AKS violation, this court will consider that element first here, because, without a sufficient link to a federal program, there is no reason for the court to consider any other feature of the relevant entities' business relationships. The AKS is not a statute that governs the entirety of the healthcare field; rather, by its own terms, it governs only the admittedly large chunk of that field paid for, in whole or in part, by the federal government—in this case, through the joint state-federal Medicaid program. If the plaintiffs are mistaken about this case's connection to Medicaid, then they are also mistaken in their assumption that the AKS is implicated by the underlying arrangements.

The plaintiffs allege that each service at issue was paid for under the Medicaid program in one of two ways. For a few of those services—the ones compensable through the ordinary claims process, such as certain podiatry services—there is no reasonable basis for disputing that such claims were paid under Medicaid. Those were simply ordinary Medicaid claims; if any Medicaid claims qualify for AKS protection—which they do—then those claims did as well. The second category of alleged Medicaid payment, however, is both more complicated and more central to the plaintiffs' case. Although compensable specialty services accounted for a portion of the defendants' business, the historical core of the business was dentistry, and all parties agree that neither Tennessee nor Louisiana Medicaid pays for most non-emergency adult dental services. The

plaintiffs argue that such services nevertheless were paid for "under" those programs because they were subsidized through IME deductions.

At least as a practical matter, an IME deduction based on a dental service is indeed a manner through which the Medicaid program effectively pays a portion of the fee for that service. The term "IME deduction" threatens to obscure the fact that the IME system is not simply about *reducing* individual patients' healthcare liabilities but also *increasing* the Medicaid program's payments on behalf of that beneficiary. A patient's IME payment that is deducted from the patient liability share of his LTC charge is simultaneously added to the Medicaid program's payment on the same charge, so that the patient can retain that sum without any reduction in the LTC facility's total income. An amount equal to the patient's retained sum—which, again, directly reflects an increase in Medicaid's LTC payment—is paid to the dentist or other provider who performed the IME-eligible service. The money involved may pass through several hands, and there may be extra paperwork involved, but none of that complexity changes the core fact that Medicaid disburses a certain extra amount and a corresponding amount ends up in the pocket of the IME service provider as payment for the service. From an accounting perspective, it is difficult to dispute that Medicaid is paying for a portion of the service at issue, even if it does so in a roundabout way.

Of course, for the plaintiffs' claims to succeed, it is not enough to establish that Medicaid subsidized the services subject to the referrals in an abstract sense; the plaintiff must establish that the services were paid for "under" a "federal healthcare program" *as those terms are used in the AKS*. The AKS does not provide an express statutory definition of "under" for these purposes, but its definition of "federal health care program" does support the plaintiffs' reading. That definition covers any wholly or partially federally funded program "that provides health benefits, whether directly, through insurance, *or otherwise*." 42 U.S.C. § 1320a-7b(f)(1) (emphasis added). In other words, the AKS explicitly applies to all federal programs that "provide[] health benefits," whether

31

directly, through "insurance," or through any other means, including those that do not fall within either of the first two categories. Even if one assumes that IME deductions are not Medicaid claims in a conventional sense, they may still fall under the AKS because the IME program is a mechanism for using federal funds to provide healthcare. The distinction between compensable, "covered" services paid through the traditional Medicaid claims process, on one hand, and non-covered services subsidized by the IME deduction, on the other, may be quite meaningful from the perspective of the Medicaid program itself, but the AKS explicitly eschews such technical distinctions in order to reach all federal healthcare programs broadly. Whether one considers those services to be paid "under" Medicaid or "under" a distinct, secondary program for supporting non-covered services *through* Medicaid—that is, the IME program—is immaterial. The court, accordingly, holds that the scope of the AKS encompasses at least all services for which Medicaid pays a discrete sum as a means to compensate for a specific service that was actually provided, whether or not such a payment occurred directly, through the ordinary claims process alone, or indirectly, through the application of an IME deduction.

2. Remuneration for the Purpose of Inducement: Scheme One

The plaintiffs have also adequately pleaded that the defendants provided LTC facilities with remuneration for the referrals that CSM and its affiliates received. The AKS does not provide a single, comprehensive definition of "remuneration," but it makes clear that the concept includes "transfers of items or services for free or for other than fair market value." *Jones-McNamara v. Holzer Health Sys.*, 630 F. App'x 394, 400 (6th Cir. 2015) (quoting 42 U.S.C. § 1320a–7a(i)(6)). The defendants provided free services to facilities' zero-liability residents, and those services were undoubtedly valuable. Although the defendants protest that the services were provided to the plaintiffs and not to the LTC facilities themselves, the plaintiffs have plausibly alleged that those services were valuable to the facilities because they (1) were a valuable amenity that was attractive

32

to residents and (2) reduced the costs associated with assisting residents with transportation. Just how valuable the free services provided to zero-liability patients were to LTC facilities themselves is a question of fact dependent on a number of contextual factors, and the plaintiffs will ultimately bear the burden of establishing that those services were, in fact, being knowingly provided in exchange for referrals from the LTC facility. At this stage, however, the plaintiffs were only required to plead the elements of their claim plausibly and with particularity, which they have done.

### 3. Remuneration for the Purpose of Inducement: Scheme Two

Although Scheme One was about kickbacks in the form of services, Scheme Two involves an arguably more straightforward cash-for-referrals scheme. According to the plaintiffs, CSM secured contracts with LTC facilities that gave them access to a client base, and they referred those clients to their provider affiliates, in exchange for which the provider affiliates kicked back particular sums of money.

The defendants argue that the relationship between CSM and its provider affiliates was simply an ordinary business arrangement between a regional company with a sound business model and local contractors who performed necessary services in conjunction with that business model. But the presence of some legitimate business motivations is not necessarily fatal to an alleged AKS violation. For example, courts have held that a payment made for the purpose of inducing a referral can violate the AKS, "even if the payments were also intended to compensate for professional services." *United States v. Borrasi*, 639 F.3d 774, 782 (7th Cir. 2011) (quoting *United States v. Greber*, 760 F.2d 68, 72 (3d Cir. 1985)). Indeed, it is common for AKS violations to occur alongside legitimate medical business activities; kickback schemes are only successful insofar as they are able to embed themselves within the vast, lucrative universe of ordinary healthcare services and payments. The defendants will have the opportunity to set forth evidence

33

regarding the purposes of the payments they made to provider affiliates, as well as whether they possessed knowledge of the supposed wrongfulness of such payments. At this stage, however, the plaintiffs have adequately pleaded that the payments, whatever else they were, were also kickbacks. The court therefore will not dismiss the claims based on Scheme Two.

### 4. Knowledge and Willfulness

In order for a financial arrangement to amount to an AKS violation, the party soliciting or offering remuneration for a referral must do so "knowingly and willfully." 42 U.S.C. § 1320a-7b(b)(1)–(2). The FCA, TMFCA, and MAPIL also require that the plaintiff show that the defendant acted with a culpable mental state, although the standard under those statutes is less demanding and can be satisfied by either "actual knowledge," "deliberate ignorance," or "reckless disregard of . . . truth or falsity." Tenn. Code Ann. § 71-5-182(b); La. Rev. Stat. Ann. 46:437.3(11). The defendants argue that the plaintiffs have failed to plead facts sufficient to establish that their alleged AKS violations and false claims were willful and that the far more plausible version of events is that, even if CSM's business model *was* inappropriate in some sense, any kickbacks that occurred were merely the result of the defendants' trying but failing to comply with the law, which, while it might give rise to other consequences, would not constitute a violation of the AKS because any error was inadvertent and made without the requisite intent.

Even when a claim is governed by the heightened pleading requirements of Rule 9(b), "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). Both Folse and the State Plaintiffs have cleared that bar by alleging that the defendants acted knowingly in causing the submission of claims that, by dint of their relationship to kickbacks, were false. (See, e.g., Doc. No. 22 ¶ 89; Doc. No. 76 ¶¶ 150, 165.) The defendants may ultimately be correct that a reasonable finder of fact would conclude that the more plausible

34

reading of events was that any so-called kickbacks were inadvertent and non-willful. At the pleading stage, however, the plaintiffs have adequately asserted knowledge and willfulness.

5. Other AKS Issues

The defendants raise a number of other arguments, seemingly in the context of the AKS, although none of these arguments bears on the plaintiffs' claims. For example, the CSM Defendants devote a significant amount of briefing to caselaw regarding a different federal statute governing referrals that is not at issue here: the Stark Act. The Stark Act, generally speaking, "prohibit[s] physicians from referring their Medicare and Medicaid patients to business entities in which the physicians or their immediate family members have a financial interest." *United States v. Halifax Hosp. Med. Ctr.*, No. 6:09-CV-1002-ORL-31, 2013 WL 6017329, at *4 (M.D. Fla. Nov. 13, 2013). The AKS and the Stark Act are different laws with different requirements, and the plaintiffs do not maintain that the Stark Act was implicated here.

Similarly, the defendants argue that the claims against them should be dismissed because the plaintiffs have not sufficiently alleged that the defendants billed for unnecessary or inadequate services. To some degree, the State Plaintiffs may have brought this argument on themselves by including, in the Complaint in Intervention and in their briefing, some language about the tendency of kickbacks to result in services that are "more expensive, medically unnecessary, or harmful to patients." (Doc. No. 76 ¶ 49.) The defendants, however, have not identified any statutory language or caselaw suggesting that such harms are actually a required element for finding a violation of the AKS, FCA, TMFCA, or MAPIL. The question of whether the AKS is actually a necessary or effective tool for preventing unnecessary or needlessly expensive services may be debatable, but it is far outside this court's appropriate considerations in this case. All that the court can do is evaluate the pleadings for adequacy under the law as it currently exists, and, under current law, the plaintiffs' claims are plausible.

35

**F. Conspiracy**

Many of the defendants' challenges to the conspiracy allegations echo issues that they raised with regard to the non-conspiracy claims, which the court has already addressed. However, the defendants also complain that the plaintiffs have failed to adequately allege conspiracy itself. To plead conspiracy to violate the FCA or other, FCA-modeled false claims statutes, a plaintiff must allege facts that establish the existence of both an unlawful agreement to have a false claim paid and at least one act performed in furtherance of the conspiracy. *U.S. ex rel. Farmer v. City of Houston*, 523 F.3d 333, 343 (5th Cir. 2008). Rule 9(b)'s heightened pleading standard applies to FCA claims of conspiracy, just as it applies to claims for direct violations of the Act. *Marlar*, 525 F.3d at 445. Under Rule 9(b), general allegations of a conspiracy, without supporting facts to show when, where or how the alleged conspiracy occurred, amount to only a legal conclusion and are insufficient to state a cause of action. *U.S. ex rel. Dennis v. Health Mgmt. Assocs., Inc.*, No. 3:09-CV-00484, 2013 WL 146048, at *17 (M.D. Tenn. Jan. 14, 2013) (citing *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106–07 (9th Cir. 2003)).

Although, as the court has explained, there are various grounds on which the defendants may ultimately be able to dispute whether, factually, fraud occurred, the plaintiffs have adequately alleged that, if there was fraud, then there was also a conspiracy to commit fraud by the particular defendants. With regard to the individual defendants—who appear to be the intended subject of the conspiracy claims—the State Plaintiffs alleged their particular roles in the development and growth of CSM's allegedly kickback-fueled business. (*See* Doc. No. 76 ¶¶ 64–89.) Moreover, because the allegedly fraudulent scheme at issue here went to the core of CSM's business, allegations about individuals' roles in the business itself function as, in effect, allegations regarding their role in the fraud. Regardless of how frequently the plaintiffs did or did not use any magic words regarding a "conspiracy" or "unlawful agreement," the plaintiffs have alleged that all of the

36

actions taken were part of a comprehensive, coordinated unlawful business scheme. Although the plaintiffs cannot know what words specifically passed between the defendants in private, even Rule 9(b) does not require that level of omniscience. The plaintiffs have alleged that the defendants planned to act together in furtherance of fraud and then did so; that is sufficient, at this stage, to proceed.

## G. Tennessee Common Law Claims

### 1. Substance of Claims

The defendants also ask the court to dismiss the two non-statutory counts brought in this case—claims on behalf of Tennessee for unjust enrichment and payment by mistake. Although Folse would have had no authority to bring such claims himself, the State of Tennessee pleaded the claims on its own behalf when it filed its Complaint in Intervention. The court is aware of no reason, in either the relevant substantive law or the Federal Rules of Civil Procedure, why Tennessee would have been prevented from doing so. The court, accordingly, will consider whether these Tennessee counts should be dismissed on the merits.

It is common for a government plaintiff to plead claims of unjust enrichment and payment by mistake as, "in essence[,] . . . alternative pleadings to its fraud claims under the False Claims Act" or a state false claims statute. *United States v. United Techs. Corp.*, 626 F.3d 313, 323 (6th Cir. 2010), as amended (Jan. 24, 2011). The fact that such a practice is *common*, however, does not mean that it is actually supported in every case. Under Tennessee law, "[t]he elements of an unjust enrichment claim are: 1) '[a] benefit conferred upon the defendant by the plaintiff'; 2) 'appreciation by the defendant of such benefit'; and 3) 'acceptance of such benefit under such circumstances that it would be inequitable for him to retain the benefit without payment of the value thereof.'" *Freeman Indus., LLC v. Eastman Chem. Co.*, 172 S.W.3d 512, 525 (Tenn. 2005). The Complaint in Intervention adequately alleges that some CSM affiliate providers, at least,

37

received benefits from the TennCare program, because the program paid their claims for compensable services. CSM and the other defendants, moreover, appreciated at least a portion of those benefits as part of their business relationship. If the only issue was whether the defendants received a benefit from *TennCare*, then, the claims for unjust enrichment would be adequately pleaded.

However, the TennCare program is not the plaintiff with regard to these claims; the State of Tennessee is, and the two are not synonymous with each other. As the Complaint in Intervention itself explains, Tennessee has chosen to administer its Medicaid program primarily through a managed care model, which means that most payments under the program are made by and at the immediate expense of a private contractor, not the state:

> TennCare operates as a special demonstration project authorized by the Secretary of the Department of Health and Human Services under the waiver authority conferred by 42 U.S.C. § 1315. . . . TennCare contracts with private managed care contractors (MCCs) through contracts known as Contractor Risk Agreements (CRAs), which must conform to the requirements of 42 U.S.C. § 1395mm, along with any related federal rules and regulations. Tenn. Code Ann. § 71-5-128. The MCCs contract directly with healthcare providers to provide services to eligible TennCare beneficiaries, including the telemedicine services CSM provider affiliates provide. Providers who have entered into such a contract with an MCC are known as Participating Providers. Tenn. Comp. R. & Regs. § 1200-13-13-.01(91). Pursuant to the CRAs, TennCare distributes the combined state and federal Medicaid funding to the MCCs, which then pay Participating Providers for treatment of TennCare beneficiaries. TennCare-eligible persons seeking medical assistance enroll with an MCC to receive healthcare services from a Participating Provider.

(Doc. No. 76 ¶¶ 22–23.) In other words, while the State of Tennessee "is ultimately responsible for administering Medicaid and ensuring it complies with federal law," *Wilson v. Gordon*, 822 F.3d 934, 952 (6th Cir. 2016), the actual payment of funds—that is, the conferral of monetary benefits, to use the language of unjust enrichment law—is, at least in most instances, performed by the private MCC, not the state.

38

The TMFCA creates a statutory cause of action, conferred upon the government, that expressly reaches some payments made through third-party intermediaries, meaning that the role of MCCs should typically be no obstacle to the state's pleading of a statutory TMFCA claim. *See* Tenn. Code Ann. § 71-5-182(c) (discussing false claims to state contractors, grantees, and agents for money to be used on the state's behalf); Tenn. Code Ann. § 71-5-183(a)–(b)(1) (granting cause of action to the state). Unjust enrichment, however, is a common law concept and has not been statutorily expanded or otherwise altered to reflect the complexities of the modern administrative state. Arguably, then, the appropriate plaintiff for an unjust enrichment claim would be the party that actually conferred the benefit—typically, the MCC.

"When resolving an issue of state law," a federal court must "look to the final decisions of that state's highest court, and if there is no decision directly on point, then [it] must make [a] guess to determine how that court, if presented with the issue, would resolve it." *In re Fair Fin. Co.*, 834 F.3d 651, 671 (6th Cir. 2016) (quoting *Conlin v. Mortg. Elec. Registration Sys., Inc.*, 714 F.3d 355, 358–59 (6th Cir. 2013)). If there is no definitive ruling on the issue by the state's highest court, however, the federal district court can look to decisions by the state's lower courts to provide non-dispositive clues as to how the highest court would rule. *See Meridian Mut. Ins. Co. v. Kellman*, 197 F.3d 1178, 1181 (6th Cir. 1999) (stating that, in the absence of a ruling by the state's highest court, a federal district court should generally defer to the interpretation of an intermediate appellate court "unless it is convinced by other persuasive data that the highest court of the state would decide otherwise"). To that end, the defendants draw the court's attention to *State v. Pain MD, LLC*, No. 2017-262, 2017 WL 4862529 (Tenn. Cir. Ct. Oct. 12, 2017), in which the Williamson County-based Circuit Court for Tennessee's 21st Judicial District concluded that the State of Tennessee could, in fact, pursue unjust enrichment claims based on improperly paid TennCare claims because "a direct benefit is not required for a valid unjust enrichment claim." *Id.*

39

at *19. The Circuit Court's interpretation is consistent with the Tennessee Supreme Court's holding, in *Freeman Industries, LLC v. Eastman Chemical Co.*, that, "to recover for unjust enrichment, a plaintiff need not establish that the defendant received a direct benefit from the plaintiff. Rather, a plaintiff may recover for unjust enrichment against a defendant who receives *any* benefit from the plaintiff if the defendant's retention of the benefit would be unjust." *Freeman*, 172 S.W.3d at 525. The Tennessee Supreme Court explained that, pursuant to that rule, the "plaintiff need not pay the money directly to the defendant" for an unjust enrichment claim to arise. *Id.* (discussing *Hirsch v. Bank of Am.*, Cal. Rptr. 2d 220, 229 (2003)).

Of course, the fact that a plaintiff's conferral of a benefit for the purposes of an unjust enrichment claim can be indirect does not necessarily mean that *any* link between the plaintiff and the defendant's benefit, no matter how distant and/or interrupted by intervening third parties, will be sufficient. The relationship between the State of Tennessee and its TennCare MCCs is complex, and it may be that, once the facts of this case are developed, the link between state funds and any wrongful enrichment by the defendants would be simply too attenuated to support a cause of action based in the common law. Based on the facts as pleaded and the current state of Tennessee caselaw, however, the court holds that the Tennessee Supreme Court would likely conclude that payments from the TennCare program can form the predicate of an unjust enrichment claim on behalf of the state.

As with the statutory claims, the role of the IME deduction makes matters somewhat more complicated, but it does not ultimately change whether the claims are viable. For the purposes of unjust enrichment, "[a] benefit is any form of advantage that has a measurable value including the advantage of being saved from an expense or loss." *Freeman*, 172 S.W.3d at 525 (citing *Lawrence Warehouse Co. v. Twohig*, 224 F.2d 493, 498 (8th Cir. 1955)). Admittedly, the defendants did not themselves receive IME deductions. They did, however, appreciate the benefit of those deductions,

40

in that payments that were made to the defendants were subsidized by those deductions, and wrongful appreciation of the benefit is all that an unjust enrichment claim requires.

Insofar as "payment by mistake" is a distinct cause of action distinguishable from unjust enrichment, Tennessee's claim survives for similar reasons. "[T]he elements for a common law payment by mistake claim are (1) a payment was made; (2) the payment was made based on a mistake, error, or it was illegally made; and (3) the party receiving the payment did not have the right to the payment." *United States v. Life Care Centers of Am., Inc.*, No. 1:08-CV-251, 2014 WL 11429265, at *14 (E.D. Tenn. Mar. 26, 2014) (citation omitted). The defendants have not identified any directness requirement for a payment by mistake claim, just as they have identified no such requirement with regard to unjust enrichment. This court finds it unlikely that the doctrine of payment by mistake adds much to this case that unjust enrichment does not, but Tennessee has adequately pleaded both. The court, accordingly, will dismiss neither.

### 2. Timeliness

The defendants argue, in the alternative, that the common law claims are untimely. As many courts have observed, "[s]tatute-of-limitations defenses are," at least typically, more "properly raised in Rule 56 motions [for summary judgment], rather than Rule 12(b)(6) . . . motions, because '[a] plaintiff generally need not plead the lack of affirmative defenses to state a valid claim.'" *Munson Hardisty, LLC v. Legacy Pointe Apartments, LLC*, 359 F. Supp. 3d 546, 567 (E.D. Tenn. 2019) (quoting *Paulin v. Kroger Ltd. P'ship I*, No. 3:14-cv-669, 2015 WL 1298583, at *4 (W.D. Ky. Mar. 23, 2015)); *see also Cataldo v. U.S. Steel Corp.*, 676 F.3d 542, 547 (6th Cir. 2012). Only if it is "'apparent from the face of the complaint that the time limit for bringing the claim[s] has passed'" does the plaintiff have an "obligation to plead facts in avoidance of the statute of limitations defense." *Bishop v. Lucent Techs., Inc.*, 520 F.3d 516, 520 (6th Cir. 2008) (quoting *Hoover v. Langston Equip. Assocs., Inc.*, 958 F.2d 742, 744 (6th Cir. 1992)).

41

This court does not find that the plaintiffs' complaints gave rise to an obligation to establish timeliness at this stage. Although there is no Tennessee statute of limitations specifically applicable to unjust enrichment claims, the Tennessee Supreme Court has apparently recognized that other general statutes of limitations may apply, depending on whether the unjust enrichment claim ultimately sounds in tort or contract. *See Individual Healthcare Specialists, Inc. v. BlueCross BlueShield of Tennessee, Inc.*, 566 S.W.3d 671, 680 n.6 (Tenn. 2019). Even once the applicable statute of limitations is resolved, however, issues of discovery and accrual may require factual development, particularly when a claim is based on a hidden fraudulent scheme. The court will not prematurely judge the timeliness of Tennessee's common law claims at this stage.

## H. Issues Specific to Fleur de Lis

In Fleur de Lis' motion, it raises a number of arguments for dismissal, most of which overlap with the arguments raised by the CSM Defendants. As Fleur de Lis points out, however, "a fraud claim," in order to comply with Rule 9(b), "requires specific allegations as to each defendant's alleged involvement . . . ." *N. Port Firefighters' Pension-Local Option Plan v. Fushi Copperweld, Inc.*, 929 F. Supp. 2d 740, 773 (M.D. Tenn. 2013) (Haynes, C.J.). In other words, mere "'group pleading' . . . fails to meet . . . [Rule] 9(b)'s specificity requirements . . . ." *D.E.&J Ltd. P'ship v. Conaway*, 284 F. Supp. 2d 719, 730 (E.D. Mich. 2003), *aff'd*, 133 F. App'x 994 (6th Cir. 2005). Accordingly, even if the plaintiffs generally succeeded in pleading fraud plausibly and with particularity, they had an additional obligation to plead facts specific to Fleur de Lis itself that would support the claims against it, in particular.

Folse's Amended Complaint includes allegations setting forth that Fleur de Lis was a mobile dental business that became a CSM provider affiliate and engaged in CSM's scheme of kickbacks related to LTC residents. (*See, e.g.*, Doc. No. 22 ¶¶ 72, 76, 81, 83.) The allegations explicitly specific to Fleur de Lis in the State Plaintiffs' Complaint in Intervention are far scanter.

42

(*See* Doc. No. 76 ¶ 17.) The State Plaintiffs point out that they have explained, in detail, what provider affiliates did as part of CSM's schemes and that it should be clear, in context, that those allegations are applicable to Fleur de Lis, whether or not the entity's name was used in the relevant sentences. The State Plaintiffs' response makes sense, up to a point. The principle that Rule 9(b) requires more than mere group pleading should not be misconstrued as a technical requirement to use nothing but proper nouns or to repeat oneself unnecessarily so as to avoid ever talking about defendants as a group, even when it is clear and efficient to do so. Even with that caveat in mind, however, the State Plaintiffs' near-total lack of specific focus on Fleur de Lis cannot be reconciled with the caselaw applying Rule 9(b) to false claims cases in this circuit.

This infirmity is more akin to Louisiana's technical failure to include sufficient claims examples than to any deficiency that would warrant dismissal with prejudice outright. Indeed, given that Fleur de Lis is itself a Louisiana entity, this deficiency in the Complaint in Intervention is, in a sense, merely an outgrowth of that broader error. The court, accordingly, will permit the State Plaintiffs to supplement their claims with examples specific to Fleur de Lis, just as they will be permitted to supplement their claims with any other required examples.

## I. Proposed Compulsory Joinder of Potential LTC Defendants

Finally, the CSM Defendants argue that, even if the court concludes that the substance of the plaintiffs' allegations, as pleaded, is adequate, Folse and the State Plaintiffs nevertheless erred by failing to include, as defendants, the various LTC facilities involved in the underlying transactions. The defendants argue that the court, therefore, must either require the plaintiffs to plead claims against those additional potential defendants or dismiss the claims against the current defendants due to the absence of an indispensable party under Rule 12(b)(7) of the Federal Rules of Civil Procedure, which authorizes a defendant to move to dismiss a complaint for failure to join a party under Rule 19. Dismissal under Rule 12(b)(7) is appropriate "when there is an absent

43

person without whom complete relief cannot be granted." 5C Wright & Miller, Federal Practice and Procedure § 1359. When considering a motion to dismiss under Rule 12(b)(7), just as is the case under Rule 12(b)(6), the court accepts the plaintiff's allegations as true and draws all reasonable inferences in his favor. *Nanko Shipping, USA v. Alcoa, Inc.*, 850 F.3d 461, 465 (D.C. Cir. 2017) (citing *Paiute-Shoshone Indians of the Bishop Cmty. v. City of Los Angeles,* 637 F.3d 993, 996 n.1 (9th Cir. 2011)).

The court's analysis under Rule 19 involves two steps: (1) the court must determine whether the absent parties are required; and, if so, (2) the court must determine whether, in those parties' absence, equity and good conscience require that the case be dismissed. *Sch. Dist. v. Sec'y of U.S. Dept. of Educ.*, 584 F.3d 253, 264–65 (6th Cir. 2009). "If the answer to either question is no, then Rule 19 does not" require dismissal. *Id.* at 265.The first step of the inquiry is set out in Rule 19(a)(1), which provides that an absent party is required for joinder if

> (A) in that person's absence, the court cannot accord complete relief among existing parties; or
>
> (B) that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may:
>
>> (i)      as a practical matter impair or impede the person's ability to protect the interest; or
>>
>> (ii)      leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest.

Fed. R. Civ. P. 19(a). If the court finds that an absent party is required but that joinder is not feasible, then the court proceeds to the second step, which is governed by Rule 19(b). *Sch. Dist.*, 584 F.3d at 264.

The Supreme Court has stated that "the issue of joinder [under Rule 19] can be complex, and determinations are case specific." *Republic of Phil. v. Pimentel*, 553 U.S. 851, 863 (2008) (citing *Provident Tradesmens Bank & Trust Co. v. Patterson*, 390 U.S. 102, 118–19 (1968)). Thus,

44

Rule 19 "is not to be applied in a rigid manner but should instead be governed by the practicalities of the individual case." *Smith v. United B'hood of Carpenters & Joiners*, 685 F.2d 164, 166 (6th Cir. 1982) (citing *Patterson*, 390 U.S. at 116 n.12). "Rule 19 calls for a pragmatic approach; simply because some forms of relief might not be available due to the absence of certain parties, the entire suit should not be dismissed if meaningful relief can still be accorded." *Keweenaw Bay Indian Cmty. v. Michigan*, 11 F.3d 1341, 1346 (6th Cir. 1993) (citation omitted).

The defendants are undoubtedly correct that the LTC facilities with which CSM did business are important actors in the underlying events, and it may even be the case that those LTC facilities themselves violated the law. Those facts alone, however, are not sufficient to require that the facilities be included as defendants in this case. The false claims statutes, by creating causes of action against not only the submitters of false claims but also the full array of people who caused those submissions, already contemplate that, for any given false claim, there may be multiple potential defendants. Indeed, a single false claim may have been caused by numerous people and entities, ranging from multimillion-dollar healthcare companies to individual medical coders working for limited wages. Nothing in the statutes, the Rules, or the governing caselaw suggests that a government plaintiff or a relator has an obligation to plead a claim against every such defendant. As with many types of enforcement, false claims statutes contemplate that government officials will exercise their judgment to determine which purported bad actors should be prioritized and which should not. Nothing about the statutes makes it impossible to fully resolve a claim against one potential defendant whom the government has chosen to prioritize unless other, non-prioritized parties are included. Joinder is therefore not required under Rule 19(a)(1)(A).

With regard to Rule 19(a)(1)(B), it may be that the LTC facilities have some "interest" in this litigation, in the colloquial sense. If the defendants lose, then it will mean that a court has held that the LTC facilities engaged in a practice that was, at least for some involved, unlawful. But the

same risk exists even for an LTC facility that never had any dealings with CSM at all, but rather simply entered into a similar relationship with a different company that had the same legal flaws. In virtually every complex civil case involving the healthcare industry, the fate of one company involved has the potential to send ripples out to countless others. As unfortunate (or, from the perspective of a deterrence-minded government, fortunate) as that may sometimes be, it is simply a reality of litigation—not a ground for mandatory joinder. The LTC Facilities may be interested parties in a sense, but they do not possess the kind of interest that requires joinder under Rule 19(a)(1)(B).

The court accordingly holds that the LTC facilities are not subject to mandatory joinder in this case and, therefore, there is no basis either for ordering the plaintiffs to include them or for dismissing the case pursuant to Rule 12(b)(7). Of course, if the defendants believe that they have causes of action against the LTC facilities, they are free to explore whether avenues exist for them to file third-party claims as part of this litigation. That, though, is not the responsibility of the plaintiffs, who acted within their statutory discretion in selecting which potential defendants to pursue.

## IV. CONCLUSION

For the foregoing reasons, the CSM Defendants' first Motion to Dismiss Pursuant to Fed. R. Civ. P 12(b)(6) (Doc. No. 89), second Motion to Dismiss Pursuant to Fed. R. Civ. P 12(b)(6) (Doc No. 93), and Motion for Joinder or, in the Alternative, to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(7) (Doc. No. 95), as well as Fleur de Lis' Motion to Dismiss Relator's First Amended Complaint (Doc. No. 106) and Motion to Dismiss Complaint in Intervention (Doc. No. 106), will be denied. The State Plaintiffs' Motion to Exclude Additional Facts Outside the Pleadings (Doc. No. 117) and Fleur de Lis' Motion to Strike and Exclude Facts Outside the Complaint (Doc. No. 130) will be granted.

An appropriate order will enter.

_____
ALETA A. TRAUGER
United States District Judge