# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA and the STATES OF GEORGIA, LOUISIANA, TENNESSEE, and VIRGINIA ex rel. GREGORY FOLSE,** | ) ) ) ) ) | |
| **Plaintiffs,** | ) ) | |
| **v.** | ) ) | **Case No. 3:17-cv-1478** |
| **MARQUIS "MARK" NAPPER, JOSHUA KILGORE, DANIEL BIRD, CARE SERVICES MANAGEMENT LLC, MARQUIS HEALTH SYSTEMS LLC, MARQUIS MOBILE DENTAL SERVICES LLC, and SALLY B. DALY DDS LLC d/b/a FLEUR DE LIS MOBILE DENTAL,** | ) ) ) ) ) ) ) ) | **Judge Aleta A. Trauger** |
| **Defendants.** | ) ) | |

## MEMORANDUM

Relator Gregory Folse has filed a Motion to Strike Certain Affirmative Defenses from the [Care Services Management, LLC ("CSM")] Defendants' Answer to Relator's Second Amended Complaint (Doc. No. 165), and plaintiffs Tennessee and Louisiana have filed a Motion to Strike Certain Affirmative Defenses from the CSM Defendants' Answer to Amended Complaint in Intervention (Doc. No. 167). The CSM-affiliated defendants—that is, CSM, Marquis "Mark" Napper, Joshua Kilgore, Daniel Bird, Marquis Health Systems, LLC, and Marquis Mobile Dental Services, LLC—have filed a Response (Doc. No. 169) addressing both motions, and Folse has filed a Reply (Doc. No. 172). For the reasons set out herein, each motion will be granted in part and denied in part.

# I. BACKGROUND

## A. Nature of the Case

This is a healthcare fraud action originally filed by Folse pursuant to the *qui tam* provisions of the False Claims Act ("FCA")[1] and a few state-level counterparts. The details of the alleged scheme—and the features of the Medicaid program on which the scheme is premised—can be found in the court's memorandum of October 27, 2021. *See United States v. Napper*, No. 3:17-CV-1478, 2021 WL 4992651, at *2 (M.D. Tenn. Oct. 27, 2021). In short, Folse and the governments of Louisiana and Tennessee have alleged that the defendants, who provide dental and other specialty medical services, engaged in kickbacks related to the Medicaid program's policy of increasing the program's share of financial responsibility for a patient's long-term care ("LTC") based on the patient's "independent medical expenses" ("IMEs") accrued in connection with services that Medicaid does not cover directly. *See* 42 C.F.R. § 435.725(c)(4). Those allegations make this case somewhat unique, compared to most Medicaid-based FCA cases, because, unlike those cases, this case touches on Medicaid's roundabout method of subsidizing IMEs, not merely its direct payment of claims for services.

CSM provides IME-eligible specialty services to Medicaid-participating LTC residents through "provider affiliates" who contract with CSM and work directly with the LTC providers. (Doc. No. 144 ¶ 65.) The plaintiffs and relator assert that CSM improperly enticed the LTC

---

[1] "[T]he *qui tam* provision of the FCA" allows a private party—known as a "*qui tam* relator"—to file a cause of action "in the name of the United States." *U.S. ex rel. Smith v. Lampers*, 69 F. App'x 719, 720 (6th Cir. 2003) (citing 31 U.S.C. § 3730(b)(1)). The complaint is initially placed under seal, while the United States has an opportunity to evaluate the relator's allegations. 31 U.S.C. § 3730(b)(2). The United States ultimately must either elect to intervene in the case— in which case, it takes over the prosecution of the claims—or decline to intervene, giving the relator the option to pursue the FCA claims in the name of the government himself. 31 U.S.C. § 3730(b)(4), (c). Either way, if the claims are ultimately successful, the relator will be entitled to a share of the recovery, as a reward for his assistance and an enticement for future potential whistleblowers. 31 U.S.C. § 3730(d).

facilities into such arrangements by offering inducements—most prominently, free services for some patients and administrative support for the facilities—in exchange for referrals, allegedly in violation of the federal Anti-Kickback Statute ("AKS"). By statute, "a claim that includes items or services resulting from a violation of [the AKS] constitutes a false or fraudulent claim for purposes of subchapter III of chapter 37 of Title 31,' i.e., the FCA." *U.S. ex rel. Arnstein v. Teva Pharms. USA, Inc.*, No. 13 CIV. 3702 (CM), 2019 WL 1245656, at *5 (S.D.N.Y. Feb. 27, 2019) (quoting 42 U.S.C. § 1320a-7b(g)).

Folse filed his initial *qui tam* Complaint on behalf of the United States, Tennessee, Louisiana, and Georgia on November 22, 2017. (Doc. No. 1.) The Complaint was served on the respective named governments, and they began their evaluation of the allegations. On March 13, 2018, the United States formally declined to intervene. (Doc. No. 15.) The state governments, however, continued looking into the matter. (*See* Doc. Nos. 17, 19 (seeking and receiving extension of time to consider intervention).) On December 11, 2018, Folse filed an Amended Complaint, in which he added claims on behalf of the Commonwealth of Virginia and named some additional defendants. (Doc. No. 22.) The state governments continued to evaluate the claims, and, on November 25, 2020, they filed a joint Notice, informing the court that Tennessee and Louisiana had elected to intervene, but Georgia and Virginia had declined to do so. (Doc. No. 40.) On February 9, 2021, Folse filed a Notice of Voluntary Dismissal regarding some Georgia and Virginia-based defendants, with the consent of the various governments, although he did not otherwise dismiss any claims related to Medicaid in Georgia or Virginia. (Doc. No. 51.)

On March 10, 2021, Tennessee and Louisiana filed a joint Complaint in Intervention. (Doc. No. 76.) They alleged two "schemes of fraud," which they referred to as "Scheme One" and "Scheme Two." Scheme One involved alleged kickbacks between LTC facilities and the

defendants, in the form of free services provided to (or for the benefit of) LTC facilities. (*Id.* ¶¶ 100-01.) Scheme Two involved alleged kickbacks between the defendants and their provider affiliates, in the form of the affiliates' providing CSM with a portion of their revenues in exchange for access to CSM's client base. (*Id.* ¶¶ 114–18.) Scheme One and Scheme Two each included some claims based on conventional Medicaid reimbursement for covered services and some claims based on IME deductions based on non-covered services. (*Id.* ¶¶ 119–23.)

The State of Tennessee pleaded four counts. Tennessee Count 1 encompassed Tennessee Medicaid False Claims Act ("TMFCA") claims based on the defendants' knowingly causing false claims to be submitted to Tennessee's Medicaid program, known as "TennCare." (*Id.* ¶¶ 147–50.) Tennessee Count 2 was also under the TMFCA but was based on alleged conspiracy. (*Id.* ¶¶ 151–53.) Tennessee Counts 3 and 4 were, respectively, common law claims for unjust enrichment and payment by mistake. (*Id.* ¶¶ 154–60.) The State of Louisiana pleaded two counts. Louisiana Count 1 was pursuant to the anti-kickback provisions of Louisiana's Medical Assistance Programs Integrity Law ("MAPIL"). (*Id.* ¶¶ 161–63.) Louisiana Count 2 was pursuant to MAPIL's provisions regarding false claims. (*Id.* ¶¶ 164–67.)

**B. The Court's Prior Holdings**

Various defendants filed motions to dismiss—five such motions, in total. (Doc. Nos. 89, 93, 95, 106, 121.) On October 27, 2021, the court denied those motions but required Folse and Louisiana to rectify some relatively minor deficiencies in their pleadings. *See Napper*, 2021 WL 4992651, at *24. Although some of the issues that the court addressed in response to those motions are irrelevant to the matters currently under consideration, Folse and the states rely extensively on other aspects of the court's holdings in support of their pending requests. Accordingly, the court will reiterate a few core aspects of its earlier rulings.

4

As a preliminary matter, the court addressed the relationship between the AKS and the relevant false claims statutes. As the court has already noted in this opinion, a claim to receive payment for "items or services resulting from a violation of" the AKS is, by statute, a false or fraudulent claim under the FCA. 42 U.S.C. § 1320a-7b(g)). That statutory rule, however, was enacted fairly recently and, on its face, applies only to the FCA, not FCA-modeled state statutes like the TMFCA or the relevant provisions of MAPIL. Accordingly, while the TMFCA and the MAPIL false claims provisions may resemble the FCA in most ways, they do not share its explicit approach to AKS violations. The court concluded that a Medicaid claim tainted by an AKS violation could still theoretically support a claim under those statutes, but only if the relevant state established the necessary elements of falsity and materiality under a "false certification of compliance with a material condition" theory, as set out by the Supreme Court in in *Universal Health Servs., Inc. v. U.S. ex rel. Escobar*, 579 U.S. 176, 183 (2016). Because Folse and the states had sufficiently pleaded falsity and materiality, they were entitled to proceed under such a theory. *See Napper*, 2021 WL 4992651, at *12–15.

Having concluded that an AKS violation could support a claim under the TMFCA and MAPIL, as well as under the FCA, the court turned next to whether the arrangements described in the complaints represented plausible AKS violations. The court relied on the following list of elements required for finding such a violation:

> (1) the defendant solicited or received [or offered or paid] any remuneration, including any kickback or bribe, directly or indirectly, overtly or covertly, in cash or in kind, to any person; (2) that the remuneration was solicited or received to induce such person to refer an individual to a person for furnishing or arranging of an item or service; (3) that the item or service was one for which payment may be made in whole or in part under a federal healthcare program; and (4) that the defendant acted knowingly and willfully.

*Napper*, 2021 WL 4992651, at \*15 (quoting *United States v. St. Junius*, 739 F.3d 193, 210 n.18 (5th Cir. 2013)).

The defendants had argued that, at least for most of the transactions at issue in this case, the plaintiffs could not satisfy the third element, because the services involved were not covered by Medicaid, which, the defendants argued, meant that there was no payment for an item or service "under a federal healthcare program." The court explained the situation as follows:

> The plaintiffs allege that each service at issue was paid for under the Medicaid program in one of two ways. For a few of those services—the ones compensable through the ordinary claims process, such as certain podiatry services—there is no reasonable basis for disputing that such claims were paid under Medicaid. Those were simply ordinary Medicaid claims; if any Medicaid claims qualify for AKS protection—which they do—then those claims did as well. The second category of alleged Medicaid payment, however, is both more complicated and more central to the plaintiffs' case. Although compensable specialty services accounted for a portion of the defendants' business, the historical core of the business was dentistry, and all parties agree that neither Tennessee nor Louisiana Medicaid pays for most non-emergency adult dental services. The plaintiffs argue that such services nevertheless were paid for "under" those programs because they were subsidized through IME deductions.

*Id.* at \*16. The court ultimately agreed with the plaintiffs' argument in that regard based on a close reading of the language of the AKS, holding that the AKS's prohibition applies, at least, to "all services for which Medicaid pays a discrete sum as a means to compensate for a specific service that was actually provided, whether or not such a payment occurred directly, through the ordinary claims process alone, or indirectly, through the application of an IME deduction." *Id.*

The court turned next to the defendants' argument regarding the first two elements of an AKS violation, regarding remuneration. The court concluded that the plaintiffs had adequately alleged remuneration related to both Scheme One and Scheme Two. Regarding Scheme One, involving kickbacks to LTC facilities, the court wrote:

> The defendants provided free services to [some of] facilities' . . . residents, and those services were undoubtedly valuable. Although the defendants protest that the

6

services were provided to [residents] and not to the LTC facilities themselves, the plaintiffs have plausibly alleged that those services were valuable to the facilities because they (1) were a valuable amenity that was attractive to residents and (2) reduced the costs associated with assisting residents with transportation. Just how valuable the free services provided to . . . patients were to LTC facilities themselves is a question of fact dependent on a number of contextual factors, and the plaintiffs will ultimately bear the burden of establishing that those services were, in fact, being knowingly provided in exchange for referrals from the LTC facility. At this stage, however, the plaintiffs were only required to plead the elements of their claim plausibly and with particularity, which they have done.

*Id.* at *17. Regarding Scheme Two, involving kickbacks from provider affiliates, the court wrote:

The defendants argue that the relationship between CSM and its provider affiliates was simply an ordinary business arrangement between a regional company with a sound business model and local contractors who performed necessary services in conjunction with that business model. But the presence of some legitimate business motivations is not necessarily fatal to an alleged AKS violation. For example, courts have held that a payment made for the purpose of inducing a referral can violate the AKS, "even if the payments were also intended to compensate for professional services." *United States v. Borrasi*, 639 F.3d 774, 782 (7th Cir. 2011) (quoting *United States v. Greber*, 760 F.2d 68, 72 (3d Cir. 1985)). Indeed, it is common for AKS violations to occur alongside legitimate medical business activities; kickback schemes are only successful insofar as they are able to embed themselves within the vast, lucrative universe of ordinary healthcare services and payments. The defendants will have the opportunity to set forth evidence regarding the purposes of the payments they made to provider affiliates, as well as whether they possessed knowledge of the supposed wrongfulness of such payments. At this stage, however, the plaintiffs have adequately pleaded that the payments, whatever else they were, were also kickbacks.

*Id.* The court considered and rejected a handful of additional AKS-based arguments, including whether the plaintiffs adequately pleaded knowledge and willfulness (they had) and whether the plaintiffs were required to plead or show any of the services involved were unnecessary or inadequate (they were not). *Id.* at *17–18. The court also concluded that the plaintiffs had adequately pleaded conspiracy. *Id.* at *18–19.

Finally, the court considered Tennessee's common law claims. The court noted that the structure of the TennCare system, which relies on managed care intermediaries rather than direct payments to providers, complicated matters somewhat, but the court ultimately concluded that

7

established Tennessee caselaw recognizing the potential viability of claims for indirect unjust enrichment meant that dismissing the claims was not supported. The court addressed a few more arguments that are of limited importance at this juncture and denied the motions to dismiss, with the qualification that Louisiana and Folse would need to amend their complaints to resolve certain drafting deficiencies. *Id.* at *24. Shortly thereafter, the states filed an Amended Complaint in Intervention and Folse filed a Second Amended Complaint. Those Amended Complaints rectified the flaws that the court had identified but otherwise retained the basic structure and allegations that had previously been pleaded. (Doc. Nos. 143–44.)

**C. The Defendants' Answers and the Pending Motion**

On February 1, 2022, CSM and its related defendants filed an Answer to each Amended Complaint. (Doc. Nos. 161–62.) Each Answer included a list of forty "AFFIRMATIVE AND ADDITIONAL DEFENSES." (Doc. No. 162 at 5–14.; Doc. No. 163 at 12–20.) On February 22, 2022, Folse and the governments filed separate, but largely overlapping, Motions to Strike directed at the defenses. (Doc. No. 165, 167.) Broadly speaking, the challenges to the defenses can be grouped into five arguments: (1) the Answers were untimely and therefore all defenses should be barred; (2) some defenses are inconsistent with the court's earlier opinion; (3) some defenses are common law in nature and cannot be applied to statutory claims, particularly those based on congressionally authorized appropriations; (4) some defenses do not actually represent defenses to liability under the relevant causes of action; and (5) some defenses are duplicative of each other. The first of those arguments applies to each defense pleaded. The remaining four are, cumulatively, directed at a bit over half of the forty defenses.

## II. LEGAL STANDARD

Under Rule 12(f) of the Federal Rules of Civil Procedure, a court may, on its own or upon a timely motion, "order any redundant, immaterial, impertinent, or scandalous matter stricken from any pleading, motion, or other paper." Fed R. Civ. P. 12(f). Rule 12(f) expressly acknowledges that "[t]he objection that a responsive pleading or separate defense therein fails to state a legal defense may be raised by motion filed under this section." *Id.* However, courts construing and applying Rule 12(f) have followed the rule that "[a] motion to strike is a drastic remedy that should be used sparingly and only when the purposes of justice require." *Driving Sch. Assoc. of Ohio v. Shipley*, No. 1:92-CV-00083, 2006 WL 2667017, at *1 (N.D. Ohio 2006) (citing *Brown & Williamson Tobacco Corp. v. United States*, 201 F.2d 819, 822 (6th Cir. 1953)).

A motion to strike an affirmative defense under Rule 12(f) "is proper if the defense is insufficient; that is, if 'as a matter of law, the defense cannot succeed under any circumstances.'" *S.E.C. v. Thorn*, No. 2:01-CV-290, 2002 WL 31412440, *2 (S.D. Ohio 2002) (quoting *Ameriwood Indus. Int'l Corp. v. Arthur Andersen & Co.*, 961 F. Supp. 1078, 1083 (W.D. Mich. 1997)). A motion to strike should not be granted "if the insufficiency of the defense is not clearly apparent, or if it raises factual issues that should be determined on a hearing on the merits." *United States v. Pretty Prods. Inc.*, 780 F. Supp. 1488, 1498 (S.D. Ohio 1991) (quoting 5A Wright & Miller, Fed. Prac. & Proc. § 1380 (1990)). The court "may only strike those defenses 'so legally insufficient that it is beyond cavil that defendants could not prevail on them.'" *Id.* (citation omitted). The decision whether to strike an affirmative defense is within the discretion of the district court. *See Conocophillips Co. v. Shaffer*, No. 3:05 CV 7131, 2005 WL 2280393, at *2 (N.D. Ohio 2005) ("Rule 12(f) permits the Court to act with discretion in that it *may* strike irrelevant and superfluous

9

defenses or let them stand. There is absolutely no harm in letting them remain in the pleadings if, as the Plaintiff contends, they are inapplicable.")

## III. ANALYSIS

### A. Nature of the Pending Requests

Before the court addresses the substance of the pending motions, it may be helpful to highlight specifically what is—and what is not—at stake. Federal Rule of Civil Procedure 8(c) generally requires defendants to "affirmatively state any avoidance or affirmative defense" in their first response to a pleading, and the failure to do so may (but does not necessarily) result in waiver of the defense. *See Brent v. Wayne Cnty. Dep't of Hum. Servs.*, 901 F.3d 656, 680 (6th Cir. 2018) (citing *Horton v. Potter*, 369 F.3d 906, 911 (6th Cir. 2004); *Kennedy v. City of Cleveland*, 797 F.2d 297, 300 (6th Cir. 1986)); *but see Shelbyville Hosp. Corp. v. Mosley*, No. 4:13-CV-88, 2017 WL 5586729, at *14 (E.D. Tenn. Nov. 20, 2017) ("[F]ailure to raise an affirmative defense by responsive pleading does not always result in waiver.") (quoting *Smith v. Sushka*, 117 F.3d 965, 969 (6th Cir. 1997)). As a practical matter, then, the inclusion of an affirmative defense in an answer often functions a great deal like the inclusion of a claim in a complaint; it establishes that the particular defense is actually part of the case before the court.

Not every way that a defendant might defeat a claim, however, is an *affirmative* defense. "An affirmative defense, under the meaning of Fed. R. Civ. P. 8(c), is a defense that does not negate the elements of the plaintiff's claim, but instead precludes liability even if all of the elements of the plaintiff's claim are proven." *Roberge v. Hannah Marine Corp.*, 124 F.3d 199 (Table), 1997 WL 468330, at *3 (6th Cir. Aug. 13, 1997). Aside from admitting or denying the specific allegations in the complaint, an answer is not required to do anything or plead anything to

preserve the defendant's right to pursue a defense based on negating elements of the plaintiff's claims.

Many of the defenses included by these defendants in their Answers plainly fall in this latter category of those for which special pleading is not required. For example, the Twenty-Eighth Defense is that each relevant Amended Complaint "fails to establish the elements necessary for recovery under any state or federal False Claims Act, the Federal Priority Statute and doctrines of unjust enrichment, payment by mistake or any other common law claim." (Doc. No. 162 at 10; Doc. No. 163 at 17.) That defense involves nothing but the negation of the stated claims and therefore is not an affirmative defense that required special pleading. Other pleaded defenses are similarly focused on the elements of the claims at issue. Such unnecessarily pleaded defenses do not preserve any argument or issue, and, just as they add nothing to the case, striking them would remove nothing. Substantial portions of the plaintiffs' motions are, in essence, inconsequential requests to remove just-as-inconsequential language—classic "time wasters" focused on "purely cosmetic" matters, as motions to strike are often criticized for being. *Neal v. City of Detroit*, No. 17-13170, 2018 WL 1399252, at *1 (E.D. Mich. Mar. 19, 2018) (quoting Wright & Miller, 5C Fed. Prac. & Proc. § 1382 (3d ed. 2004)).

That said, there are sometimes good reasons to move to strike a defense—particularly a meritless affirmative defense that, unless stricken, would expand the scope of issues under consideration in a case. It may, moreover, be helpful to obtain rulings from the court, at an early stage, on core legal issues that will determine the direction of litigation, and a motion to strike a defense is one legitimate way to obtain such an early ruling. In this case, however, the court has already issued a lengthy opinion in which it resolved five separate motions to dismiss, and the

11

court hopes that its reasoning in that opinion provided the parties with sufficient notice of the framework on which the court expects to rely in this case.

The court will therefore exercise its discretion to focus on the aspects of the plaintiffs' and the relator's requests, if any, that either present actual opportunities to move the case forward or that identify defenses that are so truly extraneous to the case as to warrant being stricken, rather than just ignored. Such an approach is not merely a good use of the court's time and resources, but also consistent with the high standard governing motions to strike. While a motion to strike a defense may superficially resemble a 12(b)(6) motion to dismiss a claim—just with the shoe on the other foot—Rule 12(f)'s "cannot succeed under any circumstances" standard is significantly more demanding of the movant than Rule 12(b)(6). *See Hutchings v. Fed. Ins. Co.*, No. 6:08-CV-305-ORL-19KR, 2008 WL 4186994, at *2 (M.D. Fla. Sept. 8, 2008) (noting differences between standards under Rule 12(b)(6) and Rule 12(f)). Many of the defendants' claimed defenses may be unlikely to pan out, but there is no basis, under the Rules of Civil Procedure, for rushing ahead to evaluate them now by the same standard that the court applies to claims in a complaint.

## B. Timeliness of Answer

Pursuant to Rule 15(a)(3) of the Federal Rules of Civil Procedure, "[u]nless the court orders otherwise, any required response to an amended pleading must be made within the time remaining to respond to the original pleading or within 14 days after service of the amended pleading, whichever is later." By that rule, the CSM defendants should have filed their Answers by November 23, 2021. They did not file the Answers, however, until February 1, 2022. (Doc. Nos. 162–63.) The CSM defendants concede that their Answers were untimely, which they say was the result of "a series of unforeseeable circumstances," including a "computer crash that resulted in data loss and required several weeks to rectify" and two separate family funerals.  (Doc. No. 169

12

at 5 n.2.) The defendants argue, however, that the states and Folse have not been prejudiced by the delay and that the court should therefore permit the defendants to proceed without any sanction for their untimeliness.

Most litigation deadlines at the district court level are subject to the qualification, set out in Rule 6(b)(1), that, "[w]hen an act may or must be done within a specified time, the court may, for good cause, extend the time: (A) with or without motion or notice if the court acts, or if a request is made, before the original time or its extension expires; or (B) on motion made after the time has expired if the party failed to act because of excusable neglect." Fed. R. Civ. P. 6(b); *see MRP Props., LLC v. United States*, No. 17-CV-11174, 2017 WL 11518355, at *1 (E.D. Mich. Oct. 5, 2017). The court therefore construes the defendants' Answers and/or their Response to the pending motions as including a request for an extension pursuant to Fed. R. Civ. P. 6(b)(1)(B), which the court will grant.

"Excusable neglect is a 'somewhat elastic concept' that is 'at bottom an equitable one, taking account of all relevant circumstances.'" *Century Indem. Co. v. Begley Co.*, 323 F.R.D. 237, 241 (E.D. Ky. 2018) (quoting *Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 395 (1993)). Each of the "principal factors" typically considered by courts—"(1) the danger of prejudice to the nonmoving party, (2) the length of the delay and its potential impact on judicial proceedings, (3) the reason for the delay, (4) whether the delay was within the reasonable control of the moving party, and (5) whether the late-filing party acted in good faith," *Nafziger v. McDermott Int'l, Inc.*, 467 F.3d 514, 522 (6th Cir. 2006)—supports granting an extension here. The court therefore does so and will not impose any sanctions for untimeliness. In the future, however, if any party needs an extension, it should request that extension in a timely manner—ideally, before the relevant deadline.

13

## C. Consistency with the Court's Earlier Opinion

The court's prior opinion addressed a number of foundational issues, including some raised by the relatively novel features of this case. Some of the defendants' stated defenses directly contradict aspects of that analysis. For example—and most egregiously—Defense 31 is not really a substantive defense at all, but rather a bare claim that the claims at issue were not pleaded "with the degree of specificity and particularity required." (Doc. No. 163 at 17.) The sufficiency of the underlying pleading, however, was already addressed by the court at length in response to multiple motions. Although the defendants take issue with the details of some of the arguments that Folse and the governments make regarding the earlier opinion, they do not ultimately dispute that they have pleaded some defenses that are difficult to square with the court's already-issued reasoning. Rather, the defendants simply argue that they should be permitted to plead any colorable defenses that they wish to state and preserve, even if the court's holdings suggest that a particular defense is unlikely to succeed at the district court level.

The defendants are correct that there is a difference between merely preserving a colorable, but rejected, defense, as the defendants have done, and improperly trying to resurrect such a rejected argument in connection with a substantive motion. If the defendants raise any already-decided issue in connection with any future motion, the court expects to adhere to the ordinary rule that, in most such instances,

> [t]he law-of-the-case doctrine precludes reconsideration of a previously-decided issue at a subsequent stage in the litigation "unless one of three exceptional circumstances exists: [1] the evidence in a subsequent trial was substantially different; [2] controlling authority has since made a contrary decision of law applicable to such issues; or [3] the decision was clearly erroneous, and would work a substantial injustice."

*J.L. Spoons, Inc. v. Ohio Dep't of Pub. Safety*, 509 F. App'x 464, 469 (6th Cir. 2012) (quoting *Poundstone v. Patriot Coal Co.*, 485 F.3d 891, 895 (6th Cir. 2007)). Re-raising arguments that the

14

court has already rejected, in the absence of such circumstances, would indeed be unwelcome. That does not mean, however, that there is no basis for keeping the rejected defenses on the books. For example, it is within the realm of reasonable possibility that the Sixth Circuit or Supreme Court could issue intervening caselaw drawing this court's conclusions into question, particularly in light of the novel nature of some of the questions involved. And, of course, depending on how this case is resolved, the issues may be raised directly on appeal in this case itself. There is, in short, nothing wrong with the defendants' having taken care to preserve these arguments and issues, despite the fact that the court has rejected some of their positions under current law.

The court is unpersuaded by the argument that it should revisit and reiterate its earlier holdings on these issues in order to avoid hypothetical discovery abuses based on the rejected defenses. The court's prior legal holdings stand, regardless of what the Answers say. Nothing about the Answers prevents the court from keeping those holdings in mind when making decisions about the scope of discovery. Indeed, the fact that these issues might come up again in discovery is just more proof that it is unnecessary to go further into them now.

Going through each stated defense in order to parse the precise degree to which it is or is not consistent with the court's prior opinion would be both a poor use of the court's time and a departure from the court's ordinary role of answering only those legal questions actually presented as part of the necessary process of resolving a case or controversy. The court's opinion resolving the motions to dismiss speaks for itself. If the developed facts of this case ultimately call on the court to consider the scope of its earlier holdings—whether during discovery, in connection with a motion for summary judgment, or in some other way—the court will do so. Diving into those details now, however, based solely on the defendants' broad phrasing of potential defenses, would

15

necessitate a lengthy interpretation of the court's prior holdings that is not contemplated by the Federal Rules as part of the ordinary progress of a case.

## D. Non-Statutory Defenses

The Answers include a number of defenses—such as those involving "unclean hands"—that rely on common law and equitable principles rather than any citation to affirmative law involving the FCA, the AKS, or the Medicaid program. Folse argues that applying such defenses would be an impermissible intrusion on federal prerogatives, and the state governments, although they do not pursue the most aggressive form of Folse's constitutional argument, argue that those defenses are inapplicable to the governments' statutory claims.

In the CSM defendants' Response, they do not go so far as to argue that the equitable defenses that they have pleaded are sufficient to defeat recovery under the FCA, TMFCA, or MAPIL. *See, e.g., U.S. ex rel. Dye v. ATK Launch Sys., Inc.*, No. 1:06-CV-39 TS, 2008 WL 4642164, at *2 (D. Utah Oct. 16, 2008) (striking equitable defense as insufficient as a matter of law to defeat FCA liability). Rather, the defendants argue that the states' Amended Complaint "opened the door to asserting these defenses" by including "claims of unjust enrichment and quantum meruit" on behalf of "both Tennessee and Louisiana." (Doc. No. 169 at 8.) This characterization is not entirely accurate, as far as the court can tell. Tennessee pleads four counts, the latter two of which are, in fact, common law claims relying on conventional equitable principles—although neither one actually uses the term "quantum meruit." (Doc. No. 144 ¶¶ 154–60.) Louisiana, though, only pleads two counts, both of which are expressly statutory. (*Id.* ¶¶ 161–67.) In any event, however, it is true that the states' operative complaint includes some common law claims, such that raising equitable defenses is supported. The court therefore will not strike equitable defenses from that Answer.

16

Folse, however, has pleaded no such common law claims. His Second Amended Complaint, rather, includes three expressly statutory causes of action. (Doc. No. 143 ¶¶ 85–109.) The defendants' only response to that fact is that, "[t]echnically, Folse could move to amend his complaint to assert similar claims." (Doc. No. 169 at 8.) The court is not inclined to assume that such an amendment would be supported, given that Folse's only role in this case is pursuant to his statutorily-granted authority to initiate—and, in the absence of intervention, pursue—statutory claims on behalf of the relevant governments as a relator. Regardless, the purpose of an answer is to respond to the complaint that was filed, not a hypothetical complaint that a plaintiff "technically . . . could" file. The inclusion of equitable defenses in the Answer to Folse's Second Amended Complaint therefore does appear to be the kind of wholly unsupported pleading that would warrant being stricken.

That argument, though, only extends insofar as the cited defenses are, in fact, non-statutory in nature. Folse suggests that this argument supports striking Defenses 1, 11, 28, 29, and 40. Defenses 1, 11, and 29 involve issues of unclean hands and estoppel that are genuinely equitable in nature, and the court will order those defenses stricken. Defenses 28 and 40, however, are not so plainly confined to the common law. Defense 28 reads, in its entirety, as follows: "The Complaint fails to establish the elements necessary for recovery under any state or federal False Claims Act, the Federal Priority Statute and doctrines of unjust enrichment, payment by mistake or any other common law claim." (Doc. No. 162 at 10.) The references, in the latter part of the defense, to equitable grounds for recovery that Folse has not pleaded, are misplaced, but the rest of the defense is focused on federal statutes and is not implicated by Folse's argument in this regard. The court, accordingly, will strike this defense only in part.

17

Defense 40 asserts that the claims being prosecuted by Folse as the relator "fail because they are barred by reason of public disclosure and/or because [Folse] engages in substantially the same practice and has encouraged the practices he claims are unlawful to dentists in the form of continued education and seminars." (*Id.* at 12.) Aspects of that defense could be read as reiterating the unclean hands defense that the court has rejected as inapplicable to the FCA. The defense also, however, appears to reference the so-called "public-disclosure bar," a statutory provision that "bars *qui tam* actions that merely feed off prior public disclosures of fraud." *See United States ex rel. Holloway v. Heartland Hospice, Inc.*, 960 F.3d 836, 843 (6th Cir. 2020) (citing 31 U.S.C. § 3730(e)(4)(A)). While the public-disclosure bar is not a defense to FCA liability, it may have bearing on Folse's own authority to pursue that liability in the wake of the government's declination to intervene. Citation to that provision as a defense would therefore make sense. However, the CSM defendants already pleaded public disclosure separately, in Defense 30. (Doc. No. 162 at 10.) While the court, as it will discuss later in this opinion, does not consider mere redundancy, taken alone, to be a persuasive ground for striking a defense, the redundancy does eliminate any harm that could come from striking the mention of public disclosure in Defense 40.

Other parts of Defense 40 may reflect an attempt to invoke the subsection of the FCA stating that, "if the court finds that the action was brought by a person who planned and initiated the violation of [the FCA] upon which the action was brought, then the court may, to the extent the court considers appropriate, reduce the share of the proceeds of the action which the person would otherwise receive." 31 U.S.C. § 3730. That provision, though, is not a defense to liability or even to the amount of damages; it bears only on how the damages are split between the relator and the government. Moreover, it applies to relators who played a role in "the violation . . . upon

18

which the action was brought," not relators who simply committed somewhat similar violations in their own businesses. This reading of Defense 40 therefore similarly does not support retaining it.

The court will therefore grant Folse's motion as to Defenses 1, 11, 29, and 40 and will grant it partially as to Defense 28.[2] The court will not, however, strike the defenses from the defendants' Answer to the governments' claims. The State of Tennessee chose to include common law claims in its Complaint, and it must therefore contend with common law defenses—at least as long as those common law defenses are, as the court will discuss later in this opinion, actually directed at the governments' claims.

**E. Defenses Alleged to be Insufficient**

1. Defenses Related to Acquiescence by TennCare

Defenses 20, 23, and 24 address issues related to the Medicaid program's handling of the underlying claims and deductions. Defense 20 is that "[t]he claims fail, in whole or in part, because the Defendants have received approval to provide their services and support for their business practice from individuals at TennCare, including the former Director of TennCare." (Doc. No. 163 at 16.) Defense 23 adds the contention that "the government's knowledge of the facts underlying the allegedly false claims negates the scienter, falsity, and materiality requirements of the False Claims Act," and Defense 24 extends the argument a step further to suggest that the defendants' "actions were taken in good faith and in reasonable reliance upon regulatory interpretations and judgments by the Government and its agents and contractors upon whom the Defendants were entitled to rely." (*Id.*) The governments and Folse point out, correctly, that acquiescence by specific government actors is not, in and of itself, a recognized defense to liability under the FCA or,

---

[2] Because these defenses will be stricken as not directed at any claim pleaded by Folse, the court will not address Folse's argument that applying those defenses to claims related to Medicaid would violate *OPM v. Richmond*, 496 U.S. 414 (1990).

19

presumably, state statutes modeled on the FCA. The injured party in an FCA case is the government, not individual government administrators, and "[i]t is well established that estoppel cannot be used against the government on the same terms as against private parties." *Fuller v. United States*, 475 F. Supp. 3d 762, 767 (S.D. Ohio 2020) (quoting *United States v. Guy*, 978 F.2d 934, 937 (6th Cir. 1992)).

The defendants respond by arguing that information about what the governments knew and what they communicated to the defendants is potentially relevant to (1) whether the defendants possessed the requisite culpable mental state, (2) whether the governments considered the conditions with which the defendants failed to comply to be material to payment, and (3) whether the governments "considered the [d]efendants' conduct to amount to fraud." (Doc. No. 169 at 4–5.) The court is aware of no viable, separate defense to FCA, TMFCA, or MAPIL liability that would fit the description of the third item on that list; false clams liability does not hinge on whether government actors thought that the false claims at issue met a particular legal definition of "fraud." With regard to the first two potential defenses, however, the defendants are correct. A violation of the FCA must be knowing, reckless, or made in deliberate ignorance of the truth, 31 U.S.C. § 3729(a)(1), (b)(1)(A), and the government's acquiescence to an alleged behavior may be relevant to that inquiry, particularly when liability is premised on the question of whether the defendant impliedly certified compliance with a particular requirement. *See U.S. ex rel. Burlbaw v. Orenduff*, 548 F.3d 931, 951–57 (10th Cir. 2008) (discussing rationales for considering government knowledge as part of scienter inquiry under the FCA). It is fair to wonder how one could impliedly certify a proposition to a listener, if both you and the listener openly know that the proposition is false.

20

As for materiality, the Supreme Court has clearly held that, "if the Government pays a particular claim in full despite its actual knowledge that certain requirements were violated, that is very strong evidence that those requirements are not material." *Escobar,* 579 U.S. at 195. And, as the court has already held, the TMFCA and the false claims provisions of MAPIL—unlike the FCA—require the governments to establish materiality of an AKS violation as a factual matter. *See Napper*, 2021 WL 4992651, at *12–15. At most, then, Defenses 20, 23, and 24, arguably overstate the breadth and certainty of the defenses asserted. That, though, is no basis for striking them.

### 2. Defenses Pleaded Against the Governments that Apply Only to the Relator

As the governments point out, two of the defenses pleaded in the CSM defendants' Answer to the Amended Complaint in Intervention—specifically, Defense 9 and Defense 11—are plainly inapplicable to the governments' claims. Defense 9 involves Folse's lack of "firsthand, personal knowledge of the Defendants' business practices." (Doc. No. 163 at 14.) Defense 11 involves Folse's having allegedly "engage[d] in substantially the same business practices." (*Id.*) Neither defense has anything to do with the governments' own claims. The court will accordingly strike the defenses as wholly inapplicable to the claims at issue, just as it will strike the defendants' equitable defenses to claims that Folse has not actually pleaded.

## F. Duplicative Defenses

Finally, the court turns to the argument that many of the defenses are duplicative. It is hard to deny that many of the defenses are redundant, but it is also hard to see why that matters or even why there is necessarily anything wrong with that redundancy. Nearly every well-drafted affirmative pleading includes some extraneous material. Indeed, as the court observed in its prior opinion, the plaintiffs themselves have pleaded information that is not strictly necessary for the

21

statement or preservation of their claims, for no apparent purpose other than telling the story of the case and explaining the importance of the legal principles at issue. *See Folse*, 2021 WL 4992651, at *18.

Moreover, while redundancy may not always be good *writing*, it is frequently good *lawyering*. There is no penalty for preserving a key claim or defense twice or three times, but if a lawyer fails to preserve a key claim or defense altogether, it can be disastrous for the client's case. As a result, pleadings often take great, repetitive pains to make sure that every argument that needs to be preserved has been preserved, even if that preservation probably could have been done in many fewer words. That is an unfortunate fact of litigation. A pleading's inefficiency, however, is not ameliorated by responding to it with a functionally meaningless motion to strike. The court accordingly sees no basis for exercising its discretion to strike redundant material from the Answer under Rule 12(f).

### IV. CONCLUSION

For the foregoing reasons, Folse's Motion to Strike Certain Affirmative Defenses from the CSM Defendants' Answer to Relator's Second Amended Complaint (Doc. No. 165) and the state plaintiffs' Motion to Strike Certain Affirmative Defenses from the CSM Defendants' Answer to Amended Complaint in Intervention (Doc. No. 167) will each be granted in part and denied in part. The court will strike Defenses 1, 11, 29, and 40 from the CSM Defendants' Answer to Folse's Second Amended Complaint, as well as part of Defense 28, and will strike Defenses 9 and 11 from the CSM Defendants' Answer to the Amended Complaint in Intervention.

An appropriate order will enter.

_____
ALETA A. TRAUGER
United States District Judge

22