# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

UNITED STATES OF AMERICA and the )
STATES OF GEORGIA, LOUISIANA, )
TENNESSEE, and VIRGINIA ex rel. )
GREGORY FOLSE, )
                                       )
Plaintiffs, )
                                       )
v. )        **Case No. 3:17-cv-1478**
                                       )        **Judge Aleta A. Trauger**
MARQUIS "MARK" NAPPER, JOSHUA )
KILGORE, DANIEL BIRD, CARE )
SERVICES MANAGEMENT LLC, )
MARQUIS HEALTH SYSTEMS LLC, )
MARQUIS MOBILE DENTAL SERVICES )
LLC, and SALLY B. DALY DDS LLC )
d/b/a FLEUR DE LIS MOBILE DENTAL, )
                                       )
Defendants. )

## MEMORANDUM & ORDER

The State of Tennessee and State of Louisiana have filed a Motion for Leave to Supplement

Complaint (Doc. No. 200), to which the defendants have filed a Response (Doc. No. 208), and the

plaintiff governments have filed a Reply (Doc. No. 210). For the reasons set out herein, the motion

will be granted.

## I. BACKGROUND

This is a healthcare fraud action originally filed in 2017 by relator Gregory Folse pursuant

to the *qui tam* provisions of the False Claims Act ("FCA"), 31 U.S.C. §§ 3729 to 3732,[1] and a few

---

[1] "[T]he *qui tam* provision of the FCA" allows a private party—known as a "*qui tam* relator"—to file a cause of action "in the name of the United States." *U.S. ex rel. Smith v. Lampers*, 69 F. App'x 719, 720 (6th Cir. 2003) (citing 31 U.S.C. § 3730(b)(1)). The complaint is initially placed under seal, while the United States has an opportunity to investigate the relator's allegations. 31 U.S.C. § 3730(b)(2). The United States ultimately must either elect to intervene in the case— in which case, it takes over the prosecution of the claims—or decline to intervene, giving the relator the option to pursue the FCA claims in the name of the

state-level counterpart statutes. The details of the alleged scheme can be found in the court's memorandum of October 27, 2021. *See United States v. Napper*, No. 3:17-CV-1478, 2021 WL 4992651, at *2 (M.D. Tenn. Oct. 27, 2021). In short, the plaintiffs allege a number of improper kickback relationships between specialty services provider Care Services Management, LLC ("CSM") and long-term care facilities that did business with the states' Medicaid programs. *Id.* at *7.

On March 13, 2018, the United States formally declined to intervene in the case. (Doc. No. 15.) The named state governments continued to investigate the allegations, and, on November 25, 2020, they filed a joint Notice informing the court that Tennessee and Louisiana had elected to intervene, whereas the other two named states, Georgia and Virginia, had elected to decline. (Doc. No. 40.) Some additional procedural developments ensued, but the details are unimportant for present purposes. What matters is that what remains pending are the following claims against CSM and a handful of related defendants: (1) FCA claims that belong to the United States but that Folse, as relator, is permitted to pursue due to the federal government's declination; (2) Tennessee Medicaid False Claims Act ("TMFCA") claims asserted by the State of Tennessee; and (3) Medical Assistance Programs Integrity Law ("MAPIL") claims asserted by the State of Louisiana.

On January 20, 2023, the state plaintiffs filed a Motion for Leave to Supplement Complaint. (Doc. No. 200.) They explain the reason for supplementation as follows:

> Since the First Amended Complaint in Intervention was filed, Defendant Care Services Management changed the name of its business to ExcelHealth Group, LLC. For the reasons set forth in the accompanying Memorandum of Law and Exhibits, Plaintiffs seek leave from the Court to add ExcelHealth Group, LLC ["ExcelHealth"] as a Defendant to these proceedings.

government. 31 U.S.C. § 3730(b)(4), (c). Either way, if the claims are ultimately successful, the relator will be entitled to a share of the recovery, as a reward for his assistance and an incentive for future potential whistleblowers to come forward. 31 U.S.C. § 3730(d).

(Doc. No. 200 at 1.)

The proposed Supplemental Complaint in Intervention tells a slightly more complicated story. The plaintiffs do not allege that CSM simply changed its name. Rather, they state that CSM itself "is no longer in operation or has substantially and materially limited its operations," but that, "[t]hroughout 2021 and 2022, CSM transferred employees, assets and clients to" ExcelHealth. (Doc. No. 200-1 ¶¶ 3–4.) "ExcelHealth and CSM," the plaintiffs assert, "are managed by the same people, employ[] the same people, utilize[] the same databases, and are headquartered in the same offices." (*Id.* ¶ 176.) CSM also sent emails to customers that referred to the changeover to ExcelHealth as a change in CSM's name and web address. (*Id.* ¶ 174.) According to the plaintiffs, the defendants transferred both CSM's "operations" and its "funds" to ExcelHealth, such that CSM now "lacks sufficient funds to cover its current indebtedness or contingent liabilities." (*Id.* ¶ 191.)

The plaintiffs further allege that "CSM and ExcelHealth have failed to maintain an arms-length relationship in their business dealings," that they "have commingled corporate funds," and that "[t]he business purposes of CSM and ExcelHealth are similar, if not identical." (*Id.* ¶¶ 185, 192–93.) The State of Tennessee subpoenaed bank records revealing that "money has continually flowed from CSM to ExcelHealth over the past 18 months." (*Id.* ¶ 188.) The plaintiffs have also identified an email from defendant Mark Napper to the Louisiana Department of Health, on behalf of ExcelHealth, claiming "we have taken care of 1000s of [Louisiana] residents over many years"—which could only be true if ExcelHealth was a continuation of CSM. (*Id.* ¶ 190.) The plaintiffs argue that they therefore should be permitted to recover from ExcelHealth, either as an alter ego of CSM or through successor liability. The defendants oppose the motion.

## II. LEGAL STANDARD

When a party wishes to plead facts about "any transaction, occurrence, or event that happened after the date of" the party's initial pleading, that party should rely on a supplemental pleading pursuant to Rule 15(d), not on an amended pleading pursuant to Rule 15(a). "Amended and supplemental pleadings differ in [that the] former relate to matters that occurred prior to the filing of the original pleading and entirely replace the earlier pleading," while "the latter deal with events subsequent to the pleading to be altered and represent additions to or continuations of the earlier pleadings." Wright & Miller, 6A Fed. Prac. & Proc. Civ. § 1504 (3d ed.). "The purpose of supplemental pleadings under Rule 15(d) is to allow a plaintiff to update [its] complaint to add allegations of later events relating to [its] original complaint." *Cage v. Harry*, No. 09–512, 2010 WL 1254562, at *1 (W.D. Mich. Mar. 26, 2010) (magistrate judge's order). In addition to the different purposes served by amendment and supplementation, there is a key procedural difference: a supplemental complaint cannot be filed as a matter of course, regardless of its timing; "all supplemental pleadings require leave of court under Rule 15(d)." Wright & Miller, 6A Fed. Prac. & Proc. Civ. § 1504 (3d ed.).

Although Rule 15(d) does not set out a specific standard governing requests, courts have generally assumed that, unless there is a persuasive reason to the contrary, leave to supplement should be "freely given," just as leave is freely given to good-faith, timely amendments under Rule 15(a)(2). *Ne. Ohio Coal. for the Homeless v. Husted*, No. 2:06-CV-00896, 2015 WL 13034990, at *6 (S.D. Ohio Aug. 7, 2015). The Sixth Circuit has interpreted that standard as embodying a "liberal amendment policy." *Brown v. Chapman*, 814 F.3d 436, 442 (6th Cir. 2016) (quoting *Morse v. McWhorter*, 290 F.3d 795, 800 (6th Cir. 2002)). Denial may nonetheless be appropriate when there is "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to

4

cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc." *Id.* (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)).

## III. ANALYSIS

The defendants devote a significant amount of their briefing to the fact that the plaintiffs have not asserted that ExcelHealth itself was a participant in CSM's alleged kickback scheme. The proposed Supplemental Complaint in Intervention does not make such an allegation, however, because that is not the theory of liability that the plaintiffs are seeking to assert. Nor, to cite another argument that the defendants have spent time unnecessarily refuting, are the plaintiffs pursuing the type of "piercing the corporate veil" argument that would apply to a parent company or shareholder of CSM. Rather, the plaintiffs seek to assert their TMFCA and MAPIL claims against ExcelHealth through two alternative mechanisms: liability of ExcelHealth as a mere alter ego of CSM; and liability of ExcelHealth as the successor to CSM's liabilities. If either option has been plausibly pleaded, then the supplementation of the Complaint would not be futile and is therefore permissible unless foreclosed by other factors.

### A. Alter Ego Liability

Under Tennessee law, "[a]n alter ego . . . relationship is typified by" one "corporation's control of [another] corporation's internal affairs or daily operations." *Wells ex rel. Baker v. State*, 435 S.W.3d 734, 756 (Tenn. Ct. App. 2013) (quoting *Gordon v. Greenview Hosp., Inc.*, 300 S.W.3d 635, 652 (Tenn. 2009)). Factors to be considered in determining whether an alter ego relationship exists include:

> (1) whether there was a failure to collect paid in capital; (2) whether the corporation was grossly undercapitalized; (3) the nonissuance of stock certificates; (4) the sole ownership of stock by one individual; (5) the use of the same office or business location; (6) the employment of the same employees or attorneys; (7) the use of the

5

corporation as an instrumentality or business conduit for an individual or another corporation; (8) the diversion of corporate assets by or to a stockholder or other entity to the detriment of creditors, or the manipulation of assets and liabilities in another; (9) the use of the corporation as a subterfuge in illegal transactions; (10) the formation and use of the corporation to transfer to it the existing liability of another person or entity; and (11) the failure to maintain arms length relationships among related entities.

*F & M Mktg. Servs., Inc. v. Christenberry Trucking & Farm, Inc*., 523 S.W.3d 663, 667 (Tenn. Ct. App. 2017) (quoting *Rogers v. Louisville Land Co.*, 367 S.W.3d 196, 214 (Tenn. 2012)). Louisiana law also recognizes the alter ego doctrine and instructs courts to consider similar factors. *See Brennan's Inc. v. Colbert*, 85 So. 3d 787, 791 (La. App. 2012) (citing *Riggins v. Dixie Shoring Co.*, 590 So. 2d 1164, 1168 (La. 1991); *Crutcher-Tufts Res., Inc. v. Tufts*, 992 So. 2d 1091, 1093 (La. App. 2008)).

"The existence of an alter-ego relationship is a question of fact." *Well*s, 435 S.W.3d at 756 (citing *Bracken v. Earl*, 40 S.W.3d 499, 502 (Tenn. Ct. App. 2000)). The plaintiffs have alleged facts suggesting that several of the aforementioned factors—particularly Tennessee's factors 2, 5, 6, 8, and 11—would support a finding of alter ego liability. That is more than sufficient to plead the theory adequately. An amendment to that effect therefore would not be futile.

## B. Successor Liability

"Tennessee recognizes the traditional rule that 'when one company transfers some or all of its assets to another company the successor is not liable for the debts of the predecessor' except under certain enumerated circumstances." *Johnson v. Tanner-Peck, L.L.C.*, No. W2009-02454-COA-R3CV, 2011 WL 1330777, at *13 (Tenn. Ct. App. Apr. 8, 2011) (quoting *Hopewell Baptist Church v. Southeast Window Mfg. Co.*, LLC, No. E2000–02699–COA–R3–CV, 2001 WL 708850, at *4 (Tenn. Ct. App. June 25, 2001); citing *Gas Plus of Anderson County, Inc. v. Arowood*, No. 03A01–9311–CH–00406, 1994 WL 465797 (Tenn. Ct. App. Aug. 30, 1994); George W. Kuney,

6

*Successor Liability in Tennessee*, 43 Tenn. Bar J. 24 (May 2007); 19 Am. Jur. Corporations § 2319

(2010)). Although the caselaw on this issue is not robust, those exceptions appear to be as follows:

> (1) The purchaser expressly or impliedly agrees to assume such debts; (2) the transaction amounts to a consolidation or merger of the seller and purchaser; (3) the purchasing corporation is merely a continuation of the selling corporation; or (4) the transaction is entered into fraudulently in order to escape liability for such debts . . . . A fifth exception, sometimes incorporated . . . . is the absence of adequate consideration for the sale or transfer.

*Hopewell*, 2001 WL 708850, at *4 (quoting 1 L. Frumer & M. Friedman, Products Liability §

5.06(2), at 70.58(2)-(3) (1981)). A new corporate entity will be considered a "mere continuation"

of the old one if:

> (1) a corporation transfers its assets; (2) the acquiring corporation pays less than adequate consideration for the assets; (3) the acquiring corporation continues the selling corporation's business; (4) both corporations share at least one common officer who was instrumental in the transfer; and (5) the selling corporation is left incapable of paying its creditors.

*Signature Combs, Inc. v. United States*, 331 F. Supp. 2d 630, 641 (W.D. Tenn. 2004) (quoting *IBC*

*Mfg. Co. v. Velsicol Chem. Corp.*, 187 F.3d 635 (6th Cir. 1999)). Louisiana law is broadly similar:

> [T]he general rule of corporate liability is that, when a corporation sells all of its assets to another, the latter is not responsible for the seller's debts or liabilities, except where (1) the purchaser expressly or impliedly agrees to assume the obligations; (2) the purchaser is merely a continuation of the selling corporation; or (3) the transaction is entered into to escape liability.

*Pichon v. Asbestos Defendants*, 52 So. 3d 240, 243 (La. App. 2010) (quoting *Golden State Bottling*

*Co. v. N.L.R.B.*, 414 U.S. 168, 182 n.5 (1973)).

The proposed Supplemental Complaint pleads facts sufficient to support plausible

inferences that ExcelHealth is merely a continuation of CSM and/or that the transfer of assets and

operations from CSM to ExcelHealth was undertaken to escape liability. Allegations, of course,

are not evidence, and ExcelHealth is entitled to the opportunity to defend itself before any liability

can attach. At this stage, however, all the plaintiffs are required to do is assert liability plausibly, such that the court cannot assume that amendment would be futile

## C. Other Rule 15(d) Considerations

No other factor weighs meaningfully against granting the motion. On the issue of prejudice, the defendants make bold, but unpersuasive, claims about the unfair harms that supplementation would supposedly cause them. Specifically, they argue that CSM was driven out of business by actions taken by Tennessee's Medicaid agency, the Bureau of TennCare, following intervention in this case and that adding ExcelHealth as a defendant would have "a substantial likelihood of . . . causing [ExcelHealth's] destruction" as well. (Doc. No. 208 at 2.) That argument, however, is meritless on its face. Simply being named in a false claims suit is not a corporate death sentence, and even the defendants' own telling of events seems to confirm that the real dangers it faces come from the Bureau of TennCare's policy decisions, not the unproven allegations of pleadings in this court. Moreover, ExcelHealth and its employees would likely be burdened by this litigation even if the court did not permit adding ExcelHealth as a formal party, because they would have discovery obligations in this case regardless.

The defendants' arguments regarding permissive joinder of parties under Rule 20 of the Federal Rules of Civil Procedure are similarly unavailing. The defendants argue that ExcelHealth's potential liability is not sufficiently tied to the transactions underlying CSM's liability for the parties to be joined, but that could not be further from the truth. The underlying claims are not merely related—they are the *same claims*. The plaintiffs are not asserting some other, later-arising fraud scheme on behalf of ExcelHealth, but rather that "ExcelHealth should be held jointly and severally responsible for any judgment entered against CSM in this case" and/or that "ExcelHealth is responsible for the indebtedness and liabilities of CSM, including any judgment rendered in this

8

case." (Doc. No. 200-1 ¶¶ 197, 205.) Such allegations squarely bring ExcelHealth within the scope of permissible defendants pursuant to Rule 20(a)(2).

As for delay, normally an attempt to plead new facts in a case this old would raise red flags for the court, but the plaintiffs could not have sued ExcelHealth before it existed. The plaintiffs have provided Secretary of State records confirming that ExcelHealth was not created until May of 2021 (Doc. No. 201-3), and there is no evidence that the plaintiffs failed to exercise reasonable diligence in pursuing claims against that new entity. Nor is there any evidence of bad faith, fraud, or other wrongdoing by the plaintiffs, and the court sees no reason to think that adding ExcelHealth would substantially prolong these proceedings. The court accordingly will permit the plaintiffs to file their Supplemental Complaint in Intervention.

## IV. CONCLUSION

For the foregoing reasons, the plaintiff states' Motion for Leave to Supplement Complaint (Doc. No. 200) is hereby **GRANTED**.

It is so **ORDERED**.

_____
ALETA A. TRAUGER
United States District Judge

9