# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA and the STATES of TENNESSEE and LOUISIANA *ex rel.* GREGORY FOLSE, <br><br> Plaintiffs, <br><br> v. <br><br> MARQUIS "MARK" NAPPER, JOSHUA KILGORE, DANIEL BIRD, CARE SERVICES MANAGEMENT LLC, MARQUIS HEALTH SYSTEMS LLC, MARQUIS MOBILE DENTAL SERVICES LLC, SALLY B. DALY DDS LLC d/b/a FLEUR DE LIS MOBILE DENTAL, and EXCELHEALTH GROUP, LLC, <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) <br><br> **Case No. 3:17-cv-01478** <br> **Judge Aleta A. Trauger** |

## MEMORANDUM

Before the court is the Motion for Summary Judgment (Doc. No. 408) filed by defendants Care Services Management, LLC ("CSM"), Marquis Health Systems, LLC ("MHS"), Marquis Mobile Dental Services, LLD ("MMDS"), Excel Health Group, LLC ("Excel"), Mark Napper, Josh Kilgore, and Daniel Bird (collectively, "defendants").[1] The motion is supported by a Memorandum of Law and a Statement of Undisputed Material Facts ("SUMF"), and the

---

[1] Defendant Sally B. Daly DDS LLC d/b/a Fleur de Lis Mobile Dental ("Fleur de Lis") did not join in the Motion for Summary Judgment and has not actively participated in this lawsuit since the withdrawal of her counsel on August 29, 2022 (Doc. No. 180) and the submission of a letter from its owner, Sally Daly, on September 27, 2022, notifying the court that Fleur de Lis was no longer in business, would not be resuming business in the future, and lacked funds to pay an attorney to represent it (Doc. No. 185). Through June 2025, court orders mailed to Fleur de Lis have been returned as undeliverable. (*See, e.g.*, Doc. Nos. 401, 402.) However, Louisiana has submitted the July 24, 2025 Declaration of Sally Daly in support of its Response in Opposition to the Motion for Summary Judgment. (*See* Doc. No. 415-2.)

evidentiary material cited in the SUMF. (Doc. Nos. 408-1, 408-2, 409-1 through -14). Relator Folse ("Relator") and the States of Tennessee and Louisiana (collectively, the "States") have each filed a separate Response to the SUMF (Doc. Nos. 420, 417, 414) and a separate Response in Opposition to the Motion for Summary Judgment (Doc. Nos. 419, 416, 415), along with substantial quantities of evidentiary materials (filed as attachments to Doc. Nos. 415, 418, and 421). The defendants filed a Reply. (Doc. No. 426.)

In addition, Louisiana filed a Motion to Strike the defendants' SUMF, with a supporting Memorandum of Law. (Doc. Nos. 412, 413.) The defendants oppose the motion, and Louisiana filed a Reply in further support thereof. (Doc. Nos. 425, 426.)

For the reasons set forth herein, the Motion to Strike will be denied. The Motion for Summary Judgment will be granted, *except* with respect to Louisiana's and the Relator's claims for violation of Louisiana's anti-kickback statute.

## I.    MOTION TO STRIKE

Louisiana moves to strike the defendants' SUMF, arguing that it violates Federal Rule of Civil Procedure 56(c) and/or Local Rule 56.01(a). (Doc. No. 413 at 1.) Citing *McLemore v. Gumucio*, 619 F. Supp. 3d 816 (M.D. Tenn. 2021) (Richardson, J.), Louisiana asserts that the SUMF, which is 35 pages long and contains 95 enumerated factual statements, each supported by a citation to the record, should be stricken in its entirety on the grounds that it consists of argumentative, conclusory, and insufficiently supported statements. Louisiana maintains that approximately 20 of the statements should be stricken because they "describe general background information which is not concise, material or necessary," "add unnecessary length," and "distract from any crucial facts." (*Id.* at 2.) Four additional statements, or parts thereof, purportedly consist of "opinions and belief," rather than facts, and 22 more statements contain legal conclusions. (*Id.* at 2–3.) Louisiana argues that all of these should be stricken and that requiring it to "respond to

self-serving and unsupported testimony, immaterial facts, conclusions of law, conclusory statements, legal arguments, opinions and personal beliefs" places an unnecessary burden on it. (*Id.* at 3.)

The defendants respond that Louisiana has, in fact, responded to the SUMF, agreeing without objection that all but one of the statements containing "general background information" are undisputed for purposes of summary judgment, and that Louisiana responded to an additional 60 or so statements by indicating only that the statements are "disputed," either providing no evidentiary support for the dispute or providing insufficiently specific record citations, in violation of L.R. 56.01(e)(3). Regarding whether "opinions" constitute facts, the defendants point out that the plaintiffs have the burden of proving the defendants' scienter, making their "subjective understanding admissible in determining their intent." (Doc. No. 425 at 2.) Finally, the defendants defend the supposedly "self-serving" Declaration submitted by Mark Napper on the grounds that declarations are always self-serving, but that does not make them inadmissible.

Louisiana filed a Reply, generally arguing that defendants' Response fails to address the "substance" of Louisiana's motion and fails to address the lack of evidentiary support for the SUMF. Louisiana continues to argue that the SUMF should be stricken in accordance with *McLemore.* (Doc. No. 427.) In other words, the filing of the Motion to Strike has entailed a substantial amount of work—including on the part of the court.

While the court has inherent discretion, in the management of the docket, to strike submissions filed in violation of the court's Local Rules, *Am C.L. Union of Ky. v. McCreary Cnty.*, 607 F.3d 439, 451 (6th Cir. 2010), motions to strike are generally "viewed with disfavor and are not frequently granted," *Operating Eng'rs Loc. 324 Health Care Plan v. G & W Constr. Co.*, 783

F.3d 1045, 1050 (6th Cir. 2015). Louisiana offers no compelling basis for striking any of the individual statements in the SUMF, much less for striking the filing in its entirety.

In *McLemore,* confronted with a responding party's objection to a statement that was 78 pages long and consisted of 334 statements of purported fact, Judge Richardson took the opportunity to "discuss in considerable detail [his] view of the purpose and permissible content of such a statement [of undisputed material facts], as well as the statement's relationship to summary judgment law and procedure," and to explain why, in his opinion, "a summary judgment movant may wish to include in such a statement substantially less content than it would be permitted to include." 619 F. Supp. 3d at 819. *McLemore* noted, in particular, that statements of law "simply do[] not belong in a statement of material facts" and that statements pertaining to legislative history, even if properly considered statements of fact, are only rarely properly included in a Local Rule 56.01(b) statement and, if included, should be supported by an explanation by the movant as to why they are material. *Id.* at 821. Even then, he did not strike in its entirety the statement of facts at issue there. *See id.* at 827–28 (deferring decision on whether to strike any statements).

The SUMF in this case is not nearly as long as that at issue in *McLemore*; nor, in the court's view, does it contain an inordinate number of immaterial or inadequately supported facts. Moreover, while too much can be too much, this court generally finds useful those background facts that—though perhaps not strictly "material"—are nonetheless relevant and necessary to an understanding of the broader context within which the parties' dispute arises. Without the inclusion of such background facts in a Rule 56 statement of facts, and a clear understanding of whether they are disputed, the court frequently is required to resort to the pleadings to set the stage for the dispute and to determine what background facts are actually undisputed. In addition, the line between material and immaterial is often not immediately apparent, and the moving party has

substantial discretion in deciding what facts to include within a statement of facts.

To the extent the SUMF contains statements that Louisiana deems immaterial, inadequately supported, or simply not factual, the State has (or had) the ability to object to individual statements on that ground in responding to them. However, it has not shown that the defendants abused Local Rule 56.01 or unnecessarily compounded the plaintiffs' burden of responding to the Motion for Summary Judgment. In short, the length of the SUMF and the number of statements are not disproportionate to the nature and complexity of the dispute. Moreover, the mere assertion that responding to these facts is burdensome does not, in and of itself, establish that this burden is avoidable or disproportionate to the needs of this case. Responding to a statement of facts submitted in support of a motion for summary judgment is nearly always going to impose a burden on the responding party. Such is the nature of litigation. The motion will be denied.

## II.     MOTION FOR SUMMARY JUDGMENT

### A.     Rule 56 Standard of Review

Under Federal Rule of Civil Procedure 56, any party "may move for summary judgment, identifying each claim or defense . . . on which summary judgment is sought." Fed. R. Civ. P. 56(a). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.*

"[A] fact is 'material' within the meaning of Rule 56(a) if the dispute over it might affect the outcome of the lawsuit under the governing law." *O'Donnell v. City of Cleveland*, 838 F.3d 718, 725 (6th Cir. 2016) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A dispute is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Peeples v. City of Detroit*, 891 F.3d 622, 630 (6th Cir. 2018) (quoting *Ford v. Gen. Motors Corp.*, 305 F.3d 545, 551 (6th Cir. 2002)). By its terms, Rule 56 anticipates "that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise

properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson*, 477 U.S. at 247–48 (emphasis in original). In other words, even if genuine, a factual dispute that is irrelevant or unnecessary under applicable law is of no value in defeating a motion for summary judgment. On the other hand, "summary judgment will not lie if the dispute about a material fact is 'genuine.'" *Id.*

In ruling on a motion for summary judgment, it is not the judge's function to make credibility determinations, "weigh the evidence[,] and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. In determining whether a genuine issue of material fact exists, the court must assume that the nonmoving party's evidence is true and draw all reasonable inferences in that party's favor. *Id.* at 255; *Tolan v. Cotton*, 572 U.S. 650, 660 (2014). However, the "mere existence of a scintilla of evidence in support of the" nonmoving party is not sufficient to avoid summary judgment. *Anderson*, 477 U.S. at 252. "[T]here must be evidence on which the jury could reasonably find for the [nonmoving party]." *Id.* The inquiry, therefore, "asks whether reasonable jurors could find by a preponderance of the evidence that the" nonmoving party is entitled to a verdict. *Id.*

B.     **Statutory Background**

This case, as described in greater detail below, involves indirect payment by Medicaid—and, more specifically, the States' Medicaid programs—for dental services provided by the defendants, in what the plaintiffs describe as an illegal kickback scheme in violation of federal and state False Claims Act ("FCA") statutes and the federal Anti-Kickback Statute ("AKS"). A basic understanding of the underlying law may better facilitate an understanding of the factual allegations and legal claims in this case.

### 1.    *Medicaid and the IME System*

"Enacted in 1965, Medicaid offers federal funding to States to assist pregnant women, children, needy families, the blind, the elderly, and the disabled in obtaining medical care." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 541 (2012) (citing 42 U.S.C. § 1396a(a)(10)). When a state elects to participate the Medicaid program—which every state has done—it agrees that, in exchange for federal funds, the state will "comply with federal criteria governing matters such as who receives care and what services are provided at what cost." *Id.* at 541–42. Medicaid pays for a wide range of medical services, including, at least in some instances, the cost of room and board at long-term care facilities ("LTCFs") for beneficiaries who, due to aging, illness, and/or disability, are unable to live independently. 42 U.S.C. §§ 1396(a)(10), 1396d(a)(4).

While the scope of its coverage is broad, Medicaid does not pay for every medical service a beneficiary may need. Central to this case are two types of payments for beneficiaries' medical services that Medicaid typically will not make: (1) payment for the so-called "patient liability" share of LTCF costs; and (2) payment for "non-covered" services—services that, although medical in nature, are outside the scope of the Medicaid program. The first of those two categories—patient liability payments—arises from the fact that the Center for Medicare and Medicaid Services ("CMS") "requires [LTCF] residents with income remaining . . . to contribute [a portion of] that income to the [LTCF] to defray the cost of their care to the extent possible." *Md. Dep't of Health & Mental Hygiene v. CMS*, 542 F.3d 424, 430 (4th Cir. 2008) (citing 42 C.F.R. § 435.725(a)). Medicaid beneficiaries in LTCFs routinely qualify for patient liability because, even if they have no other income or assets, the beneficiaries often have income from the Social Security Act's Supplemental Security Income program or other sources of limited passive income. (*See* Doc. No. 404 ¶ 51.) The amount of patient liability in any given beneficiary's case is calculated based on the beneficiary's income minus a number of deductions. *See* 42 C.F.R. § 435.725(b)–(c). The

patient liability share calculated pursuant to Medicaid rules is subtracted from the amount that Medicaid pays to the LTCF, and the patient must pay that amount himself. 42 C.F.R. § 435.725(a)(1).

Payment for non-covered services is the second category of medical expenses ostensibly not covered by Medicaid but central to this case. Most relevant here, non-emergency adult dentistry is a service that, at least for the most part (and during the time period at issue in this case),[2] is not covered by either of the two state Medicaid programs at issue, Louisiana Medicaid and Tennessee Medicaid ("TennCare"). However, while non-covered services are not *directly* reimbursed, Medicaid employs tools to subsidize or encourage certain services. Specifically with regard to adult dental services provided to LTCF residents, the Medicaid program subsidizes the services in two ways: first, by requiring Medicaid-participating LTCFs to assist their residents in obtaining *emergency* dental services, despite the fact that Medicaid itself will not separately compensate the facility for that assistance, *see* 42 C.F.R. § 483.55(b); and, second, by requiring states to allow Medicaid-eligible LTCF residents to classify the money they spend on non-emergency dental services (and some other specialty services) as "incurred medical expenses" ("IMEs") that can be deducted from the resident's income for the purpose of calculating the patient liability share of the resident's LTCF charges, *see* 42 C.F.R. § 435.725(c)(4).

Requiring LTCFs to assist residents in need of emergency dental care has the potential to benefit every Medicaid beneficiary residing in an LTCF. Generally, LTCFs must provide necessary emergency care without charge to the resident, irrespective of the resident's ability to pay, and no provision is made for the LTCF to recoup money expended on these services. (Doc. No. 404 ¶ 54.) The benefits of the IME deduction, however, are less broadly shared. Medicaid's

---

[2] TennCare apparently adopted a dental benefit in 2023. (*See* Doc. No. 416 at 16.)

ability to offer subsidies through IME deductions is inherently limited to recipients whose income causes them to have some patient liability in the first place; otherwise, there is nothing to deduct from. For patients with no recognized income and therefore no share of LTCF charges apportioned to patient liability—referred to by the parties in this case as "zero liability" patients—there is no equivalent mechanism under Medicaid for subsidizing non-emergency dental care. It seems such patients typically either do not receive non-emergency dental care or are required to pay for it out-of-pocket, if they can.

### 2. *The False Claims Act and State False Claims Statutes*

The federal FCA "authorize[s] both the Attorney General and private *qui tam* relators to recover from persons who make false or fraudulent claims for payment to the United States." *Graham Cnty. Soil & Water Conservation Dist. v. U.S. ex rel. Wilson*, 559 U.S. 280, 283 (2010).[3] Since the FCA's enactment, Congress has set forth a number of ways an individual or entity can incur liability under the FCA, some of which do not even expressly refer to a "false claim" at all, and others of which allow the underlying "claim" either to be false or somehow fraudulent. Under the statute, as relevant to the claims here, a person or company violates the FCA if he or it

> (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

_____

[3] "[T]he *qui tam* provision of the FCA" allows a private party—known as a "*qui tam* relator"—to file a cause of action "in the name of the United States." *U.S. ex rel. Smith v. Lampers*, 69 F. App'x 719, 720 (6th Cir. 2003) (citing 31 U.S.C. § 3730(b)(1)). The complaint is initially placed under seal, while the United States has an opportunity to evaluate the relator's allegations. 31 U.S.C. § 3730(b)(2). The United States ultimately must either elect to intervene in the case— in which case, it takes over the prosecution of the claims—or decline to intervene, giving the relator the option to pursue the FCA claims in the name of the government himself. 31 U.S.C. § 3730(b)(4), (c). Either way, if the claims are ultimately successful, the relator will be entitled to a share of the recovery, as a reward for his assistance and an enticement for future potential whistleblowers. 31 U.S.C. § 3730(d). State false claims statutes contain similar whistleblower provisions. *See, e.g.*, Tenn. Code Ann. § 71-5-183(b)(1); La. Stat. Ann. § 46:439.1(A).

. . .

(C) conspires to commit a violation of subparagraph (A) . . . or (G);

. . . or

(G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government . . . .

31 U.S.C. § 3729(a)(1)(A), (C), (G).

The FCA has grown to play a major role in combating fraud within the federal healthcare programs, including Medicaid. In addition, because the Medicaid program is operated and partially paid for by the individual states,[4] many states, including Tennessee and Louisiana, have enacted their own false claims statutes that largely mirror the federal version and that are, in some instances, specifically targeted at fraud in the Medicaid program. Indeed, the federal government not only encourages but incentivizes states to do so. By federal statute, "if a State has in effect a law relating to false or fraudulent claims" that is "at least as effective in rewarding and facilitating *qui tam* actions for false or fraudulent claims as" the FCA and "contains a civil penalty that is not less than the amount of the civil penalty authorized" by the FCA, then the federal government will decrease the state's share of fiscal responsibility for its Medicaid program "by 10 percentage points." 42 U.S.C. § 1396h(a), (b)(2), (b)(4).

Tennessee has two false claims acts: the Tennessee Medicaid False Claims Act ("TMFCA"), Tenn. Code Ann. §§ 71-5-181 to -185, which is specifically directed at the TennCare program, and the Tennessee False Claims Act, Tenn. Code Ann. §§ 4-18-101 to -108, which, like

---

[4] According to the plaintiffs, the federal government, through CMS, provides approximately 65% of the funds used by TennCare and approximately 63% of the funds used by the Louisiana Medicaid Program, with the states making up the remainder. (Doc. No. 404 ¶ 25.)

the federal FCA, applies generally to all government programs. The TMFCA creates a cause of

action against any entity or individual who:

> (A) Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval under the medicaid program;
>
> (B) Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim under the medicaid program;
>
> (C) Conspires to commit a violation of subdivision (a)(1)(A), (a)(1)(B), or (a)(1)(D); or
>
> (D) Knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money, or property to the state, or knowingly conceals, or knowingly and improperly, avoids, or decreases an obligation to pay or transmit money or property to the state, relative to the medicaid program . . . .

Tenn. Code Ann. § 71-5-182(a)(1).

Louisiana, likewise, has adopted its own false claims act that covers Medicaid false claims:

the Medical Assistance Programs Integrity Law ("MAPIL"), La. Stat. Ann. §§ 46:437.1 to

46:440.16. In relevant part, the MAPIL provides that

> A. No person shall knowingly present or cause to be presented a false or fraudulent claim.
>
> B. No person shall knowingly engage in misrepresentation or make, use, or cause to be made or used, a false record or statement material to a false or fraudulent claim.
>
> C. No person shall knowingly make, use, or cause to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the medical assistance programs, or to knowingly conceal, avoid, or decrease an obligation to pay or transmit money or property to the medical assistance programs.
>
> D. No person shall conspire to defraud, or attempt to defraud, the medical assistance programs through misrepresentation or by obtaining, or attempting to obtain, payment for a false or fraudulent claim.
>
> E. (1) No person shall knowingly submit a claim for goods, services, or supplies which were medically unnecessary or which were of substandard quality or quantity.

*Id.* § 46:438.3.

### 3.    *The Anti-Kickback Statute*

The Anti-Kickback Statute ("AKS"), is primarily a criminal statute, *see* 42 U.S.C. § 1320a-7b(a)–(b), but a violation of the AKS may also constitute an FCA violation if (1) "a claim submitted to the government for reimbursement includes items or services resulting from a violation of the AKS," or (2) "where cost reports submitted to the government for reimbursement include an express certification that the underlying claims comply with the AKS." *Jones-McNamara v. Holzer Health Sys.*, 630 F. App'x 394, 400 (6th Cir. 2015) (citing 42 U.S.C. § 1320a–7b(g) for the first type of claim, and *U.S. ex rel. Wilkins v. United Health Grp., Inc.*, 659 F.3d 295, 312–13 (3d Cir. 2011), for the second).

As particularly relevant to this case, the AKS prohibits 'knowingly and willfully offer[ing] or pay[ing] any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or kind to any person to induce such person . . . to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program." 42 U.S.C. § 1320a–7b(b)(2)(A). The AKS defines "Federal health care program" broadly to include state-operated Medicaid programs that receive federal funding. 42 U.S.C. § 1320a-7(h); 42 U.S.C. § 1320a-7b(f).[5] The purpose of this prohibition is to "protect federal health care programs from 'increased costs and abusive practices resulting from provider decisions that are based on self-interest rather than cost, quality of care or necessity of services.'" *U.S. ex rel. Suarez v. AbbVie, Inc.*, 503 F. Supp. 3d 711, 723 (N.D. Ill. 2020) (quoting *United States v. Patel*, 778 F.3d 607, 612 (7th Cir. 2015)).

---

[5] In addition to outlawing the offering or paying of kickbacks, the AKS also prohibits soliciting or receiving "remuneration" in exchange for providing referrals, 42 U.S.C. § 1320a–7b(b)(1)(A), meaning that both parties to a kickback transaction violate the law.

Tennessee does not have an anti-kickback statute, but Louisiana does, under the heading "Illegal Remuneration." La. Stat. Ann. § 46:438.2. Section 46.438.2 largely mirrors the AKS, except that it is not strictly a criminal statute, and Louisiana expressly authorizes enforcement of its Illegal Remuneration statute through civil *qui tam* actions. La. Stat. Ann. § 46.439.1(A).

## C.    Facts

As noted above, the Relator, Tennessee, and Louisiana filed three separate Responses to the defendants' SUMF. Some of their responses to individual statements mirror each other's and some conflict. When possible, depending to some extent on whether a particular statement is relevant to a particular plaintiff's claims, the court has attempted to reconcile these responses to determine whether the defendants' statements are, in fact, disputed. Those statements for which no citation is provided are undisputed by all three plaintiffs, at least for purposes of summary judgment. Unless otherwise indicated, the facts are viewed in the light most favorable to the plaintiffs as the non-moving parties.

CSM is a Tennessee-based healthcare management company formed to assist healthcare providers in multiple aspects of care specific to skilled nursing facilities. Dental care was the primary service offered by CSM's providers. MHS specialized in medical billing and handled billing processes for Incurred Medical Expense (IME) deductions. MMDS was the dental provider based in Tennessee. Defendant Fleur de Lis Mobile Dental, LLC was the dental provider in Louisiana. (1st Napper Decl., Doc. No. 331-1 ¶ 4.) CSM allegedly ceased operations and transferred its employees, assets, and clients to defendant Excel in 2021 and 2022. (Doc. No. 404 ¶ 4.) As discussed in greater detail below, defendant Marquis ("Mark") Napper is or was an owner and CEO of CSM, Excel, MMDS, and MHS. Joshua Kilgore is or was the managing partner of CSM, Excel, and MHS. (*Id.* ¶ 19.) Daniel Bird is the (or an) owner of MMDS and had "an

ownership interest" in CSM. (*Id.* ¶ 20.) The individual defendants are alleged to have "caused the submission of the false claims at issue in this case." (*Id.* ¶¶ 18–20.)

During the time period relevant to this lawsuit, neither TennCare nor Louisiana Medicaid covered adult dental care. However, if a Medicaid beneficiary in an LTCF required dental care, the LTCF was required to assist the resident in making an appointment and to arrange transportation for the resident to and from a dentist's office. 42 C.F.R. § 483.55(b)(2). LTCFs must also "assist residents who are eligible and wish to participate to apply for reimbursement of dental services as an [IME] under the State plan." 42 C.F.R. § 483.55(b)(5).

CSM's business model was designed to assist the LTCFs in meeting those legal requirements by providing them mobile dental (and other medical) services and handling the IME billing process at no cost to the LTCF. (Doc. No. 331-1, 1st Napper Decl. ¶ 4.) That is, the defendants provided a service to the LTCFs that allowed them to meet their legal obligation to arrange, but not pay, for dental services for their residents. In a typical scenario, an LTCF entered into an agreement with CSM to coordinate medical services between participating residents and medical care providers affiliated with CSM. At the same time, the LTCF would enter into a Dental Services Agreement with the specific medical provider. CSM was then responsible for obtaining patient consent forms, scheduling visits in conjunction with the LTCF, and handling billing and other administrative tasks.

According to the defendants, each LTCF resident is entitled to select any dentist they choose. (1st Napper Decl. ¶ 7.) If the resident elected to obtain dental care through CSM and its providers, CSM obtained a signed consent form from the resident or responsible party prior to the provision of dental treatment. (*Id.*) The defendants also scheduled the dental appointments and billed the resident. (*Id.*) The plaintiffs note that, while there was no exclusivity requirement

between LTCF residents and any defendant, some MMDS Dental Services Agreements included exclusivity provisions, requiring the facility not to contract with any other dental provider for the duration of the contract, which was terminable with thirty days notice. (*See, e.g.*, Doc. No. 418-1, MMDS Dental Services Agreement ¶ 14.)[6]

When a person becomes a long-term Medicaid resident in a nursing facility, and that person has income from Social Security or a retirement pension, the funds from such income may be managed in one of two ways. First, the LTCF may set up a "resident trust account" for those monies, and the monies will be managed by the LTCF's business office manager (BOM). The defendants generically called this arrangement "bill facility" because, for an invoice to be paid on behalf of the resident, the facility BOM must receive a copy of the invoice so that she or he can write a check from that individual resident's trust account. The other way is for the resident's family to manage their monies. The defendants called this arrangement "bill family," since a family member or other person typically identified as having a power of attorney ("POA") for the resident must receive a copy of the invoice in order pay from the resident's account that the family member or POA holder manages.

For each IME application TennCare or Louisiana Medicaid approved, the funds to pay the defendants' invoices for dental services came directly from one of those two accounts: a resident trust account managed by the LTCF or a patient account managed by a family member or other person with a POA. Thus, no defendant received funds directly from TennCare, Louisiana

---

[6] The Relator asserts that CSM did not always obtain a signed consent form prior to providing dental treatment, citing deposition testimony from a former CSM employee, according to whom Mark Napper took the position that, if a provider was unable to reach the responsible party by telephone, the responsible party's consent to care was not strictly necessary if a patient with dementia was in pain or needed care and consented on his own behalf. (*See* Doc. No. 418-10, Meredith Dep. 70–71.) To the extent there is a factual dispute about obtaining consents, it is not material.

Medicaid, or an LTCF. However, as a result of the IME reduction described above, the patient's liability for a portion of the cost of staying at the LTCF was reduced by the amount of the patient's payment for dental services, and TennCare or Louisiana Medicaid's payment to the LTCF was commensurately increased. (*See* Doc. No. 415-1, Andrepont Decl. ¶ 14 ("[Louisiana] Medicaid's vendor payment for the LTC resident's facility stay is increased by the amount of the IME deduction, which results in an indirect payment for the noncovered services after the services are provided."); Doc. No. 418-2, Evans Decl. ¶ 7 ("If TennCare approves payment for the dental service as an IME, that decreases the member's patient liability to the LTC facility for future months by the amount of the IME, and TennCare then increases its payment to the LTC facility correspondingly to make up the difference. Thus, when a member receives dental care that qualifies for an IME deduction, and it is approved, TennCare's reimbursement to the LTC facility on behalf of the resident increases by the amount of the cost of the care that was provided to the resident.").)

The defendants outline the process for payment as follows:

STEP 1: Nursing Home Resident elected to receive treatment by the CSM affiliated dental provider and all treatment was documented in CSM's HER Software, including consent forms;

STEP 2: MHS prepared paperwork required for an Item-D "IME" deduction for the uncovered medically necessary services from the resident's applied income;

STEP 3: MHS sent a copy of the completed IME Packet to TennCare or [Louisiana Medicaid] to process the resident's IME deduction, including:

*Signed Consent Form, Progress Note for Treatment Verification of Services Form, Denture Necessity Form (If Applicable), Patient's Invoice (Billable to the Patient)*

The IME packet represented two things: 1) That non-covered medically necessary dental care was performed; 2) the patient was billed for those services.

STEP 4: TennCare or [Louisiana Medicaid] reviews the resident's Incurred Medical Expense for completeness of the IME packet, and ensures the resident has available applied income for the deduction;

STEP 5: Once processed, TennCare or [Louisiana Medicaid] reduces the resident's personal funds (applied income) liability to the LTC[F], so they will have their available monies needed to pay for the uncovered medical expense they incurred;

STEP 6: TennCare or [Louisiana Medicaid] notifies the resident or power of attorney for the resident and the [LTCF] of their reduced liability to the nursing home;

STEP 7: The resident or facility on behalf of the resident notifies MHS it has received the deduction and is able to pay the outstanding "out of pocket" medical expense.

STEP 8: The resident is invoiced either directly (bill family) or through the LTC Resident Trust account (bill facility), and the invoice is paid entirely with patient funds.

The plaintiffs do not dispute this outline. They simply point out that, while the initial funds paid to the dental provider come from the resident's account, that amount is eventually offset by a deduction of the patient's liability share of the cost of care at the LTCF and a commensurate increase in the amount paid by TennCare or Louisiana Medicaid. (*See* Andrepont Decl. ¶¶ 14–15; Evans Decl. ¶ 7.) As explained in an illustration provided by Katie Andrepont, long-term care unit director for Louisiana Medicaid at the Louisiana Department of Health:

> [Suppose a long-term care resident ("LTC resident")] incurs dental services of $100 from the dental provider. LTC resident currently owes $1,000/month in [patient liability] to the LTC provider based on the LTC resident's income and allowable deductions. When the invoice for the $100 incurred dental services is received by Medicaid, the responsibility of the LTC resident to the LTC provider is reduced by the $100, resulting in a $900 responsibility to the LTC provider. Medicaid then pays $100 more to the LTC provider in vendor payment for the incurred expense.

(Andrepont Decl. ¶ 15.)

Over 100 Dental Services Agreements produced by the defendants in discovery (out of an undisclosed total), contained a clause similar or identical to the following, referred to by the plaintiffs as the "six-for-one" provision:

> SSI/Zero liability residents: Provider shall provide exam, cleaning, x-rays, extractions, restorations and prosthesis adjustments annually. Residents are only eligible for this program if a resident does not have resources to pay for these dental

services ("zero liability residents")[.] Provider will provide these services annually at no additional cost, *subject to a cap of one zero liability resident to every six Item-D [IME] eligible residents per unit visit*. As with all residents, all proper consents must be signed before treatment.

(Doc. No. 418-31, Hullender Decl. ¶ 6 (emphasis added).)[7]

This six-for-one provision is the crux of the claims against the defendants. The plaintiffs characterize it as a kickback in violation of state and federal law. The defendants deny that it constitutes a kickback. They assert that providing dental services to indigent patients was simply the "just and moral thing to do," but they also limited indigent care to one patient for every six paying patients as an "economic guardrail," to maintain the profitability and sustainability of their business model. (1st Napper Decl. ¶¶ 11, 12.)

The defendants insist that the LTCFs never "referred" any patients to CSM, that CSM did not "refer" patients to its providers, and that patients at LTCFs were "free to obtain dental services from any other provider." (1st Napper Decl. ¶¶ 11–14.) The plaintiffs, however, have presented evidence showing that the defendants provided LTCFs "Dental Referral Forms," which the LTCFs completed and sent back to the defendants. (*See* Doc. No. 421-9 (faxed "Referrals" on forms provided by the defendants, filled out by various LTCFs).)

The defendants assert that, when their service providers arrived at a facility, they had no way of knowing which patients were "zero liability" prior to rendering service. (1st Napper Decl. ¶ 30(e).) However, as the plaintiffs point out, the defendants did, at least on some occasions, turn away referred patients as exceeding the "zero liability" limit. (*See* Doc. No. 418-34 (MMDS "Final List" of patients to be seen at Graceland Nursing and Rehab on 4/26/2018, list 25 patients, five of

---

[7] According to Sally Daly, a dentist who operated Fleur de Lis and provided mobile dental services for CSM in Louisiana, many LTCFs did not want the six-for-one language, and their contracts did not contain a six-for-one provision. (Doc. No. 415-2, Daly Decl. ¶¶ 17–18.)

whom were identified with a "Ø," and a note indicating that an additional twelve residents had been "removed from the final list" because of "too many zero liabilities").)

Mark Napper avers that he "knew that no statement for [the defendant companies'] services was ever to be paid from funds of the State of Tennessee or the United States," even though he was "certainly aware that the State through its 'IME' process had allowed the creation of accounts which consisted entirely of patient money and were held in trust." (1st Napper Decl. ¶ 30(a).) He asserts that TennCare and Louisiana Medicaid "reviewed and approved thousands of [the defendant companies'] statements without objection" but that "Tennessee, because of its lack of personnel, failed to process countless claims and has left [the defendants] with over a million dollars in unpaid charges, which [they] have no means to collect." (*Id.* ¶ 30(b).) He also maintains that he is "generally aware that there are procedures under which a government agency might pay the facility an amount equal to the agency's obligation when the patient fund has been exhausted" but that "[t]his is a matter between the agency and the facility," and the defendant companies "are not involved in that process and earn nothing from it." (1st Napper Decl. ¶ 30(f).)

As the plaintiffs point out, this latter statement is contradicted by Napper's statement that the defendant companies have not been paid because TennCare has failed to process IME requests, indicating that he was aware of the connection between his companies' charges and Medicaid payments. In fact, as the defendants themselves described in Step 7 of their process, *supra*, the defendants' provider generally is not paid until "[t]he resident or facility on behalf of the resident notifies MHS it has received the [IME] deduction and is able to pay the outstanding 'out of pocket' medical expense." (Doc. No. 408-2, SUMF ¶ 16.)

It is undisputed that CSM entered into a contract with the Tennessee Department of Veterans Affairs, which operates an LTCF for veterans. Pursuant to this contract, the facility

promised to use its best efforts to make a minimum of ten residents available for each visit. This contract was signed by the Commissioner of Veterans Affairs and the Comptroller of the State, and no one questioned the propriety of this arrangement. The defendants maintain that this contract formed the "paradigm" for their business model and that Tennessee explicitly approved it. The plaintiffs point out that this contract does not contain a six-for-one provision. (*Compare* Doc. No. 331-2, Tennessee/CSM Contract ¶ A.9., *with* Doc. No. 421-1, MMDS Contract ¶ 4(e).)

The defendants also point out that the Relator, who was a competitor of the defendants, provided dental services at LTCFs in Louisiana, received referrals from nursing facilities that gave him the name of patients who needed to be seen, and provided free services to some patients, in approximately the same ratio as the defendants' six-for-one ratio. The plaintiffs respond that the Relator did not enter into contracts expressly requiring him to treat zero liability patients free of charge in exchange for referrals of the facilities' paying patients. (Doc. No. 421-11, Folse Dep. 55, 58–59, 71–72.)

The defendants deny "market[ing] free services for zero liability patients." (1st Napper Decl. ¶¶ 9–10.) The plaintiffs dispute this statement, pointing to the Declaration of a former CSM employee, attesting that Napper offered to treat one zero liability patient for six paying patients during his sales pitch to nursing homes, if nursing home administrators raised the issue of treatment for zero liability patients. (Doc. No. 481-12, Brown Decl. ¶ 6.)

On November 22, 2017, the Relator, a competitor of CSM, filed a *qui tam* suit on behalf of the United States, Tennessee, Louisiana, and Georgia against CSM, Fleur de Lis, Georgia Mobile Dental LLC, and up to a hundred John Does. (Doc. No. 1.) The United States declined to intervene. (Doc. No. 15.) After numerous extensions of the deadline, the states of Georgia and Virginia (which had been added in an amended pleading) also declined to intervene, while

Tennessee and Louisiana elected to intervene in part in November 2020 (Doc. Nos. 40, 41), and the case was unsealed (Doc. No. 42). The States filed a joint Complaint in Intervention in March 2021. (Doc. No. 76.) Relator filed his Second Amended Complaint (dropping the claims on behalf of Georgia and Virginia) (Doc. No. 143), while Tennessee and Louisiana filed their First Amended Complaint in Intervention (Doc. No. 144) in November 2021. With the court's leave, the States filed their Second Amended Complaint in Intervention in March 2023 (Doc. No. 214), and the Relator filed a Supplemental Second Amended Complaint ("Supplemental SAC") shortly thereafter (Doc. No. 231). Finally, the States, with the court's leave, filed their Third Amended Complaint in Intervention ("TAC") in June 2025, asserting a new theory of recovery. (Doc. No. 404.)

### D. Discussion

#### 1. The Plaintiffs' Claims

To be clear, the plaintiffs do not contend that the defendants submitted claims for services they did not provide, that they overbilled Medicaid, or that they provided unnecessary or inadequate treatment to Medicaid patients (or any other patients). The defendants are not alleged to have bribed LTCF administrators with cash or gifts in exchange for referrals of paying dental patients. Instead, this case is about the defendants' agreement to provide free routine dental services to indigent LTCF residents—albeit only a limited number of such patients. Without such free services, that set of patients would not receive routine dental care, because Tennessee and Louisiana do not—or did not during the relevant time period—cover such care.[8] Instead, such

---

[8] Tennessee's State Operations Manual Appendix PP – Guidance to Surveyors for Long Term Care Facilities nonetheless encouraged LTCFs to "attempt to find alternative funding sources or delivery systems so that the resident may receive the services needed to meet their dental needs and maintain his/her highest practicable level of well-being." (Tenn.'s manually filed Ex. 38 at 561.)

patients would only have been entitled to emergency dental treatment. What appears to have been a win-win-win situation for everyone involved has unfortunately become a long-running federal case.

In the TAC, the States assert claims against the defendants based on two alleged "schemes." Regarding the first, the "six-for-one scheme," they assert that the defendants' agreement to provide "remuneration" to LTCFs "in the form of free administrative services and free healthcare services to a limited number of zero-liability residents" for the purpose of inducing patient referrals from the LTCFs for healthcare services that are reimbursed by TennCare and Louisiana Medicaid violated the AKS. (Doc. No. 404 ¶ 120.) They allege that the defendants "knew they were paying remuneration to induce referrals of patients for services to be paid under a federal healthcare program," that "[c]ompliance with the AKS is material to TennCare's and Louisiana Medicaid's decisions to reimburse for IME deductions," and that "[c]laims for reimbursement for providing services to the illegally referred patients are false and submitted in violation of the TMFCA and the Louisiana FCA." (*Id.* ¶¶ 121–23.) They further allege that the defendants "knowingly caused, or conspired to cause, the submission of false claims for payment to TennCare and Louisiana Medicaid and knowingly caused to be made or used false records material to false claims under the TennCare program and Louisiana Medicaid." (*Id.* ¶ 123.)

The second "scheme"—added with the States' filing of the TAC—involves MMDS's alleged concealment of Mark Napper's ownership and control of MMDS. The plaintiffs assert that it is a violation of Tennessee law, Tenn. Code Ann. § 63-5-121(a)(2), for a non-dentist to own an active dental practice. They allege that Napper was an owner of MMDS, an active dental practice, from 2008 until at least 2013 and that he either owned or continued to "exert[] significant economic and operational control over . . . MMDS through 2021." (*Id.* ¶ 127.) They allege that Napper and

MMDS knowingly failed to comply with § 63-5-121(a)(2), that compliance with that statute is "material to Tennessee because it serves as a deterrent to non-dentists unduly influencing dentists' professional decision-making,"[9] and that Tennessee required compliance with § 63-5-121 in order to process IME deductions for dental services, *see* Tenn. Code Ann. § 71-5-140(c)(1) ("A mobile dental services provider providing such dental services shall meet and comply with . . . [t]he requirements of § 63-5-121"). (Doc. No. 404 ¶¶ 128, 132–33.) Tennessee asserts that "MMDS submitted requests for IME deductions to Tennessee . . . knowing that it was not in compliance with Tenn. Code Ann. §§ 63-5-121(a)(2) and 71-5-140(c)," that "[e]ach submission was made with an implied certification of compliance with Tenn. Code Ann. §§ 63-5-121(a)(2) and 71-5-140(c)," and that, consequently, "[a]ll of those submissions were false and actionable under the TMFCA during any time in which Mark Napper had an ownership interest in MMDS." (*Id.* ¶ 134.)

Based on these alleged schemes, Tennessee and Louisiana assert the following legal claims or "counts" in the TAC: (1) violation of the TMFCA, Tenn. Code Ann. § 71-5-182(a)(1)(A), through the knowing presentation of false or fraudulent claims for payment under the TennCare program; (2) conspiring to cause false claims to be presented to the TennCare program in violation of the TMFCA, Tenn. Code Ann. § 71-5-182(a)(1)(C); (3) unjust enrichment under Tennessee law; (4) payment by mistake under Tennessee law; (5) violation of the Louisiana anti-kickback law incorporated in the MAPIL, La. Stat. Ann. § 46:438.2; and (6) against CSM, Mark Napper, and Fleur de Lis only, violation of the Louisiana FCA, La. Stat. Ann. § 46:438.3, through the knowing presentation of false and fraudulent claims to be paid under the Louisiana Medicaid program. The States also assert that Excel should be jointly and severally liable for any judgment against CSM entered in this case, through either alter ego or successor liability. The States seek

---

[9] The plaintiffs do not allege that Napper influenced dentists' professional decision making.

damages "believed to be in excess of $12,000,000, trebled as required by Tenn. Code Ann. § 71-5-182(a) and [La. Stat. Ann. §] 46:438.6," as well as civil penalties and pre- and post-judgment interest. (Doc. No. 404 at 38.)

The Relator's Supplemental SAC alleges essentially the same facts and, in addition to asserting violations of the TMFCA, the Tennessee FCA, and the MAPIL, sets forth claims on behalf of the United States for violation of the federal FAC, 31 U.S.C. § 3729(a)(1)(A), (C), and (G), based on the violations of the federal AKS. (Doc. No. 231.)

### 2. *The Motion for Summary Judgment*

The defendants recognize that the claims against them arise under three separate statutory frameworks (federal, Tennessee, and Louisiana), but they assert that claims under all three are "subject to essentially the same false claim analysis," all of which are "predicated on an alleged violation of the Federal [AKS], 42 U.S.C. § 1320a *et seq*". (Doc. No. 408-1 at 16–17.) The defendants assert that they are entitled to summary judgment on the claims against them based on both "schemes."

### 3. *The Six-for-One Scheme and the Federal Claims*

As an initial matter, the parties dispute the elements of the FCA claim premised upon allegations that the six-for-one provision in the defendants' contracts constitutes an illegal kick-back in violation of the AKS, for purposes of an FCA claim.

#### a) *The Elements of the FCA Claim Premised on AKS Violations*

As relevant to the six-for-one scheme, the Relator asserts a violation of the FCA, 31 U.S.C. § 3729(a)(1)(A), based on the defendants' "knowingly present[ing], or caus[ing] to be presented, a false or fraudulent claim for payment or approval." To establish liability under this provision, the plaintiffs must prove that "(1) a person present[ed], or cause[d] to be presented, a claim for payment or approval; (2) the claim [wa]s false or fraudulent; and (3) the person's acts [were]

undertaken 'knowingly,' *i.e.*, with actual knowledge of the information, or with deliberate ignorance or reckless disregard for the truth or falsity of the claim." *United States ex rel. Prather v. Brookdale Senior Living Cmtys.*, 838 F.3d 750, 761 (6th Cir. 2016) (quoting *U.S. ex rel. Bledsoe v. Cmty. Health Sys., Inc.*, 342 F.3d 634, 640 (6th Cir. 2003)).

With regard to the falsity element, among other types of false claims, a "claim that includes items or services resulting from a violation of [the AKS] constitutes a false or fraudulent claim for purposes of [the FCA]." *United States v. Regeneron Pharms., Inc.*, 128 F.4th 324, 327 (1st Cir. 2025) (alterations in original) (quoting 42 U.S.C. § 1320a-7b(g)). "In other words, an 'AKS violation that results in a federal [healthcare] payment is a *per se* false claim under the FCA.'" *Id.* (quoting *Guilfoile v. Shields*, 913 F.3d 178, 190 (1st Cir. 2019)). In the Sixth Circuit, the term "resulting from" in this context means "but-for causation." *U.S. ex rel. Martin v. Hathaway*, 63 F.4th 1043, 1052 (6th Cir.), *cert. denied*, 144 S. Ct. 224 (2023).

For purposes of this type of FCA claim, the AKS prohibits, as relevant here, "knowingly and willfully offer[ing] or pay[ing] any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person . . . to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program." 42 U.S.C. § 1320a-7b(b)(2)(A). In addition, as the Sixth Circuit recently clarified, "[w]hen it comes to violations of the Anti-Kickback Statute, only submitted claims 'resulting from' the violation are covered by the False Claims Act." *Martin*, 63 F.4th at 1052 (citing 42 U.S.C. § 1320a-7b(g)).

The parties dispute the meaning and application of several of the relevant terms of the AKS claim, including whether "referrals" occurred; whether "remuneration" was offered; whether any

claims submitted for payment "resulted from" the alleged AKS violation; and whether the defendants acted "knowingly and willfully."

b)    <i>Referrals</i>

The defendants first argue that "[t]here were no referrals," as required by the plain text of the AKS. (Doc. No. 408-1 at 17.) The plaintiffs respond that there is at least a material factual dispute as to whether LTCFs referred IME eligible patients to the defendants. The court agrees. The record readily establishes that the entire purpose of the defendants' business model was to obtain referrals from LTCFs of their residents to the defendants for the provision of dental services. Documents in the record created by the defendants refer to this arrangement as "referrals." (*See, e.g.*, Doc. No. 418-9 at 2 (12/2/2016 email from CSM to an LTCF referencing "missing . . . referrals," referring to LTCF residents); Doc. No. 421-9 at 1 (7/19/2018 fax cover sheet to MMDS from an LTCF re: "Referrals," identifying two patients; *id.* at 2 (CSM "Dental Referral Form" instructing the LTCF to "Please complete the following information for any Resident you would like to refer to the Dentist," completed by same LTCF); *id.* at 3–5 (three similar Dental Referral Forms sent to MMDS by a different LTCF); *see also* Doc. No. 431-7 at 2 (2019 email from CSM Asset Partner and Growth Strategist Jeffrey Rhodes, to Texas LTCF operator Senior Living Properties, LLC, explaining, "[s]ince everyone has the need to see a dental provider every six months, then all of your residents should be referred to us, and allow them, or their RP [responsible party], to determine whether or not they want the services.").)

The defendants assert that, pursuant to the contracts that governed the relationship between providers and LTCFs, residents retained the right to use any dentist of their choice, and each resident treated by a CSM defendant consented to treatment. All of that may be true, but it does not negate the fact that LTCFs apparently referred patients to the CSM defendants.

### c) Remuneration

The defendants next assert that the defendants cannot establish *remuneration*. This issue presents a much more difficult question. The AKS does not define "remuneration," and district courts within this circuit have, in the past, generally construed it broadly. *See, e.g.*, *United States v. Millennium Radiology, Inc.*, No. 1:11cv825, 2014 WL 4908275, at *4 (S.D. Ohio Sept. 30, 2014) (interpreting the term "broadly" to mean "anything of value in any form whatsoever" and explaining that the AKS's use of the term "any remuneration" "suggests an expansive reading of the form of any kickback directly or indirectly, as opposed to a narrow reading" (citations omitted)). Likewise, this court, when briefly addressing remuneration in the context of ruling on the defendants' Motion to Dismiss, concluded that, although the free services were provided to zero-liability patients rather than to the LTCFs themselves, the plaintiffs "plausibly alleged that those services were valuable to the facilities because they (1) were a valuable amenity that was attractive to residents and (2) reduced the costs associated with assisting residents with transportation." (Doc. No. 140 at 32–33.)

The Sixth Circuit, however, recently placed limits on just how expansively "remuneration" should be construed. In *U.S. ex rel. Martin v. Hathaway*, the court held that remuneration means "just payments and other transfers of value." 63 F.4th at 1048. The court also observed that, because the same language in the AKS creates both civil and criminal liability, "if ambiguity exists over the meaning of [the] provision, the rule of lenity favors the narrower definition." *Id.* at 1050. The court expressly declined to adopt a definition that would encompass *any* "acts that may be of value to another." *Id.* at 1048; *see also id.* at 1051 ("[I]t is difficult to imagine a statute with criminal application applying to something as vague as 'anything of value' . . . .").

The plaintiffs do not contend that the six-for-one arrangement involved a "payment." Thus, given *Martin*'s definition, the court must determine whether the promise to provide free dental

services to one zero-liability resident for every six patient-liability patients referred by an LTCF constitutes a transfer of value.[10] The plaintiffs argue that "[t]here is clear value . . . to the [LTCFs] for Defendants treating zero-liability patients for free. Without the arrangement with Defendants, the [LTCFs] bore the cost of emergency dental services for their TennCare residents and scheduling and transporting residents to routine dental appointments." (Doc. No. 416 at 8; *see also* Doc. No. 419 at 4 ("Defendants' treatment of zero-liability residents for free was valuable to the LTCFs."); (Doc. No. 415 at 5 ("Moreover, the Defendants also handled the administrative aspects of contracting with the LTCs, scheduling patients, and seeking IME reimbursements from Louisiana Medicaid for eligible patients, among other things. All of these services have intrinsic value and fall well within the meaning of 'remuneration' for AKS and MAPIL purposes.").)

As an initial matter, insofar as the defendants refer to the defendants' provision of administrative services, *per se*, as "remuneration," the court is not persuaded. It appears that the Relator also provided the same type of services to LTCFs in Louisiana and that Tennessee entered into a similar contract with CSM, for the provision of dental services at an LTCF operated by the Veterans Administration. The only difference between those apparently acceptable arrangements and the defendants' arrangement is the specific ratio of paying to non-paying patients in the defendants' contracts—the six-for-one provision. And that has been the focus of the plaintiffs' AKS claims. (*See, e.g.*, Doc. No. 416 at 5 ("Defendants provided remuneration to [LTCFs] by

---

[10] The court ignores the defendants' largely irrelevant, contradictory, and self-serving attempts to characterize the six-for-one provision as not *really* providing free services (because they tried to recover payment from the zero-liability patients), and not really a six-for-one requirement (because it was not actually enforced). As the plaintiffs point out, the contracts say what they say, and ample evidence in the record suggests that they were enforced, at least sometimes. Moreover, the evidence also establishes that, insofar as the defendants attempted to recover payment for services from the zero-liability patients, they were only partially successful. In any event, there are, at a minimum, questions of fact as to the effect of the six-for-one provision, but no dispute that the six-for-one provision was included in many of the defendants' contracts.

treating one zero liability patient for every six referrals of IME-eligible patients.").) Moreover, as the defendants point out, a Tennessee statute expressly authorizes mobile dental services providers to contract with LTCFs and sets forth the procedures the defendants followed in providing services to LTCF residents and submitting IME deduction requests on behalf of the resident/patient. *See* Tenn. Code Ann. § 71-5-140.

As for the six-for-one provision itself, the agreement to provide free services in exchange for referrals looks, at first blush, like a typical quid-pro-quo that qualifies as "remuneration" under the AKS. *See Jones-McNamara*, 630 F. App'x at 400 (defining remuneration to include "transfers of items or services for free or for other than fair market value" (quoting 42 U.S.C. § 1320a–7a(i)(6)). Along the same lines, courts have stated that "contract terms that decrease[] the price of prescription drugs," including by offering rebates, free goods, volume discounts, debt forgiveness, and "other financial incentives given to providers," if offered "with corrupt intent, would be paradigm instances of behavior prohibited by anti-kickback legislation." *In re Pharm. Indus. Average Wholesale Price Litig.*, 478 F. Supp. 2d 164, 177 (D. Mass. 2007). Moreover, while "classic" examples of remuneration that may violate the AKS include such things as free continuing education for doctors, expensive dinners, golf tournaments, and tickets to ball games, *United States v. SouthEast Eye Specialists, PLLC*, 570 F. Supp. 3d 561, 578 (M.D. Tenn. 2021) (Crenshaw, C.J.), courts have found a wide array of more creative services to qualify as remuneration under the AKS. These include, to provide just a small sampling: (1) setting up a charitable foundation, funded by drug manufacturers, for the purpose of covering copays for low-income patients who would otherwise not be able to afford medically necessary oncology drugs, *Pharm. Coal. for Patient Access v. United States*, 126 F.4th 947 (4th Cir. 2025); (2) setting up a fertility support program for low-income patients whose insurance does not cover fertility

treatments by a drug manufacturer whose drugs adversely affect fertility, *Vertex Pharms. Inc. v. U.S. Dep't of Health & Hum. Servs.*, 774 F. Supp. 3d 211 (D.D.C. 2025); (3) offering valuable business-management tools to specialty oncology practices that joined programs requiring the practices to purchase a substantial proportion of their drugs from the defendant drug manufacturer, *United States ex rel. Hart v. McKesson Corp.*, 602 F. Supp. 3d 575, 579 (S.D.N.Y. 2022); (4) acquiring and then providing protected patient health information to a pharmacy for the purpose of inducing drug prescriptions, *State v. MedImmune, Inc.*, 342 F. Supp. 3d 544 (S.D.N.Y. 2018); and (5) paying or receiving commissions in return for referring a Medicare patient to a Medicare provider, *United States v. St. Junius*, 739 F.3d 193, 210 (5th Cir. 2013). The common thread linking all of these types of remuneration is the conveyance of a concrete benefit, however indirect, to the provider or entity in the position of making referrals.

That thread suggests that, on closer look, the six-for-one provision at issue here was not a classic exchange of value for value. That is, the provision of free services to zero-liability residents was an act of some value to the LTCFs, but only very indirectly. For instance, there is a possibility that the provision of such services for a limited number of zero-liability residents might, perhaps, have allowed the LTCFs to attract more residents, but the plaintiffs offer no evidence supporting that hypothesis or showing that the LTCFs used that prospect as a marketing tool to entice zero-liability (or other) residents. The services provided to zero-liability residents also might have reduced the LTCFs' cost of providing emergency dental care for those residents or increased the overall health of their residents, but, again, there is no evidence or argument in the record regarding whether, in fact, LTCF residents experienced fewer dental emergencies once the LTCFs contracted with the defendants or whether the LTCFs' costs were reduced in any way. In other words, while the provision of free services was an act of some value that the LTCFs could offer to their zero-

liability residents, it was not something of quantifiable value that the LTCFs or their administrators put in their own pockets or enjoyed on their own behalf. Moreover, the free services to zero-liability patients did not reduce those patients' payments to Medicaid or increase Medicaid's costs, because the dental services for them were not covered or reimbursed in any way by Medicaid. Thus, under the particular circumstances of this case, it is not clear to this court whether the six-for-one provision resulted in transfers of value that, under *Martin*, fall within the scope of the term "remuneration." *See Martin*, 63 F.4th at 1048 (declining to adopt a definition of remuneration that encompassed any "acts that may be of value to another").

At the same time, the provision of free dental services did have quantifiable value *to the defendants and their dental providers*. According to Daly, dentists are not required to provide *pro bono* services, but she and the other CSM providers were required to treat zero-liability patients for free. (Daly Decl. ¶¶ 30, 32.) Those services had value to the defendants, as the defendants normally billed and were reimbursed for dental services. And the defendants contracted to provide free services to at least some LTCF residents through the six-for-one provisions, "subject to a cap of one zero liability resident to every six Item-D [IME] eligible residents per unit visit" (Doc. No. 418-31, Hullender Decl. ¶ 6)—in other words, in exchange for the referral of six IME-eligible patients per zero-liability patient.

Ultimately, because the free services to zero-liability patients had value to the defendants and qualified as the offer of free services in exchange for referrals of patients for services covered by Medicaid, the court finds that the six-for-one provision constituted remuneration under the AKS.

### d) Scienter

The AKS also requires that a defendant "knowingly and willfully" offer or pay remuneration for the purpose of inducing a referral. 42 U.S.C. § 1320a-7b(b)(2)(A). As the

Supreme Court has explained, "unless the text of the statute dictates a different result, the term 'knowingly' merely requires proof of knowledge of the facts that constitute the offense." *Dixon v. United States*, 548 U.S. 1, 5 (2006) (quoting *Bryan v. United States*, 524 U.S. 184, 193 (1998)). The term "willfully," however, "requires a defendant to have 'acted with knowledge that his conduct was unlawful.'" *Id.* (quoting *Bryan*, 524 U.S. at 193); *see also United States v. Singh*, 147 F.4th 652, 659 (6th Cir. 2025) ("Medicare billing involves complicated regulations and complex reimbursement rules. Applying *Bryan*'s definition of 'willfully' to the healthcare-fraud statute is therefore necessary to avoid penalizing those who were unaware that their conduct was unlawful." (citing *Pfizer, Inc. v. Dep't Health & Hum. Servs.*, 42 F.4th 67, 77 & n.8 (2d Cir. 2022), as reaching the same conclusion in the context of the AKS)); *SouthEast Eye Specialists*, 570 F. Supp. 3d at 581 (applying same definition to an AKS violation).

Willfulness may be proved by evidence that is "entirely circumstantial." *United States v. Myers*, No. 19-5520, 2019 WL 7425387, at *3 (6th Cir. Nov. 19, 2019) (quoting *United States v. Rozin*, 664 F.3d 1052, 1059 (6th Cir. 2012)). And courts recognize that willfulness is a question of fact generally unsuitable for resolution at summary judgment. *See, e.g.*, *Godby v. Wells Fargo Bank, N.A.*, 599 F. Supp. 2d 934, 943 (S.D. Ohio 2008) (collecting cases). However, if the material facts are undisputed following discovery, summary judgment on this issue may be appropriate. *Accord id.*

The defendants argue that they submitted "thousands of IME deduction packets to the States for approval" over the years, and the States approved them for years. (Doc. No. 408-1 at 21.) They were told in a 2017 email by Louisiana Medicaid that "Medicaid has no part in this incurred Medical Expense billing process. . . . The dental provider is not billing Medicaid directly . . . . The billing and payment process are ultimately between the dental provider and the recipient."

(Doc. No. 331-4 at 1.) Tennessee told LTCFs in a 2011 memo that IME deductions, by definition, are for "expenses that are not covered by TennCare." (Doc. No. 331-5 at 2.) And the defendants' contracts were reviewed "[o]ver the years [by] dozens of healthcare attorneys representing the [LTCFs] without objection to the [six-for-one] provision" (1st Napper Decl. ¶ 12). As a result, the defendants maintain, they had no reason to believe their process was illegal and still do not believe it was illegal.

In its Response to the Motion for Summary Judgment, Louisiana urges the court to apply the definition of willfulness adopted by the Fifth Circuit in *United States v. St. Junius*, in which the court appeared to conflate the concepts of "knowing" and "willful," holding that the government only had to prove "that the defendant willfully committed an act that violated the [AKS]." 739 F.3d 193, 210 (5th Cir. 2013). The Sixth Circuit, however, has repeatedly held that "'willfulness,' in the criminal context, generally requires the government to prove that the defendant 'acted with knowledge that his conduct was unlawful.'" *Singh*, 147 F.4th at 658 (quoting *United States v. Roth*, 628 F.3d 827, 834 (6th Cir. 2011), and collecting cases). This court, therefore, declines to follow *St. Junius*.

While the Relator and Tennessee agree with the defendants' definition of the term, they contend that circumstantial evidence in the record is sufficient to show willfulness. First, they point to a May 30, 2019 email from CSM Asset Partner and Growth Strategist Jeffrey Rhodes, copying Mark Napper, to LTCF operator Senior Living Properties, LLC, in Texas, who referenced the need to "avoid any potential compliance problems with providing services to your full-vendor [zero-liability] residents." (Doc. No. 421-7 at 2.) He also informed the LTCF that, while CSM was "willing to continue to provide dental services on a referral basis only, . . . going forward [they] must have at least 15 referred residents to schedule a Mobile Unit visit," none of whom could be

zero-liability residents, so "as to maintain separation from potential anti-kickback regulations." (*Id.* at 3.)

The Relator and Tennessee also assert that Napper testified that he is familiar with the AKS and that he used attorneys to help draft the contracts with the LTCFs, when, in reality, Napper himself drafted the six-for-one provision.[11] And, in marketing materials to LTCFs, the defendants represented that their contracts had been drafted by an "attorney specializing in health care law," when, in reality, the attorney in question does not hold himself out as a healthcare law specialist. (*See* Doc. No. 421-17 at 3; Doc. No. 421-18.) Finally, these plaintiffs point to a 2019 conversation between that same attorney and an opposing attorney in litigation involving CSM (but unrelated to this case), in which the opposing attorney informed CSM's attorney of his belief that the six-for-one provision in CSM's contracts violated the AKS. (*See* Doc. No. 421-19, King Decl. ¶ 5.)

In their Reply, the defendants contend, with reference to the Rhodes email, that they were aware by 2019 that they were being investigated by the State of Tennessee, "putting the AKS front and center in the minds of Defendants." (Doc. No. 426 at 6.) They characterize the email as showing, if anything, that "Defendants did not believe they were doing anything wrong and were cautious not to do so." (Doc. No. 426 at 6.) They contend more generally that, taken together,

> [a]n email from 2019 merely acknowledging the existence of the AKS, an off-hand comment between lawyers during a deposition break in 2019, and Mark Napper having drafted the 6 to 1 provision is the grand accumulation of evidence of intent put forth by Plaintiffs after 8 years of litigation and discovery. That mere scintilla of indirect "evidence" is not enough for any reasonable juror to find Defendants willfully and knowingly violated the AKS.

(*Id.*)

---

[11] Napper testified that he did not have an attorney review the six-for-one provision because he believed that it was sufficient that the contracts had all been reviewed by the LTCFs' attorneys. (Napper Dep. 111–12.)

The court agrees. When a defendant discharges its initial burden at summary judgment by pointing out that one or more essential elements of the plaintiff's claim lack evidentiary support, the burden shifts to the plaintiff to identify record evidence sufficient to permit a reasonable jury to find for it on those elements. *Anderson*, 477 U.S. at 250; *see also Max Arnold & Sons, LLC v. W.L. Hailey & Co.*, 452 F.3d 494, 507 (6th Cir. 2006) ("[T]he moving party need not support its motion for summary judgment with evidence; instead, it only must point out the deficiencies of the nonmoving party's case." (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324–25 (1986)).

Here, the defendants have discharged their burden, and the circumstantial evidence to which the plaintiffs point is not sufficient to permit a reasonable jury to conclude by a preponderance of the evidence that any defendant acted willfully, with knowledge that the six-for-one provision was unlawful. This conclusion is only bolstered by this court's difficulty in discerning whether the six-for-one provision qualifies as "remuneration" prohibited by the AKS and the fact that the plaintiffs cannot point to any other case with a remotely similar fact pattern finding unlawful remuneration for purposes of the AKS.[12]

Under these circumstances, and in the absence of any compelling circumstantial evidence that the defendants, during the relevant time frame, knew that their conduct was illegal, the court

---

[12] The court recognizes that, as Judge Crenshaw of this court has observed (at the motion to dismiss stage), the AKS "is not a highly technical tax or financial regulation that poses a danger of ensnaring persons engaged in apparently innocent conduct," such that "the giving or taking of kickbacks for medical referrals is hardly the sort of activity a person might expect to be legal." *SouthEast Eye Specialists*, 570 F. Supp. 3d at 581 (quoting *United States v. Starks*, 157 F.3d 833, 838 (11th Cir. 1998)); *see also United States v. Patel*, 17 F. Supp. 3d 814, 824 (N.D. Ill. 2014) ("[T]he Anti–Kickback Statute is not a complex or technical one[.]"). However, the question of what constitutes "remuneration" under the statute has now generated reams of analysis and conflicting conclusions—but no clear rule that obviously encompasses the conduct here. The court is not persuaded that it should have been obvious to the defendants that the six-for-one provision constituted an unlawful kickback.

finds that the plaintiffs cannot establish that the defendants' purported violation of the AKS was both knowing *and* willful.

### e) Causation

Finally, the Sixth Circuit has held that, "when it comes to violations of the [AKS], only submitted claims 'resulting from' the violation are covered by the [FCA]. The ordinary meaning of 'resulting from' is but-for causation." *Martin*, 63 F.4th at 1052 (citing 42 U.S.C. § 1320a-7b(g)). "But-for" causation means "because of" and "imposes . . . a requirement of actual causality." *United States v. Miller*, 767 F.3d 585 593 (6th Cir. 2014) (quoting *Burrage v. United States*, 571 U.S. 204, 211 (2014)). "In the usual course, this requires proof that the harm would not have occurred in the absence of—that is, but for—the defendant's conduct." *Burrage*, 571 U.S. at 211 (internal quotation marks and citation omitted). In other words, for FCA claims predicated on an AKS violation, the AKS violation must cause the claims for Medicaid reimbursement.

Louisiana contends that but-for causation does not apply to the AKS claims or to its claims under the MAPIL. (Doc. No. 415 at 12.) Tennessee likewise argues that the TMFCA does not apply the AKS's "heightened causation standard." (Doc. No. 416 at 13.) The Relator also disputes whether the "resulting from" requirement applies to its AKS claims, arguing that the "2010 amendment"—*i.e.*, the amendment that added subsection (g) to § 1320a-7b of the AKS—"is not the only way the government or a relator can establish FCA liability predicated on violations of the AKS." (Doc. No. 419 at 20.) He also contends that the plaintiffs "are not proceeding under the 2019 amendment" and instead rely on a "false certification theory of liability." (Doc. No. 419 at 22.) He argues in the alternative that, even under the but-for causation standard, the plaintiffs have identified sufficient evidence to defeat summary judgment. The defendants, for their part, assert that subsection (g) is the *only* way to establish an FCA violation premised on an AKS violation.

The state-law claims are addressed separately, below. Regarding the AKS, both parties are partially right. The Relator is correct that the 2010 amendment to the AKS, adding subsection 1320a-7b(g), is not the only means of using the AKS to prove an FCA violation. In addition, as the First Circuit explained, an AKS violation may lead to FCA liability "when someone falsely represents compliance with a material requirement that there be no AKS violation in connection with the claim." *Regeneron*, 128 F.4th at 333. However, "[u]nder that pathway, it is not the AKS violation itself that renders the claim false. Rather, it is the false representation that there is no AKS violation." *Id.* In that situation, "the government must show that the defendant's misrepresentation of AKS compliance was material to the government's payment decision." *Id.* at 334 (citing *Universal Health Servs., Inc. v. U.S. ex rel. Escobar*, 579 U.S. 176, 181 (2016)). Conversely, there is no materiality requirement for claims brought pursuant to subsection 1320a-7b(g). *Id.* (citing *Guilfoile*, 913 F.3d at 190).

The defendants are incorrect in asserting that false certification claims were eliminated by the 2010 amendment to the FCA, but they are correct that this path is not available to the plaintiffs, at least with respect to the Scheme One claims. The States' TAC indicates that the "Scheme One" claims are premised entirely upon the submission of claims that violated the AKS and not upon express certifications to the contrary. (*See* Doc. No. 404 ¶¶ 120–25.)[13] While the Relator's pleading is somewhat ambiguous on this point, Tennessee affirmatively concedes that it has never

---

[13] The TAC does include an implied false certification claim in connection with Scheme Two, concerning Napper's alleged ownership of MMDS. (*See* Doc. No. 404 ¶ 135 ("MMDS submitted requests for IME deductions to Tennessee (either the Department of Human Services or TennCare depending upon the timeframe) knowing that it was not in compliance with Tenn. Code Ann. §§ 63-5-121(a)(2) and 71-5-140(c). Each submission was made with an implied certification of compliance with Tenn. Code Ann. §§ 63-5-121(a)(2) and 71-5-140(c). All of those submissions were false and actionable under the TMFCA during any time in which Mark Napper had an ownership interest in MMDS."); *see id.* ¶ 144.) The Scheme One allegations do not contain this type of language.

required an express certification as a condition to payment of an IME claim (Doc. No. 417, Tenn. Resp. SUMF ¶ 53), and Louisiana has not argued or submitted evidence that it required an express certification as a condition of payment of IME claims. Thus, the defendants are also correct that the "but for" standard established by § 1320a-7b(g) applies to the FCA claim against them premised upon the six-for-one provision.

What does that mean, exactly? According to the Sixth Circuit, it means that the "submitted claims" must have "result[ed] from" the AKS violation to be covered by the FCA. *Martin*, 63 F.4th at 1052. The plaintiffs generally assert that there is at least a question of fact as to whether "the six for one provision was intended to and did in fact induce referrals of the IME-eligible patients from the LTCFs." (Doc. No. 419 at 22.) The defendants argue that, while the States have attempted to quantify their damages based on the submission of IME reimbursement requests, neither has presented any facts showing that any payment "resulted from" the alleged AKS violations.

Tennessee's Rule 30(b)(6) witness testified that it was the state's position that "any IME paid . . . under a contract between Marquis Mobile Dental and a nursing facility that had the six-for-one contract provision in it" represented Tennessee's damages, but he had "no position on the but for." (Doc. No. 418-13, Tenn. Rule 30(b)(6) Dep. 32, 55.) The witness did not know whether, if it had known about the six-for-one provision, Tennessee would have approved the claims. (*Id.* at 64.) He reiterated that Tennessee's position was that "every IME submission . . . where the facility in question had the six for one [with MDS] is part of our damages, because it increases the amount TennCare has to pay for the individual services." (*Id.* at 66.) To the witness's knowledge, the procedure for approving and paying IME expenses was "the same, regardless of the nature of the contract" between the provider and the LTCF, and "TennCare doesn't . . . weigh in on the contracts between the provider and the nursing facility." (*Id.* at 70–71.) He also could not say if

there was a statistical difference in the payments made to LTCFs with and without six-for-one provisions in their contracts. (*Id.* at 77–78.)

Louisiana likewise takes the position that its damages are the sum of "any Medicaid IME payment[s]" made to LTCFs as the result of an IME offset, if the LTCF had a contract with a six-for-one provision. (Doc. No. 409-14, La. Rule 30(b)(6) Dep. 21–22.) Louisiana's Rule 30(b)(6) witness did not know which or how many payments "would not have occurred but for [an AKS] violation" and could not identify the facts on which Louisiana would rely at trial to establish that the IME submissions identified to support the state's damages claim "would not have occurred but for the alleged violation." (*Id.* at 15–16.)

The court finds, at least for purposes of the federal FCA claims premised upon AKS violations, that the States and the Relator have failed to present evidence of causation sufficient to withstand summary judgment based on this element. The plaintiffs' position seems to be that the claims submitted through the IME process for residents with patient liability were tainted by the AKS violation. The "taint" occurred because, implicitly, at least some of the LTCFs would not have contracted with the defendants if the defendants had not offered the six-for-one provision and, therefore, would not have referred any of their residents to the defendants. That is, the plaintiffs' position depends entirely on speculation that the six-for-one provision did in fact induce LTCFs to contract with the defendants—not merely that it was intended to induce the contract and referrals—and that none of the IME requests submitted by the residents at LTCFs with six-for-one provisions in their contract would have been submitted if those facilities had not contracted with the defendants. The plaintiffs, however, have not even indicated to the court what percentage of LTCFs in contract with the defendants had six-for-one provisions or whether those that did have such provisions submitted more IME claims than those that did not. They have not presented

evidence from any LTCF administrators regarding the effect of the six-for-one provision on their decision to contract with the defendants.

To prove but-for causation, the plaintiffs must present evidence giving rise to a permissible inference that, but for the defendants' inclusion of the six-for-one provision in their contracts with certain LTCFs, the IME claims would not have been submitted to the States. To be clear, as the States' Rule 30(b)(6) representatives confirmed, the States paid the LTCFs, not the defendants. The residents paid the dentist invoices with their own funds, which reduced their patient-liability share, and the State Medicaid programs increased their payments to the LTCFs in a commensurate amount. This set-up was identical, regardless of who provided the dental services. The court finds that the link between the alleged AKS violation and the IME claims is too attenuated to constitute but-for causation. The States cannot—and have not—shown that, but for the alleged violation, the same claims would not have been submitted and approved.

### f) Conclusion – The Federal AKS Claim

For purposes of the federal FCA claim premised upon the six-for-one provision as the underlying AKS violation, (1) the defendants clearly received referrals from the LTCFs, and (2) the six-for-one provision constitutes remuneration under the AKS; but (3) the plaintiffs cannot establish either the requisite "willfulness" or (4) but-for causation as required to establish a federal claim. The defendants are entitled to summary judgment on the Relator's FCA/AKS claim premised upon "Scheme One."

### 4. The TMFCA

Tennessee argues that the federal FCA differs from the TMFCA, insofar as the latter was not amended by the 2010 amendment to the AKS. It contends that, under pre-2010 caselaw, a defendant violated the TMFCA if "one purpose of the remuneration was to induce referrals, even if there was some other valid reason for the remuneration." (Doc. No. 416 at 13–14.)

This court has not located—and the parties have not identified—any Tennessee state court opinion addressing or construing the TMFCA. Those federal courts confronted with claims under the federal statutes and the TMFCA have generally held that the federal FCA is "co-extensive with the Tennessee Medicaid False Claims Act," *e.g.*, *United States v. Walgreen Co.*, 591 F. Supp. 3d 297, 304 (E.D. Tenn. 2022), without conducting any analysis of how the statutory schemes differ. This court, in ruling on Motions to Dismiss filed in this case, looked specifically to "caselaw involving the federal FCA, as applied prior to the PPACA amendment and/or as applied to statutes other than the AKS." *U.S. ex rel. Folse v. Napper*, No. 3:17-CV-1478, 2021 WL 4992651, at *13 (M.D. Tenn. Oct. 27, 2021). Ultimately, the court found that the framework articulated by the Supreme Court in *Universal Health Services, Inc. v. U.S. ex rel. Escobar* should govern the TMFCA and MAPIL claims, "given that both state statutes were drafted largely to mirror their federal counterpart." *Folse*, 2021 WL 4992651, at *14. Under *Escobar*, "the implied false certification theory can be a basis for liability" under the FCA. *Escobar*, 579 U.S. at 181. Under this theory, "liability can attach when the defendant submits a claim for payment that makes specific representations about the goods or services provided, but knowingly fails to disclose the defendant's noncompliance with a statutory, regulatory, or contractual requirement." *Id.* "In these circumstances, liability may attach if the omission renders those representations misleading." *Id.* "What matters" in determining liability is "whether the defendant knowingly violated a requirement that the defendant knows is material to the Government's payment decision." *Id.* at 181.[14]

---

[14] The FCA defines "material" to mean "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4).

As indicated above, the States do not articulate an *express* certification theory premised on the six-for-one provision, and it is questionable whether the operative pleadings state claims based on an implied certification theory premised upon that provision. Assuming that they do, the question is whether there is sufficient proof in the record to permit a conclusion that the defendants "knowingly violated a requirement that the defendant[s] know[] is material to the Government's payment decision." *Id.* More specifically, the Supreme Court explained that two conditions must be satisfied for liability under the implied certification theory to attach: "first, the claim does not merely request payment, but also makes specific representations about the goods or services provided; and second, the defendant's failure to disclose noncompliance with material statutory, regulatory, or contractual requirements makes those representations misleading half-truths." *Id.* at 190.

The TMFCA claim based on Scheme One fails to meet these conditions. First, Tennessee makes no effort to show that the defendants made "specific representations about the goods or services provided." Second, the six-for-one provision did not affect any representations made about the services provided to paying patients for whom IME claims were submitted. The IME packets represented to the States only that non-covered medically necessary services were provided and billed to the patient and that the bills were reasonable. The plaintiffs do not contest the truth of those representations, and those representations were not turned into "misleading half-truths" by the defendants' purported failure to disclose the six-for-one provision.

Tennessee argues very generally that "TennCare makes compliance with the AKS a contractual requirement and would have denied IME submissions if it had known those submissions were submitted in violation of the AKS" but that the nature of the AKS violation at issue here made "pre-payment compliance verification difficult," such that the State could not have

learned of it except through a whistleblower. (Doc. No. 416 at 25.) It also contends, confusingly, that "*Defendants* have failed to show that their violation of the AKS was *not* material to TennCare" and that their request for summary judgment on this issue should, therefore, be denied. (*Id.* (emphasis added).) However, as set forth above, the *plaintiffs* bear the burden of proof. The defendants moving for summary judgment need only point out that the plaintiffs lack proof to trigger the plaintiffs' burden to submit sufficient proof to avoid summary judgment. *Celotex Corp.*, 477 U.S. at 324–25. Tennessee has not carried that burden. Merely asserting that compliance with the AKS very broadly was material to its payment decisions is not sufficient. *Accord Escobar*, 579 U.S. at 190 ("[N]ot every undisclosed violation of an express condition of payment automatically triggers liability."); *see also id.* at 194 ("The materiality standard is demanding. . . . A misrepresentation cannot be deemed material merely because the Government designates compliance with a particular statutory, regulatory, or contractual requirement as a condition of payment. Nor is it sufficient for a finding of materiality that the Government would have the option to decline to pay if it knew of the defendant's noncompliance.").

Moreover, the plaintiffs have not submitted evidence from which a jury could reasonably conclude that the defendants had "actual knowledge" that omission of the six-for-one provision would be a material condition of payment. As the defendants point out, they were paid with patient funds, and their understanding was that the States had taken the position that the IME process did not involve Medicaid funds and fell outside the purview of the Medicaid program.

The FCA's materiality and scienter requirements are "rigorous," *Id.* at 192. The plaintiffs have not met them, and the defendants are entitled to summary judgment on the TMFCA claim as well.

### 5.     *Liability under Louisiana Law*

Insofar as Louisiana seeks to recover under La. Stat. Ann. § 46.438.3, the false claims provision of the MAPIL, the court finds that the State would be required to establish materiality and knowledge, regarding which, like Tennessee, it has failed to present sufficient proof. The defendants are entitled to summary judgment, to the extent Louisiana intended to bring a claim under § 46.438.3 premised upon the six-for-one provision.

However, Louisiana's "Illegal Remuneration" statute, a subsection within the MAPIL, provides in relevant part that

> No person shall solicit, receive, offer, or pay any remuneration, including but not limited to kickbacks, bribes, rebates, or bed hold payments, directly or indirectly, overtly or covertly, in cash or in kind, . . . [i]n return for referring an individual to a health care provider . . . for the furnishing or arranging to furnish any good, supply, or service for which payment may be made, in whole or in part, under the medical assistance programs.

La. Stat. Ann. § 46.438.2(A)(1). This court is unaware of any opinion, reported or unreported, from any state or federal court conducting any substantive analysis of this statute, much less finding liability based on it.[15]

Regardless, this provision is quoted at length in the TAC, and it forms the basis for Louisiana's Count One. (TAC ¶¶ 66, 69, 161.) Although it is referenced in the defendants' Memorandum in Support of Summary Judgment (Doc. No. 408-1 at 17), neither party makes any substantive argument about it. The court therefore finds that the defendants have not carried their burden of showing that they are entitled to summary judgment on Louisiana's state anti-kickback

---

[15] One federal district court had occasion to dismiss a claim under § 46:439.1 for failure to state a violation of any of the predicate statutes, including § 46:438.2, 438.3, or 438.4. *Burney v. Madison Par. Hosp. Serv. Dist.*, No. 3:23-01779, 2024 U.S. Dist. LEXIS 172664 at *27 (W.D. La. July 29, 2024), *R&R adopted*, 2024 U.S. Dist. LEXIS 228030 (W.D. La. Nov. 12, 2024). The court noted that "46:438.2 governs illegal remuneration" and found that the complaint did not include allegations about "misconduct" that "resulted in remuneration." *Id.*

claims premised upon the six-for-one provision.[16] Summary judgment, therefore, will be denied as to Louisiana's anti-kickback claim.

### 6.      *Scheme Two – Napper's Ownership of MMDS*

Under Tennessee law, "it is unlawful . . . [f]or an owner of an active dental practice to be other than a dentist duly licensed to practice in this state." Tenn. Code Ann. § 63-5-121(a)(2). As articulated in the TAC, Tennessee maintains that "every single submission made by Defendants to TennCare for a deduction under the IME program when Defendant Mark Napper had an ownership interest in MMDS was false, fraudulent, and in violation of Tennessee law. Defendant Mark Napper's ownership interests, and his concealment from Tennessee thereof, tainted not just those claims resulting from the kickback relationship, but each and every claim rendered to IME-eligible residents in Tennessee." (TAC ¶ 144.)

The defendants contend that, aside from the fact they did not make any submissions for payment directly to TennCare, Napper was removed as a member of MMDS in 2009, after Corporation Service Company informed him that only dentists could be members of MMDS. (Napper Dep. 58; Doc. No. 409-1, 2d Napper Decl. ¶ 3).) Napper claims that he never had a membership interest in MMDS after 2009. (2d Napper Decl. ¶ 5.) Instead, he formed MHS, in which he maintained an ownership interest, to perform the billing, collection and administrative aspects of the business, and he never hid from anyone the fact that he remained CEO of MMDS and MHS. (*Id.* ¶¶ 4–6.) In a footnote, the defendants add that "[t]his new theory also fails the 'materiality' requirement of *Escobar* discussed previously." (Doc. No. 408-1 at 32 n.4.)

---

[16] On its face, the provision seems to require only "remuneration" in exchange for "referrals" for services for which "payment may be made, in whole or in part," by Louisiana Medicaid. La. Stat. Ann. § 46.438.2(A)(1). The parties offer no evidence regarding the required scienter or standard of proof for a Louisiana "illegal remuneration" claim, and the court declines to undertake such an analysis *sua sponte*.

Tennessee responds that there is a factual dispute as to whether Napper held an ownership interest in MMDS after 2009, pointing to evidence in the record identifying him as such. (*See, e.g.*, Doc. No. 418-24, Jan. 2012 MMDS Operating Agreement ¶¶ 7, 8, 24 (identifying Mark Napper, Daniel Bird, and Chris Napper as "Members" of MMDS, entitled respectively to 30%, 40%, and 30% of the net profits or losses of the LLC, and establishing that only Mark Napper had the authority to bind the company to a contract); Doc. No. 418-25 at 1, 3, 8, 10 (2013 and 2014 Promissory Notes by MMDS identifying Napper as a Member); Doc. No. 418-26 at 4, 8, 15, 34, 40 (2011 and 2012 Form 1064, U.S. Return of Partnership Income for MMDS, designating Napper as the "tax matters partner" with a 30% interest in the company); Doc. No. 418-27 (2019 bank account opening documents showing Joshua Kilgore and Mark Napper as 50% owners of MMDS).

The defendants filed a Reply, in which they "remain adamant that Mr. Napper was not an owner of MMDS" but also arguing that, even if he were, "Tennessee would still need to show ownership and control of MMDS was material to whether or not it approved IME requests." (Doc. No. 426 at 8–9.) As with the TMFCA relating to the six-for-one provision, the defendants argue that the only representations they made in connection with the IME claims were "1) that non-covered medically necessary services were rendered and, 2) the amounts were reasonable, and 3) the patient was invoiced." (*Id.* at 9.) Under *Escobar*, these representations can give rise to FCA liability only if the defendants' omission of their "violations of statutory, regulatory, or contractual requirements . . . render the defendant[s'] representations misleading with respect to the goods or services provided." (*Id.* (quoting *Escobar*, 579 U.S. at 187).)

The court agrees, largely for the same reasons that it found that the plaintiffs failed to show that the defendants' omission of the six-for-one provision in the IME submissions was not material: Mark Napper's ownership of MMDS did not "make[] those representations misleading

half-truths." *Escobar*, 579 U.S. at 190. Irrespective of whether Mark Napper violated Tenn. Code Ann. § 63-5-121(a)(2)—and there clearly is a factual dispute as to his ownership interest in MMDS—the plaintiffs have not established that the ownership of MMDS affected the validity of the IME submissions.

### 7. *Tennessee State Law Claims*

Tennessee asserts state law claims for unjust enrichment and payment by mistake. The defendants initially argue that these claims rise or fall with the FCA/AKS claims. Tennessee argues in response that these claims have their own substantive elements and that summary judgment is not warranted, irrespective of how the court rules on the FCA/AKS claims. (Doc. No. 416 at 31–34.) The defendants provide a more fulsome analysis of these claims in their Reply, arguing that the plaintiffs cannot show that any benefit to the defendants was unjust, for purposes of unjust enrichment, or that retention of any payment by the defendants would be unconscionable. (Doc. No. 426 at 11–12.) Although the court generally will not consider arguments raised for the first time in a Reply, it will exercise its discretion to consider them here.

Under Tennessee law,

> the elements of an unjust enrichment claim are (1) "[a] benefit conferred upon the defendant by the plaintiff," (2) "appreciation by the defendant of such benefit," and (3) "acceptance of such benefit under such circumstances that it would be inequitable for him to retain the benefit without payment of the value thereof."

*Fam. Tr. Servs. LLC v. Green Wise Homes LLC*, 693 S.W.3d 284, 304–05 (Tenn. 2024) (quoting *Freeman Indus., LLC v. Eastman Chem. Co.*, 172 S.W.3d 512, 525 (Tenn. 2005). "The most significant requirement of an unjust enrichment claim is that the benefit to the defendant be unjust." *Id.* at 305. Here, the defendants are correct that Tennessee cannot establish the element of inequity, even assuming the other elements are satisfied.

That is, the State, at least arguably, conferred a benefit upon the defendants by processing IME claims, thus reducing the patient-liability share of any LTCF resident receiving such dental services and permitting TennCare beneficiaries residing at LTCFs to pay their dental bills to the defendants, while Tennessee paid the difference to the LTCFs. However, Tennessee has presented no evidence that any part of this transaction was inequitable. The defendants provided medically necessary dental services by licensed professionals, invoiced the patients for those services, and ultimately were paid by the patients for those services. The patients' patient-liability share of their LTCF room and board was decreased, while TennCare's share of the payment for the patients' stay at the LTCFs increased commensurately. Even assuming that the six-for-one provision or Napper's ownership of MMDS was illegal, the immediate transactions with respect to which Tennessee seeks recoupment involved payment for services actually rendered. More to the point, the *defendants* conferred a benefit upon individual patients by providing medically necessary dental services. Allowing the defendants to retain payment for those services would not be inequitable in any sense. Tennessee's unjust enrichment claim fails.

Payment by mistake appears to be a distinct cause of action under Tennessee law, but one that has not been well articulated.[17] Tennessee courts have stated that,

> where money is paid to another, under the influence of a mistake—that is, upon the supposition that a specific fact is true which would entitle the other to the money, but which fact is untrue, and the money would not have been paid if it had been known to the payor that the fact was untrue—an action will lie to recover it back, and it is against conscience to retain it.
>
> . . . .

---

[17] Many of the federal cases referring to "payment by mistake" apply federal common law. *See, e.g.*, *United States v. Houston*, No. 2:09-0091, 2011 WL 4899983, at *6 (M.D. Tenn. Oct. 14, 2011) (citing Fifth Circuit law); *U.S. ex rel. Martin v. Life Care Centers of Am., Inc.*, No. 1:08-CV-251, 2014 WL 11429265, at *14 (E.D. Tenn. Mar. 26, 2014) (citing *Houston*); *U.S. ex rel. Norris v. Anderson*, 271 F. Supp. 3d 950, 959 (M.D. Tenn. 2017) (citing Houston and Martin).

> The party to whom the payment was made, and who, in good conscience, has no right to retain it, cannot resist a recovery upon the ground of the plaintiff's negligence in availing himself of the means of knowledge within his reach.
>
> The right of recovery proceeds upon the ground that the plaintiff has paid money which he was under no obligation to pay, and which the party to whom it was paid had no right either to receive or to retain, and which, had the true state of the facts been present in his mind, at the time, he would not have paid.

*Guild v. Baldridge*, 32 Tenn. (2 Swan) 295, 299, 302 (Tenn. 1852); *see also Health Cost Controls, Inc. v. Gifford*, No. W1999 -02598-COA-R3-CV, 2001 WL 432490, at *4 (Tenn. Ct. App. Apr. 24, 2001) (quoting *Guild*), *appeal granted, cause remanded on other grounds* (Tenn. Sept. 17, 2001). "Ordinary negligence in failing to ascertain the facts is not alone sufficient to bar a recovery in cases of money paid under a mistake of fact." *W.E. Richmond & Co. v. Security Nat'l Ban*k, 64 S.W.2d 863, 867 (Tenn. Ct. App. 1933).

The mistake of fact here concerns the alleged technical violations of the AKS and state law governing ownership of dental practices. Again, in this case, TennCare covered the cost of medically necessary services that were actually rendered. The only way Tennessee could show that it "paid money which [it] was under no obligation to pay, and which the party to whom it was paid ha[d] no right either to receive or to retain," *Guild*, 32 Tenn. at 302, would be by proving FCA or AKS violations or, at a minimum, that these statutory violations were material to its decision to approve the IME claims. As set forth above, those claims fail. But even if they had merit, the plaintiffs have not shown that the defendants, "in good conscience," should not retain payments made for services provided. Tennessee's payment by mistake claim fails for the same reasons that the unjust enrichment claim fails.

### 8. *Conspiracy*

The defendants assert that, because the plaintiffs cannot establish a violation of a federal or state false claim statute, they are also entitled to summary judgment on the conspiracy claim.

Because the court finds that the claims asserted under the Louisiana ""Illegal Remuneration" statute will survive summary judgment, the claim for a conspiracy to violate that statute also survives summary judgment.[18]

### 9. Excel's Alter Ego/Successor Liability

The defendants' only argument for summary judgment on the alter ego/successor liability claims against Excel is that, if the court dismisses all claims against CSM, the claims against Excel must also be dismissed. (Doc. No. 408-1 at 33.) As set forth above, the court finds that the claims asserted under the Louisiana ""Illegal Remuneration" statute will survive summary judgment. Accordingly, those claims against Excel also remain intact.

## III. CONCLUSION

For the reasons set forth herein, Louisiana's Motion to Strike (Doc. No. 412) will be denied. The defendants' Motion for Summary Judgment (Doc. No. 408) will be granted *except* with respects to the claims asserted by the Relator and the State of Louisiana under the Louisiana "Illegal Remuneration" statute, made actionable under Louisiana's *qui tam* statute. La. Stat. Ann. §§ 46.438.2, 439.1. An appropriate Order is filed herewith.

_____
ALETA A. TRAUGER
United States District Judge

---

[18] The TAC filed by the States clearly states a claim on behalf of Tennessee for conspiracy to cause false claims to be submitted under the TennCare program, in violation of the TMFCA. (TAC ¶ 150.) It is unclear whether the States intended to state a conspiracy claim on behalf of Louisiana for violation of La. Stat. Ann. § 46.438.2 or against which defendants such a claim is stated. The Relator's Supplemental SAC at least arguably articulates a claim for conspiracy to violate § 46.438.2. (Doc. No. 231 ¶ 125.)